# EXHIBIT A

# In The Matter Of:

*Erik D. Rigby vs.*
*Crosscheck Solutions, LLC, et al.*

---

*Deposition of Erick Rigby*
*October 18, 2019*

---

1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

ERICK D. RIGBY,

Plaintiff,

-vs-                    Case No. 3:19-cv-00036

CROSSCHECK SERVICES, LLC d/b/a
OPTIO SOLUTIONS, LLC d/b/a
QUALIA COLLECTION SERVICES,

Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

Deposition of:

ERICK RIGBY

Portage, Wisconsin
October 18, 2019

Reported by:  Paula Wondra

2

1          DEPOSITION of ERICK RIGBY, called as a witness,

2     taken at the instance of the Defendant, under the

3     provisions of Chapter 804 of the Wisconsin Statutes,

4     pursuant to Notice, before Paula Wondra, a Notary

5     Public in and for the State of Wisconsin, at

6     Comfort Suites Wisconsin Dells Area, N5780 Kinney

7     Road, City of Portage, and State of Wisconsin, on the

8     18th day of October, 2019, commencing at 9:06 a.m.

9

10                   A P P E A R A N C E S

11

12    NATHAN C. VOLHEIM, Attorney,
      ATLAS CONSUMER LAW
13       2500 South Highland Avenue, Suite 200, Lombard,
         Illinois 60148, appearing via telephone on behalf of
14       the Plaintiff.
              Nvolheim@sulaimanlaw.com      312-313-1613
15

16    BRENDAN H. LITTLE, Attorney,
      LIPPES MATHIAS WEXLER FRIEDMAN, LLP
17       50 Fountain Plaza, Suite 1700, Buffalo, New York
         14202, appearing on behalf of the Defendant.
18            Blittle@lippes.com             716-853-5100

19

20

21

22

23

24

25

3

1                          I N D E X

2

3  WITNESS                                        Page(s)

4   ERICK RIGBY

5     EXAMINATION BY MR. LITTLE                        4

6     EXAMINATION BY MR. VOLHEIM                       54

7     FURTHER EXAMINATION BY MR. LITTLE               55

8

9                        E X H I B I T S

10    No.           Description                    Page

11    Exh 1         Complaint                         20

12    Exh 2         Plaintiff's Amended               43
                    Supplemental Answer and
13                  Objections to Defendant's
                    Interrogatories
14

15              (Exhibits retained by Mr. Little)

16  (Original transcript filed with Mr. Little and copies
                   provided to both counsel)
17

18

19

20

21

22

23

24

25

4

1                    ERICK RIGBY,

2              called as a witness, being first duly

3              sworn, testified on oath, as follows:

4                      EXAMINATION

5    BY MR. LITTLE:

6    Q   Good afternoon, Mr. Rigby.  My name is

7        Brendan Little.  I'm with the law firm of Lippes

8        Mathias Wexler Friedman in Buffalo.  I represent

9        the defendants in a lawsuit that you commenced in

10       the U.S. District Court for the Western District

11       of Wisconsin.

12           I'm going to ask you a series of questions

13       today about the lawsuit.  If at any time you don't

14       understand my question, didn't hear my question,

15       or need the question repeated for any reason,

16       please speak up and ask me to do so.  Otherwise

17       I'm going to assume you've understood the question

18       as asked.  Is that fair?

19   A   Yes.

20   Q   Okay.  I also ask you to continue to give verbal

21       responses to my questions.  Your attorney,

22       Mr. Volheim, is on the phone; so he can't see head

23       nods and shoulder shrugs.  And our court reporter

24       can't take that stuff down, so we've got to have

25       verbal communication.  So I'll remind you if you

5

1     slip up.  I -- we kind of talk mm-hmms and

2     uh-huhs, and try -- but yes, nos, I don't knows,

3     etcetera, okay?

4  A  Yes.

5  Q  And finally, I don't expect this to be too long

6     this morning.  I'm going to try to get you out of

7     here as quickly as I can.  But try to let me

8     finish my question first before you give your

9     answer.  And likewise, when you're giving your

10    answer, I'm not going to try to ask another

11    question so we're not talking over each other.  I

12    talk fast enough already, so I'm waiting for her

13    to kick me under the table; but try to let

14    one person speak at a time.

15        And likewise, if Mr. Volheim is going to say

16    something from the phone, there may be a second or

17    two delay; so we're going to have to work with the

18    situation that we have this morning.

19  A  I understand.

20  Q  And I apologize for the vacuum cleaner.  It's an

21    added effect here in the hotel.

22        What's your date of birth?

23  A  ███████1987.

24  Q  That makes you how old today?

25  A  Thirty-one.

6

1  Q   And where do you currently reside?

2  A   Tomahawk, Wisconsin.

3  Q   What's the address?

4  A   904 South Tomahawk Avenue.

5  Q   How long have you lived there?

6  A   Month and a half.

7  Q   And where did you reside before that?

8  A   423 West Leather Avenue.

9  Q   Is that also in Tomahawk?

10 A   Yes.

11 Q   And how long did you reside there?

12 A   A year.

13 Q   And prior to the 423 West -- what did you say?

14     West Leather Street?

15 A   West Leather Avenue.

16 Q   West Leather Avenue.

17         Where did you reside before --

18 A   W6095 Wadell Road, W-A-D-D-E-L [sic], Road,

19     Tomahawk, Wisconsin.

20 Q   How long have you lived in Tomahawk?

21 A   Ten years.

22 Q   Were you born in Wisconsin?

23 A   No.

24 Q   Where were you born?

25 A   Humboldt County, California.

7

1   Q   The 904 South Tomahawk address, do you own that
2       property?
3   A   No.
4   Q   Do you rent it?
5   A   Yes.
6   Q   Do you reside there with anyone?
7   A   Yes.
8   Q   Who is that?
9   A   My ex-girlfriend.
10  Q   Okay.
11  A   I am not going to reside there too much longer.
12  Q   Okay.  What is her name?
13  A   Is that relevant?
14  Q   It is.
15  A   Okay.  Amanda Graeber, G-R-A-E-B-E-R.
16  Q   I assume you weren't exes when you moved in
17      together, and this is somewhat of a recent
18      development in your life?
19  A   Yes.
20  Q   I don't want any more details.
21  A   I appreciate it.
22  Q   Do you have -- are you actively looking for a new
23      place or --
24  A   Yes.
25  Q   Okay.  So you haven't identified where you're

8

1       going?

2    A   No.  It'll still be in Tomahawk.

3    Q   Okay.  Have you ever given a deposition before?

4    A   No.

5    Q   Have you ever been convicted or pled guilty to a

6        misdemeanor or a felony?

7    A   The honest answer is yes.  The answer I was told

8        to give is no, and the answer I was told to give

9        was by the courts because I'm in a deferment.

10   Q   And is it a felony or a misdemeanor?

11   A   Felony.

12   Q   And what is it related to?

13   A   Hit and run.

14   Q   Was it an alcohol-related incident?

15   A   No.

16   Q   Was it here in Wisconsin?

17   A   Yes.

18   Q   And you're actively in the deferment program?

19   A   Yes.

20   Q   Which county?

21   A   Lincoln.

22   Q   Any other misdemeanors or felonies?

23   A   Not that I recall.

24   Q   Okay.  Have you ever been a party to a lawsuit

25       before, other than this one, whether you were the

9

1      plaintiff and initiated the lawsuit or you were a

2      defendant and someone sued you?

3  A  Yes.

4  Q  And how many times?

5  A  As far as I know, one.

6  Q  Okay.

7  A  And this is a recent development for me as well.

8  Q  Okay.  Is this -- you're talking --

9  A  I am a plaintiff I believe it is.

10  Q  Okay.  And when you say "recent," how recent?

11  A  I found out just before the case was settled that

12      I was involved in it.

13  Q  Okay.  What type of case was it?

14  A  It was a lawsuit towards C.R. England trucking

15      company.

16  Q  And when you say you found out, was it a class

17      action?

18  A  It was a class action.

19  Q  What were the -- and C.R. England is a trucking

20      company?

21  A  Yes.

22  Q  And tell me, why were you a plaintiff to that

23      lawsuit?

24  A  Because when I started driving truck, I leased a

25      truck from C.R. England; and it came up that they

10

1     were in some way, shape, or form shorting us

2     money.

3 Q  So it has somewhat to do with your employment, if

4     you will?  Are you an independent contractor?

5 A  I was an independent contractor.  They were --

6     they weren't paying what they should have been

7     paying, and then they were charging us where they

8     shouldn't have been charging us.

9 Q  So someone reached out to you and indicated that

10     you could be a part of the class action?

11 A  Correct.

12 Q  And you joined that class action?

13 A  I was -- I was automatically in it.  I didn't even

14     have to ask to join or -- they said I could

15     voluntarily remove myself if I wanted to file my

16     own separate lawsuit.

17 Q  But you did not do so?

18 A  I did not do so.

19 Q  Do you know where the case is pending?

20 A  It's not pending anymore.  It settled, and they're

21     sending out checks.

22 Q  Do you know where it was pending?

23 A  I believe it was in Salt Lake City, Utah.  It was

24     either Salt Lake City, Utah, or it was in

25     California.  Fontana, I believe.

11

1  Q  Any other pieces of litigation that you've been a
2     party to other than what we talked about already?
3  A  Not that I recall.
4  Q  Are you married, sir?
5  A  No.
6  Q  Have you ever been married?
7  A  No.
8  Q  Do you have any children?
9  A  Yes.
10 Q  How many?
11 A  Four.
12 Q  And where -- I don't want --
13 A  They all live in Tomahawk with me.
14 Q  Okay.  At the South Tomahawk address?
15 A  Correct.
16 Q  Is Amanda their mother?
17 A  Amanda is the mother of two of them.
18 Q  And they're all minors, I assume?
19 A  Yes.
20 Q  Have you ever gone by any other name other than
21     Erick Rigby?
22 A  No.
23 Q  Have you reviewed any documents or other materials
24     in preparation for your testimony today?
25 A  The complaint.

12

1   Q   Anything else?

2   A   The address on how to get here.

3   Q   Okay.  Me too.

4       Have you -- did you listen to any audio

5       recordings in preparation for your testimony

6       today?

7   A   No.

8   Q   Did you watch any videos in preparation for your

9       testimony today?

10  A   No.

11  Q   Did you speak with anyone in preparation for your

12      testimony today?

13  A   My attorney.

14  Q   And who is that?

15  A   Mister -- I can't pronounce his last name.  Nate.

16              MR. VOLHEIM:  That's okay.  That's

17      okay.

18  BY MR. LITTLE:

19  Q   Nate Volheim?

20  A   Yes.  And Teddy -- I forgot his last name.

21  Q   I won't try that one.

22      And when did you speak with Mr. Volheim and

23      Teddy?

24  A   I spoke with both of them this morning as well as

25      previously.

13

1  Q  Have you ever met Mr. Volheim or Teddy in person?

2  A  No.

3  Q  Have you met anyone from their law firm in person?

4  A  No.

5  Q  Who is Crosscheck, LLC, if you know?

6  A  I don't know who they are.  They are a creditor is

7     all I know.

8  Q  What about Optio Solutions, LLC?  Do you know who

9     they are or it is?

10  A  I've never heard that one.

11  Q  Okay.  Qualia Collection Services?

12  A  Qualia Collection Services is the company that has

13     been calling me to try to settle a debt; but when

14     they called me, it was Quality Collection

15     Services.

16  Q  When you say "it was Quality," meaning --

17  A  They introduced themselves as Quality Collection

18     Services.

19  Q  So they gave you the wrong name is what you're

20     contending?

21  A  Yes.

22  Q  Okay.  And that was each time you spoke to them?

23  A  Yes.

24  Q  Did you have a cell phone back in fall of 2018 and

25     into early 2019?

14

1   A   Yes.

2   Q   And what was that cell phone number?

3   A   966-4260.

4   Q   And the area code?

5   A   715.

6   Q   How long had you had that number prior -- strike

7       that.  Bad question.

8           How long had you had that number?

9   A   I've had that number for nine years.

10  Q   And who was the carrier for that telephone?

11  A   At the time of these phone calls, it was Sprint.

12  Q   Has that since changed?

13  A   Yes.  And it used to be Verizon prior to that, so

14      it's back to Verizon now.

15  Q   Did you have any landlines back in the fall of

16      2018 and into 2019?

17  A   I did.  I do not recall the phone number.

18  Q   You no longer have the landline?

19  A   I still have the landline.  I don't recall the

20      phone number.  It is at the house for a babysitter

21      or for my children to use to call.

22  Q   Did you receive any telephone calls from

23      Crosscheck Services or Optio Solutions or

24      Qualia Collection Services on the landline?

25  A   Not that I know of.

15

1   Q   When did you start receiving telephone calls from

2       Qualia Collection Services?

3   A   As early as September of last year, I believe it

4       was.

5   Q   So September 2018?

6   A   Yep.

7   Q   And those were on the 4260 number?

8   A   Yes.

9   Q   Have you ever received any telephone calls from

10      Qualia Collection Services on any number other

11      than the 4260 number?

12   A   I have not received a phone call from them.  My

13      mother did.

14   Q   Okay.  We'll get there.

15         So just so we're clear, the only time you

16      received telephone calls from Qualia was at the

17      number ending in 4260?

18   A   Correct.

19   Q   And when was the last telephone call that you

20      received from Qualia?

21   A   I believe in January, toward the beginning of

22      January.

23   Q   2019?

24   A   Yes.

25   Q   So the universal calls, is it fair to say, are

16

1      from September of 2018 to January of 2019?

2   A   Yes.

3   Q   And do you know how many telephone calls that you

4      received in that time period, September of '18 to

5      January of '19?

6   A   I cannot give you an exact number.

7   Q   Can you estimate for me?

8   A   I would say well over 100.

9   Q   And that number well over 100, would it be closer

10      to 100 or closer to 150?

11  A   Probably closer to 150.

12  Q   Do you think they got up to 200 calls?

13  A   Could have.

14  Q   So it's fair to say it's about 150, and it could

15      be as high as 200?

16  A   My numbers are guesstimates, and I can tell you

17      that I received between three and four phone calls

18      a day multiple times.  And then there was other

19      days that I received two phone calls, and they

20      left me alone then.  But it was multiple.  It was

21      never just one phone call in a day that I can

22      recall.

23  Q   So I understand that your testimony is it's an

24      estimate, but I'm just trying to pin down that

25      estimate, you know.  So I think what I'm hearing

17

```
1        you are saying is that it's around 150, could be
2        more, could be less?
3    A   Sure.  I'll say sure to that one.
4    Q   Yeah, I don't want to put words in your mouth.
5    A   I understand.  I cannot give you a number.  My
6        estimated number is my personal estimated number.
7        If I had to sit here and say it, I would say it's
8        probably closer to 200.
9    Q   Okay.
10   A   That's the number I would have to give you.
11   Q   Okay.  Fair enough.
12           What was the underlying debt that Qualia was
13       attempting to collect, if you know?
14   A   I guess I don't understand the question.  What was
15       the reason that they were collecting a debt?
16   Q   That probably would be -- well, may be a better
17       question.  Let me ask it this way.  Why was Qualia
18       Collection calling you, if you know?
19   A   Because I fell behind on payments for furniture
20       that I purchased.
21   Q   And where did you purchase the furniture?
22   A   Ashley Furniture store in Wausau, Wisconsin.  I
23       believe it was Ashley -- it was a lower quality.
24       The one store which is Ashley Furniture, and then
25       it was the discounted one.  I don't know how to
```

18

1       explain what the name of it was, but it was

2       through Ashley Furniture.

3   Q   Okay.  And what did you purchase that furniture

4       for?  Your home?

5   A   My home, yes.

6   Q   Is there any -- is it, in fact, true that you did

7       fall behind on the payments?

8   A   Yes.

9   Q   Do you remember what the payment terms or

10      arrangements were?

11  A   Being well over a year, no, I cannot remember

12      them.  I do not recall them.

13  Q   Were you supposed to make a monthly payment or --

14  A   Yes.  It was a monthly payment that was supposed

15      to be directly withdrawn from my account.

16  Q   From your checking account?

17  A   Yes.

18  Q   Okay.  And when you fell behind on the payments,

19      is that because they attempted to withdraw money

20      from the checking account and there was no money

21      there to withdraw or not enough money there to

22      withdraw?

23  A   At times, yes.  Yeah.  Go ahead.

24  Q   Did you keep any recordings of the telephone calls

25      that -- with Qualia Collection Services?

19

1   A   No.

2   Q   Did you keep a record or a chart of the calls that
3       were coming in?

4   A   No.

5   Q   What's the event that triggered you to contact
6       your lawyer to get representation?

7   A   Well, it was actually two events.  The first one
8       was them contacting my mother, and the second
9       event was them threatening criminal charges.

10  Q   And just so we're clear, "them" meaning Qualia
11      Collection?

12  A   Correct.

13  Q   And I'm assuming that's why then you commenced a
14      lawsuit because they contacted your mother, and
15      they threatened -- did you say criminal
16      prosecution?

17  A   They threatened criminal prosecution.  I was tired
18      of being harassed.  It -- what finally triggered
19      me to say, okay, I'm done with this, I'm done with
20      the phone calls and everything was the criminal
21      charge that they threatened me with; and then they
22      contacted my mother.  I was already irritated and
23      stressed out and overwhelmed with the phone calls,
24      the excessive phone calls.

25  Q   What are you looking for at the end of this

20

1      lawsuit?

2  A   Whatever the law allows.

3  Q   Have you -- oh, I'll get there.

4               (Exhibit No. 1 marked for identification.)

5  BY MR. LITTLE:

6  Q   Sir, I'm going to show you what's been marked as

7      Exhibit No. 1 for the purposes of this deposition.

8               MR. LITTLE:  Mr. Volheim, because

9          you're on the phone, Exhibit No. 1 is the

10         complaint.

11              MR. VOLHEIM:  Thank you.

12 BY MR. LITTLE:

13 Q   You indicated that you reviewed this document in

14     preparation for your testimony today?

15 A   Yes.

16 Q   When did you review that document?

17 A   Today and when it was first written up and

18     submitted.

19 Q   Okay.  When is the first time you saw this

20     document then, the complaint?

21 A   I don't recall.

22 Q   If the complaint was filed on January 16th of

23     2019, does that help you recall when --

24 A   I can't give you a specific date or time.

25 Q   Actually, if you flip to page number 3 and

21

1    paragraph 17, the paragraph reads, "Due to
2    Defendant's incessant calls and outrageous
3    conduct, Plaintiff demanded that it stop calling
4    his cellular phone."
5         Do you remember -- well, how many times did
6    you ask Qualia to stop calling your cell phone?
7  A  I can recall once.
8  Q  And do you know the approximate date when you --
9  A  Sometime in December.
10 Q  Of 2018?
11 A  Yes.
12 Q  And when you asked them to stop calling, did you
13    ask them to stop calling generally; or did you
14    say, stop calling my cell phone?
15 A  That part, I don't recall.
16 Q  When you had that conversation with Qualia, was
17    that as a result of a phone call that was
18    initiated to you; or did you reach out to Qualia
19    and say, hey, I need you to stop the calls?
20 A  They called me.
21 Q  Do you remember who you spoke with at Qualia when
22    you made that directive?
23 A  I do not.
24 Q  Do you know if it was a man or a woman?
25 A  I can't recall.

22

1  Q  Do you know anything about the job title of the
2     person, whether it was a collector or a manager or
3     a supervisor or anything like that?
4  A  I believe it was a supervisor because I believe I
5     requested a supervisor.
6  Q  Okay.  As you sit here today, though, you believe
7     that's the only time that you recall asking the
8     calls to stop?
9  A  I believe -- I -- how do I say that?  I believe
10    I've done it -- I did it another time, but I'm not
11    positive on whether this was just from me being
12    stressed out thinking I had the conversation or
13    actually having the conversation.
14 Q  Okay.  So it was definitely once, but maybe twice?
15 A  Correct.
16 Q  And then paragraph 18 says, "Despite Plaintiff's
17    demand, Plaintiff has received not less than 20
18    phone calls from Defendant since asking it to stop
19    calling."
20 A  Correct.
21 Q  So after you asked the calls to stop in December
22    of '18, you received at least 20 additional
23    telephone calls?
24 A  At least, yes.
25 Q  Could the number be higher than 20?

23

1   A   I can't give you an answer.

2   Q   Okay.  After you asked the calls to stop in

3       December of 2018, did you reach out to Qualia on

4       your own to initiate further conversation about a

5       resolution?

6   A   I don't recall.

7   Q   If Qualia's records reflect that you asked the

8       calls to stop on December 12th of 2018, would that

9       be -- does that date sound accurate to you?

10  A   Yes, somewhere toward the beginning.  It was just

11      before Christmas, so yeah.

12  Q   And if Qualia's records indicate that

13      approximately 20 minutes after that telephone call

14      you then reached out to Qualia in an attempt to

15      resolve the dispute, do you have any reason to

16      dispute that record?

17  A   After I asked them to not call me, within

18      20 minutes, they called me back, I answered, they

19      hung up, so I called them back.

20  Q   So it's your position that you asked the calls to

21      stop, and when that conversation ended, they

22      immediately called you back?

23  A   Correct.

24  Q   You did not pick up the call, and then you

25      returned the phone call after the missed call?

24

1   A   And asked -- no.  I picked up the phone call, they

2       hung up, I called back, asked for a supervisor,

3       and said, hey, I stopped -- I asked you not to

4       call me, and immediately called me right back.

5       That conversation, I do remember to that extent, I

6       should say, because I was very irritated, highly

7       irritated and aggravated at that.

8   Q   What do you mean "to that extent"?  Meaning there

9       were other things that happened, you just don't

10      remember what was said?

11  A   I don't remember how long the conversation was.  I

12      don't remember what supervisor I spoke to.  I

13      remember I asked them to stop calling me.  Within

14      a few minutes, they called me right back; so I

15      called them right back after they hung up on me

16      and asked to speak to a supervisor to discuss why

17      they called me back after I specifically told them

18      to stop calling me.

19  Q   And what was the supervisor's response?

20  A   I can't recall that.

21  Q   Did you -- during that call with the supervisor,

22      did you make arrangements to attempt to resolve

23      the outstanding account?

24  A   No.

25  Q   Did you ever make any -- did you ever have any

25

1      conversations with Qualia about an attempt to

2      resolve this account?

3  A   I don't recall.

4  Q   If Qualia's records indicate that there was

5      attempts and there was an agreement to resolve

6      this account, would you dispute that record?

7  A   I don't recall.  I don't know how -- I don't

8      recall setting up anything, so I would have to

9      dispute it.

10 Q   Okay.  Turning back to Exhibit 1, paragraph 19.

11 A   Okay.

12 Q   It indicates, "On at least one occasion, Defendant

13     threatened litigation and intimidated Plaintiff by

14     stating that he would be incarcerated."

15         Did I read that correctly?

16 A   Yes.

17 Q   Okay.  Now, you indicated to me earlier that

18     Qualia threatened criminal charges.  Did -- at any

19     point, did Qualia threaten litigation that they

20     were going to sue you?

21 A   Yes.

22 Q   Okay.  When was that?

23 A   I don't recall.

24 Q   And the complaint says on at least one occasion,

25     they threatened to sue you.  Did it happen on more

26

```
 1      than one occasion, or do you know one way or the
 2      other?
 3   A  I can recall one occasion.
 4   Q  Okay.  But you cannot -- so it happened once, but
 5      you don't know if it happened more than once?
 6   A  Correct.
 7   Q  When the -- when Qualia said they were going to
 8      sue you, can you give me the sum and substance of
 9      the conversation?
10   A  It went with the -- they threatened to sue me and
11      file criminal charges, and that's the only reason
12      I remember that one.  That's why I can't recall if
13      they threatened litigation prior or after.
14   Q  So it was in the same call that they threatened to
15      sue you and press criminal charges?
16   A  Correct.
17   Q  Okay.  So they didn't indicate that you would be
18      incarcerated; they just threatened purportedly
19      that they were going to pursue criminal charges?
20   A  They were going to pursue criminal charges of
21      theft, which normally would carry jail time so...
22   Q  Okay.  But the words prison or jail time --
23   A  The way it came off to me is, yes, they were
24      threatening criminal charges plus incarceration.
25      Did they specifically say I was going to be
```

27

1       incarcerated?  No.

2   Q   Okay.  So they indicated there was going to be --

3       they were going to press criminal charges; and

4       from that conversation, you yielded that that

5       could come with jail time?

6   A   Correct.

7   Q   And just to make sure I understand, the threat of

8       litigation and the threat of criminal charges

9       occurred one time in the same conversation?

10  A   One time in the same conversation.  Litigation

11      prior, it is very possible that we've had that

12      conversation as well.  Before or after.  But the

13      time that I can recall is when they threatened me

14      with criminal charges as well.

15  Q   The threat of criminal charges, did that only

16      occur one time?

17  A   Correct.

18  Q   Okay.  So to make sure I understand your testimony

19      correctly, during the one time they threatened

20      criminal charges, they also threatened litigation?

21  A   Yes.

22  Q   But it is possible that they also talked about

23      litigation prior to this telephone call that we've

24      been talking about at this point?

25  A   Yes.

28

1  Q   But you don't have a specific recollection?

2  A   Correct.

3  Q   Do you know the name of the person that threatened

4      you with criminal charges?

5  A   I do not.

6  Q   Do you know if it was a man or a woman?

7  A   I want to say it was a man, but I can't recall.

8  Q   Do you know the man's title, job role, function?

9  A   No.

10 Q   Paragraph 20 says, "Moreover, on at least one

11     other occasion, Defendant contacted Plaintiff's

12     mother and disclosed that he owes the subject

13     debt."

14         What is your mother's name?

15 A   Pinkie Wood.

16 Q   And where does your mom reside?

17 A   Portsmouth, Virginia.

18 Q   And how did you learn that Qualia Collection

19     reached out to your mother?

20 A   After she received a phone call, she called to

21     inform me that she had received the phone call

22     from them looking to get ahold of me to settle a

23     debt.

24 Q   And do you know when you received the telephone

25     call from your mom?

29

1  A  I do not.

2  Q  Do you know how much time passed from when your

3     mom received the telephone call to when she

4     reached out to you?

5  A  I know it was same day, but I don't know when she

6     received the phone call.

7  Q  Okay.  So it wasn't that she received a call on a

8     Monday and then she reached out to you the

9     following Monday to say, oh, by the way, someone

10    called?

11 A  Correct.

12 Q  You believe that she received it on a Monday

13    hypothetically, and then at some point, whether it

14    was 10 minutes after or 6 hours after, she reached

15    out to you to say, hey, I got this call?

16 A  Yes.

17 Q  Okay.  And do you know what number that she

18    received the telephone call at?

19 A  I believe it would have been her 319 number.

20 Q  And that 319, is that an area code number?

21 A  No.  That's -- so it would be 757-319, which would

22    also be her work phone.

23 Q  And what's your basis for -- that she received a

24    telephone call at that number?

25 A  If I recall correctly, I was trying to figure out

1    how they received that phone number because if I

2    give out her phone number to anybody, it's her

3    other cell phone, her personal cell phone.

4  Q  Okay.

5  A  And I got upset when I found out they called her

6    work phone.

7  Q  So your mom called you and said that she received

8    a call from whom?

9  A  Quality Collection Services.

10 Q  And then what did your mom say Quality Collection

11   Services told her?

12 A  That was so long ago, I don't recall exactly what

13   they said -- what she said.

14 Q  Okay.  Do you know whether Quality Collection

15   Services disclosed that you owed a debt to your

16   mother?

17 A  Yes, because that upset me.

18 Q  How do you know that?

19 A  Well, that's what she said.  She said that they

20   called and that they were looking to get ahold of

21   me because I owed them money.

22 Q  So you do remember then that when your mom spoke

23   to you, she indicated to you that Quality

24   Collection Services called her and indicated that

25   they were looking for Erick and that Erick owed

31

1      them money?

2  A   Yes.

3  Q   And obviously that's not a direct quote, but I'm

4      paraphrasing, if you will.

5  A   Okay.

6  Q   Right?

7  A   I know that I got irritated when they called.  I

8      got irritated that they told her that I owed them

9      money.  I got irritated that they told her -- or

10     that they called her work cell phone because I

11     don't give her work cell phone out, and that's why

12     I remember it.  I do not remember the extent of

13     mine and her conversation.  She relayed the

14     message from Quality Collection Services.  I know

15     it's Qualia, but it was always said to be Quality.

16 Q   Sure.

17 A   And because of my irritation, I remembered that

18     this conversation happened.  I cannot tell you the

19     date, the time, nothing; but I can tell you that I

20     know I got irritated because of this conversation.

21 Q   Because Qualia reached out to your mom?

22 A   Yes.  Because I hadn't been ignoring Qualia's

23     phone calls.  I answered them.  So why would they

24     reach out to my mom?  That's why I got irritated.

25 Q   So you asked Qualia to stop the calls in December

32

1    of '18, but Qualia continued to call you, and you
2    continued to answer the calls?
3  A  I would answer them and -- what can I do?  Just to
4    verify who it was, and then I'd hang up.
5  Q  So I believe your testimony was that you were
6    frustrated because you were communicating with
7    Qualia --
8  A  I was not communicating.  I was answering the
9    calls, listening to them tell me that it was them,
10   and then I would hang up.
11 Q  Okay.  But I think your testimony was that you
12   were frustrated that they called your mom
13   because --
14 A  I was still answering the phone calls.
15 Q  Still answering the calls?
16 A  Yes.
17 Q  And answering to you was listening to what they
18   had to say and then hanging up and not
19   communicating back with them?
20 A  Correct.
21 Q  When you were listening to the calls and hanging
22   up with them, did you ever respond -- you know,
23   communicate with them, respond to their questions,
24   say something to them?
25 A  I don't recall.

33

1   Q   Okay.  So in your mind, communicating with someone
2       is picking up their call but not saying anything
3       in return when they --
4   A   No.  That's not communicating.  I was not
5       communicating with Qualia Collection Services.  I
6       answered the phone, heard them identify themselves
7       after they asked for me.  That was the
8       communicating part.
9   Q   Okay.
10   A   Other than that, I did not communicate.  They
11       identified themselves, and I hung up.
12   Q   And after the date that you asked the calls to
13       stop and prior to your mother receiving a call,
14       did you ever -- did you speak with Qualia where
15       you actually said something to Qualia on the phone
16       during that time period?
17   A   I don't recall.
18   Q   And are you aware of -- we talked about you don't
19       remember the conversation -- the date of the
20       conversation between you and your mom.  And I
21       guess it would be then fair to say that, based on
22       your testimony this morning, you don't know the
23       date that Qualia reached out to your mom?
24   A   No.
25   Q   Do you know if it was in 2018 versus 2019?

34

1  A   No recollection.

2  Q   Are you aware of just a single call to your

3      mother?

4  A   Yes.

5  Q   You're not aware of any others?

6  A   No.

7  Q   If you could turn -- flip the page to paragraph 4

8      -- or excuse me, page 4, paragraph 23.

9  A   Okay.

10 Q   It indicates, "Plaintiff has suffered concrete

11     harm as a result of Defendant's actions, including

12     but not limited to, invasion of privacy."

13         And it goes on.  But we're going to take

14     these one at a time.

15         Can you tell me about the harm you suffered

16     or how your privacy was invaded?

17 A   By calling and disclosing to my mother that I owed

18     money.

19 Q   Okay.  Any other ways?

20 A   I can't recall anything else.

21 Q   Okay.  So then it says, "Aggravation that

22     accompanies collection telephone calls."

23         Can you describe to me the harm related with

24     that?

25 A   The stress, the irritation of multiples of phone

1     calls within days -- within a single day, not just

2     within the week; it was multiple phone calls in a

3     day.  I'm at work, I'm with my kids, and I'm

4     getting these phone calls.

5  Q  Okay.  Anything else?

6  A  It's just consistent phone calls.  Those were

7     ridiculous.

8  Q  Okay.  It says that you incurred emotional

9     distress.  Can you describe to me the emotional

10    distress that you incurred?

11  A  Well, embarrassment.  And once again, it goes to

12    the aggravation of them calling constantly.

13  Q  And embarrassment would mean them contacting your

14    mom?

15  A  Yes.

16  Q  Okay.  And then, I'm sorry, the second part of

17    your answer was?

18  A  Was that just the consistent phone calls --

19    consistent phone calls.  The threat of the

20    criminal charge, that was aggravating because of

21    everything else I was already going through.  That

22    was emotionally -- that one hurt.

23  Q  Everything else you were going through because --

24  A  With a previous question you asked me of criminal

25    charges and the fact that I'm in a felony

36

1       deferment right now.  At that time, I was still
2       going through that.
3    Q  Okay.
4    A  Part of my deferment is no more criminal charges.
5    Q  Makes sense.
6          Then it says that you incurred increased risk
7       of personal injury resulting from the distraction
8       caused by the never-ending phone calls.  Tell me
9       about the increased risk of personal injury that
10      you incurred.
11   A  Well, I mean, I'm inattentive because I'm paying
12      attention to the phone call.  I'm on the phone,
13      I'm holding it.  Am I still attentive?  Yes.  But
14      is it more risk?  Yes.  I'm constantly having to
15      talk on the phone.
16   Q  Okay.  So you could trip and fall while you're
17      talking on the phone?
18   A  Yes.  Yes.  Or if I answered the phone when I was
19      driving my car because, where I live, we don't
20      have a cell phone band.
21   Q  Okay.  And it says that your injury's also
22      increased use of the telephone services.  I think
23      that speaks for itself, meaning that you were on
24      the phone more than you wanted to be?
25   A  Yes.

37

1    Q    Tell me about the loss of cellular phone capacity.
2         I don't know what that is.
3    A    Well, every phone call takes up storage just from
4         the numbers.  But if you go through and delete
5         them, then you get some of your memory back.  But
6         over time, your phone just loses memory from
7         constant use.
8    Q    So your phone only has so many gigabytes of
9         memory; and if you get calls in there, it loads a
10        missed call or connected call or whatever it is.
11        And so if you had, you know, I started with 10 gig
12        today and I got a bunch of calls over the month,
13        it might go down to 9 gig or 9.8 or whatever it
14        is?
15   A    Sure.  Yes.
16   Q    Okay.  Did you ever quantify how much memory you
17        actually lost from --
18   A    No, I did not.
19   Q    Okay.  You just know generally that more calls
20        that come into your phone, you lose memory
21        capacity?
22   A    You lose memory.  Your phone slows down because
23        you're having constant use.  Your phone heats up.
24        When something heats up, it slows down.
25   Q    Okay.  And then it says, "Diminished cellular

38

1      phone functionality."

2           Is that the same thing?

3   A   Yes.

4   Q   Okay.  Decreased battery life on your cell phone,

5       does that mean because you answered the call, the

6       battery's going to go down quicker?

7   A   Yes, because it's in use.

8   Q   And then, "Diminished space for data storage on

9       the cell phone."

10          I guess that's what we talked about already

11      this morning?

12  A   Mm-hmm.

13  Q   Okay.  Have you suffered any other actual damages

14      as a result of these telephone calls that you

15      received or that your mom received?

16  A   My damages are emotional.  I won't say mental.  I

17      can't say mental.  It's emotional.  It's stress.

18      It's just taking too much time to deal with this

19      this way.  And, you know, having to -- now having

20      to drive down here is cost.  The drive down here

21      to Portage has cost me more money than I can

22      afford.

23  Q   So let me make sure I understand your answer.

24      Well, let me ask you this.  Have you sought any

25      kind of medical treatment at all for the stress or

39

1      the emotional damages you suffered as a result of
2      the phone calls?
3  A   I wouldn't say it's specifically because of the
4      phone calls.  Do the phone calls get brought up?
5      Yes.  Do the stress of my bills and finances get
6      brought up?  Yes.  Is it specifically toward
7      Qualia Collection Services?  No.
8  Q   Okay.
9                    THE WITNESS:  Is it possible to
10            take a break so I can use the restroom real
11            quick?
12                    MR. LITTLE:  Absolutely.
13            (Recess.)
14  BY MR. LITTLE:
15  Q   Did you ever indicate to Qualia on the telephone
16      that you had hired someone to help you clean up
17      your credit?
18  A   Not that I recall.
19  Q   Did you ever hire someone to clean up your credit
20      in late 2018 or early 2019?
21  A   No.
22  Q   Do you know who uses -- strike that.
23            Do you know who used the telephone number
24      (757) 277-1467 in late 2018, early 2019?
25  A   Say that again.

40

1  Q  The telephone number is (757) 277-1467.  Do you

2     know who was using that telephone number?

3  A  I don't know who was using that phone number, no.

4  Q  Okay.  What about -- it wasn't you?

5  A  It wasn't me.  I haven't had that phone number

6     since I moved to Wisconsin.

7  Q  So it's a number that you used to have?

8  A  Yes, back in 2009, 2010.  I think I got rid of it

9     at the end of 2010.

10 Q  Okay.  But since you moved to Tomahawk, Wisconsin,

11    you haven't used that number?

12 A  No.

13 Q  What about the number (757) 642-3875?

14 A  That would be my sister's phone number.

15 Q  And your sister's name is?

16 A  Tabitha Rigby.

17 Q  Do you know if Qualia ever spoke to Tabitha?

18 A  Not that I recall.

19 Q  Do you know if your cell phone records have been

20    subpoenaed in this case?

21 A  No, I don't know.

22 Q  You don't know one way or the other if they have

23    or have not?

24 A  No.

25 Q  Okay.  So I guess if I told you they would, you

41

1    have not reviewed those records?

2  A  No.

3  Q  When this lawsuit started, you initiated a claim

4    for a violation of the Telephone Consumer

5    Protection Act.  Does that jive with your

6    recollection?

7  A  Yes.

8  Q  Okay.  And it's my understanding that you've --

9    your lawyers on your behalf have since withdrawn

10    that claim.  Is that your understanding as well?

11  A  No.  I know nothing about that part.  I recall

12    bringing up the fact that they had called me -- or

13    that Qualia had called me excessively, and that

14    was part of my complaint was the fact that I

15    thought that was against the --

16  Q  TCPA?

17  A  Yeah.

18  Q  Yes?

19  A  Yes.  Yes.  Sorry.

20  Q  Okay.  So you think that claim is still in play?

21  A  As far as I know, yes.

22  Q  Okay.

23              MR. LITTLE:  Mr. Volheim, I just

24        want to confirm so I don't have to ask the

25        questions.  You are confirming that the TCPA

42

1                    claim has been withdrawn?

2                              MR. VOLHEIM:  I think the record

3                    speaks for itself.

4                              MR. LITTLE:  Well, there is no

5                    record before us this morning; so I just want

6                    to make sure that is the case so I don't have

7                    to ask Mr. Rigby about those questions.

8                              MR. VOLHEIM:  I will stipulate that

9                    anything that was filed on the record is the

10                   situation that I know of right now.  I don't

11                   really know what to tell you.  You're asking

12                   Mr. Rigby legal questions that he can't

13                   answer.  So I mean, did we stipulate that the

14                   TCPA claim is withdrawn?  That's on the

15                   record.  That's on the record.

16                             MR. LITTLE:  Okay.  That's what I

17                   was asking.  I was confirming that the

18                   stipulation was in place, that the TCPA claim

19                   has been withdrawn.  Are you agreeing to

20                   that?  I'm sorry.  One second, Nate, because

21                   there's a vacuum going on in the background;

22                   and the court reporter can't hear you.  So

23                   bear with us for one minute.  I'll let you

24                   know when the vacuum cleaner has passed by.

25                     Maybe if I move it closer to you.

43

1              Sorry.  There was some background noise here.

2              I moved the phone closer to the court

3              reporter.  I was making sure that the

4              stipulation was in place that the TCPA claim

5              has been withdrawn.  I'm asking you to

6              confirm that, please.

7                        MR. VOLHEIM:  I can confirm the

8              stipulation.

9                        MR. LITTLE:  Okay.  Thank you.

10   BY MR. LITTLE:

11   Q   Okay.  Given that the claim has been withdrawn, I

12       don't need to ask you any questions about that

13       particular claim.

14   A   Okay.

15              (Exhibit No. 2 marked for identification.)

16   BY MR. LITTLE:

17   Q   Sir, I'm going to show you what's been marked as

18       Exhibit No. 2 for this deposition.

19                        MR. LITTLE:  Mr. Volheim, Exhibit

20              No. 2 is Plaintiff's Amended Supplemental

21              Answer and Objections to Defendant's

22              Interrogatories.

23                        MR. VOLHEIM:  Thank you.

24   BY MR. LITTLE:

25   Q   Sir, have you ever seen this document before,

44

1       Exhibit No. 2?

2    A   I don't recall, no.

3    Q   Did you ever sign a verification page for this

4        particular document?

5    A   I don't recall.

6    Q   So it's possible that you've seen this document

7        before, but you don't have a specific

8        recollection?

9    A   It would have been at the very beginning of all of

10       this.  I don't -- yeah.

11   Q   At the very beginning, meaning when you started

12       the lawsuit?

13   A   Yes.

14   Q   If you flip to the last page, page 8, it shows

15       that it's dated April 18th of 2019; so this would

16       be several months after your lawsuit started in

17       January.

18   A   Then I don't -- I don't recall seeing this.

19   Q   Okay.  Quickly, since I marked it, I'll ask you,

20       flipping to page 6, Interrogatory No. 10.

21   A   Okay.

22   Q   This interrogatory asks the dates and times that

23       you demanded Optio or Qualia Collection Services

24       to stop calling your phone.  I assume that your

25       testimony earlier today or our conversation

45

1    earlier today, you don't have a specific
2    recollection, but you think it was sometime in
3    December of '18?
4  A  Yes.
5  Q  And moving on to number 11 on the same page,
6    "Threatened litigation and intimidating the
7    plaintiff that he would be incarcerated."
8       Again, we're talking about the single
9    telephone call that, in that telephone call, there
10   was a threat of criminal charges and litigation?
11 A  Yes.  I can say I've seen something like this, but
12   I can't say it's specifically this one.
13 Q  So you're flipping through Exhibit No. 2, for the
14   record, just so we're clear, because we have to
15   articulate it to the court reporter.
16 A  Yes.
17 Q  You're flipping through Exhibit 2, and you're
18   saying you've seen a document similar to that
19   before, but you can't say for sure that --
20 A  It was this one.
21 Q  -- it was this specific document?
22 A  Yes.
23 Q  Okay.  So can you, in your own words, describe to
24   me the actual damages that you suffered as a
25   result of the telephone calls we talked about here

46

1      this morning?

2                      MR. VOLHEIM:  Objection.  Asked and

3            answered.  You can go ahead, Mr. Rigby.

4                      THE WITNESS:  I thought we already

5            answered that one.  But undue stress, time

6            away from what I need to worry about and take

7            care of.  Yeah.  I mean, I believe we've

8            already -- we answered that previously.

9   BY MR. LITTLE:

10  Q    Okay.  So it's the stress of dealing with the

11       calls and the time away from your personal life?

12  A    The time away from dealing with my job, dealing

13       with my children, dealing with the other

14       responsibilities that I have to deal with.  We

15       already covered what the damages were, and I

16       thought I answered those in my own words as well

17       when you asked the questions about them.

18  Q    Okay.  Have you suffered any economic harm,

19       meaning money out-of-pocket?

20  A    Yes.  And that would have been -- I can't give you

21       a total unless I go back and look at it, but I

22       believe it was somewhere around $600.

23  Q    Okay.

24  A    Because when all of this started, they were

25       withdrawing money.  I asked them to stop so I can

47

1    fix it.  That way they had the money in the
2    account to withdraw it from.  I called and
3    explained to them what was going on on that fact
4    that the money wasn't there and they still
5    withdrew it anyways, which caused me to get even
6    further behind.

7        And I had to pay these funds back before I
8    could have the account stable enough for them to
9    withdraw.  They wouldn't listen to that part.
10   Even though they said they understood, they didn't
11   stop withdrawing.  And at those times, it started
12   with one; so I went to fix it.  And before I could
13   get it fixed, they withdrew it again, which caused
14   me two more fees.  And it just kept building that
15   up until the end of October, beginning of November
16   of 2018.

17 Q So when you say -- I've got to breakdown that
18   answer a little bit.  "They" meaning Qualia, I
19   assume?

20 A Yes.

21 Q Okay.  And you --

22 A Qualia, Crosscheck, whatever.  That company of
23   whom I spoke with, they would not stop withdrawing
24   money from my bank account.  It caused it to
25   overdraw for insufficient funds.  When I called

48

```
 1        and said, hey, stop, I will make a payment on this
 2        day, they still withdrew it before I could make
 3        the payment, and they caused my account to
 4        continuously be overdrawn.  I didn't have the
 5        opportunity to fix it.
 6    Q   Let me make sure I understand what you're saying.
 7        So you're saying that you had a payment scheduled
 8        to come out of your account on the 1st of the
 9        month?
10    A   Mm-hmm.
11    Q   Yes?
12    A   Yes.
13    Q   And you called before that payment was scheduled
14        to come out of your account and said, hey, I can't
15        make the payment on the 1st, there's not enough
16        funds, I'm going to make a payment on a different
17        date?
18    A   I didn't do that the first time this happened.  I
19        did that the second time this happened.
20    Q   Okay.  So you knew that I guess -- well, let me
21        make sure I understand.  So --
22    A   The first time this happened, I thought I had the
23        funds in there.  I found out I didn't have the
24        funds, so I called and told them, hey, I have the
25        funds in there now, you can pull it.  They pulled
```

49

```
 1        that one.
 2             Then I called and said the funds are not
 3        going to be here until this date, and they still
 4        pulled it on this date.  I don't have a specific
 5        date.
 6   Q    Let me ask -- I think I can clear it up.  So it
 7        was supposed to draw -- the money was supposed to
 8        come out of your account on a certain date.  You
 9        thought you had enough money in the account.  It
10        turns out that you didn't.  Then you called after
11        the fact and said, okay, now there is enough
12        money, go ahead and withdraw, and they did?
13   A    Yes.
14   Q    Then you knew coming up that they were going to
15        withdraw on a date in the future.  In advance of
16        that happening, you contacted Qualia in advance to
17        say, hey, I'm not going to have enough money in my
18        account, please do not withdraw on this date?
19   A    Yes.
20   Q    And your claim is that they ignored your directive
21        and still withdrew the money?
22   A    Yes.
23   Q    And as a result of that, you incurred some kind of
24        fee with your bank?
25   A    Yes.
```

50

1  Q   Okay.  And it's my understanding that you have
2      approximately $600?
3  A   Yes, in fees.
4  Q   In fees.  Bank fees?
5  A   Correct.
6  Q   Okay.  What bank were they trying to withdraw --
7      strike that.
8          What account at what bank were they using to
9      try to withdraw funds?
10 A   It would have been my Ripco account, my Ripco
11     checking account.
12 Q   And Ripco, R-I-P-C-O?
13 A   Yep.
14 Q   Okay.  Is that a --
15 A   It's a credit union.
16 Q   Okay.  I'm not from here.
17 A   Yeah, it's a credit union in northern Wisconsin.
18 Q   Okay.  And it would have been Ripco that charged
19     you approximately $600 in fees because of the
20     attempts to debit the account, but there were
21     insufficient funds?
22 A   Correct.
23 Q   Okay.  Other than the bank fees that we talked
24     about this morning, have you suffered any other
25     economic harm as a result of these telephone

51

1      calls?

2   A   Of the telephone calls, no.

3                      MR. VOLHEIM:  Objection.  Asked and

4          answered.  You can go ahead.

5                      THE WITNESS:  For this whole thing

6          going on now, this is adding cost.

7   BY MR. LITTLE:

8   Q   "This" meaning the deposition?

9   A   Correct.

10  Q   Okay.  You had to pay for gas to drive down here

11      today?

12  A   Gas, maintenance on my vehicle, all of that to

13      come down here, yes.

14  Q   Okay.  So for the economic loss, I have the bank

15      fees, your time here today.  Anything else?

16  A   I'm missing work today.

17  Q   I didn't ask you this.  I guess my question would

18      be, are you currently employed?

19  A   Yes, I am currently employed.

20  Q   Okay.  And where are you working?

21  A   Country Terrace.

22  Q   And what is Country Terrace?

23  A   It's an assisted-living home in Tomahawk,

24      Wisconsin.

25  Q   And what do you do there?

52

1   A   I am the head cook.

2   Q   And because -- so you -- in order to sit for your

3       deposition today, you had to take the day off of

4       work?

5   A   Yes.

6   Q   And you don't have vacation time, etcetera?

7   A   No.

8   Q   So you're losing your pay for today?

9   A   Correct.

10  Q   And because I'm trying to calculate all of this,

11      do you have an approximation as to what you would

12      have earned today if you would have worked?

13  A   8 times 14.

14  Q   8 hours times $14 an hour?

15  A   Yes.

16  Q   Okay.  I'll do that math later.  I won't count on

17      my fingers here.

18          Any other economic harm?

19  A   Not that I can recall.

20  Q   I'm just going to go over my notes to see if I

21      have anything else for you.  Bear with me for one

22      second.

23  A   All right.

24              (Recess.)

25

53

```
 1  BY MR. LITTLE:
 2  Q   At the time of these telephone calls in late '18
 3      and early '19, were you employed by the same
 4      employer?
 5  A   No.
 6  Q   Where were you employed back then?
 7  A   Redline Transportation.
 8  Q   Is that a trucking company?
 9  A   Yes.
10  Q   When did you start your current job?
11  A   July of this year, of 2019.
12                    THE WITNESS:  Can I ask you an
13           off-the-record question?
14                    MR. LITTLE:  Yeah, go ahead.  We
15           can go off the record.
16                    COURT REPORTER:  Yes.
17              (Recess.)
18                    MR. LITTLE:  We can go back on the
19           record.  Okay.  I have no further questions,
20           Mr. Rigby.
21                    THE WITNESS:  All right.  Thank
22           you.
23                    MR. LITTLE:  Mr. Volheim, do you
24           have anything?
25                    MR. VOLHEIM:  Just very few.  And
```

54

1          actually, that would be one of my questions

2          too; so I'm impressed with that.  Erick, I

3          just have very, very few questions for you.

4          Can you hear me all right?

5                    THE WITNESS:  Yes.

6                    MR. VOLHEIM:  Okay.  Great.

7                    EXAMINATION

8    BY MR. VOLHEIM:

9    Q   So when you made the purchase from

10       Ashley Furniture, did you provide any phone

11       numbers to them that belong to your mother?

12   A   I don't recall.  I don't believe so.

13   Q   Okay.  Did you ever provide any of your mother's

14       phone numbers to Qualia Collection or any of the

15       other entities that we spoke about -- that you

16       spoke about today?

17   A   No.

18   Q   Do you have any idea how Qualia Collections got

19       your mother's phone number?

20   A   I do not.

21   Q   You testified earlier today that you -- the phone

22       calls and your communications with Qualia made you

23       stressed; is that correct?

24   A   Yes.

25   Q   When you're stressed out or experiencing anxiety

55

1      and things like that, do you ever get headaches?

2  A   Yes.

3  Q   Do you take any over-the-counter, like, Aspirin or

4      Advil or headache medicine when you get headaches?

5  A   Ibuprofen or Aspirin as needed.

6  Q   Okay.  Did you purchase that with money out of

7      your pocket?

8  A   Yes.

9  Q   Do you recall if you took any ibuprofen or Aspirin

10     as needed related to any of the conduct by Qualia?

11  A  I can't recall that one.

12  Q  Is it possible that you did?

13             MR. LITTLE:  Form.  Go ahead.

14             THE WITNESS:  Yes.

15             MR. VOLHEIM:  I don't have any

16     other questions for you, Erick, subject to

17     whatever Mr. Little asks.  Thank you.

18             MR. LITTLE:  I just have one

19     follow-up question.

20           FURTHER EXAMINATION

21  BY MR. LITTLE:

22  Q  Are you -- as a part of your claim here today, are

23     you claiming that your purchase of Aspirin or

24     ibuprofen is monetary damages as a result of this

25     lawsuit?

56

1    A    No.

2                      MR. LITTLE:   Okay.   That's all I

3          have.   All set, Nate?

4                      MR. VOLHEIM:   I don't have anything

5          further.   Yeah, I'm done.

6                      MR. LITTLE:   Okay.   We'll go off

7          the record.

8                      MR. VOLHEIM:   Our order will be an

9          electronic version without the exhibits.

10                     (Adjourned at 10:15 a.m.)

57

```
 1  STATE OF WISCONSIN      )
                            ) SS
 2  COUNTY OF DANE          )

 3

 4         I, Paula Wondra, a Notary Public in and for the

 5      State of Wisconsin, do hereby certify that the

 6  foregoing deposition was taken before me at

 7  Comfort Suites Wisconsin Dells Area, N5780 Kinney

 8  Road, City of Portage, and State of Wisconsin, on the

 9  18th day of October, 2019; that it was taken at the

10  request of the Defendant, upon verbal

11  interrogatories; that it was taken in shorthand by

12  me, a competent court reporter and disinterested

13  person, approved by all parties in interest and

14  thereafter converted to typewriting using

15  computer-aided transcription; that said deposition is

16  a true record of the deponent's testimony; that the

17  deposition was taken pursuant to Notice; that said

18  ERICK RIGBY before examination was sworn by me to

19  testify to the truth, the whole truth, and nothing

20  but the truth relative to said cause.

21         PAULA WONDRA          Dated October 22nd, 2019
           Notary Public
22         State of Wisconsin    Paula Wondra

23                               _____

24                               Notary Public
                                 In and for the State of Wisconsin

25
```

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

**$**

**$14 (1)**
52:14
**$600 (3)**
46:22;50:2,19

**[**

**[sic] (1)**
6:18

**A**

**Absolutely (1)**
39:12
**accompanies (1)**
34:22
**account (19)**
18:15,16,20;24:23;
25:2,6;47:2,8,24;
48:3,8,14;49:8,9,18;
50:8,10,11,20
**accurate (1)**
23:9
**Act (1)**
41:5
**action (4)**
9:17,18;10:10,12
**actions (1)**
34:11
**actively (2)**
7:22;8:18
**actual (2)**
38:13;45:24
**actually (6)**
19:7;20:25;22:13;
33:15;37:17;54:1
**added (1)**
5:21
**adding (1)**
51:6
**additional (1)**
22:22
**address (4)**
6:3;7:1;11:14;12:2
**Adjourned (1)**
56:10
**advance (2)**
49:15,16
**Advil (1)**
55:4
**afford (1)**
38:22
**afternoon (1)**
4:6
**again (4)**
35:11;39:25;45:8;
47:13
**against (1)**
41:15
**aggravated (1)**

**24:7**
**aggravating (1)**
35:20
**Aggravation (2)**
34:21;35:12
**ago (1)**
30:12
**agreeing (1)**
42:19
**agreement (1)**
25:5
**ahead (6)**
18:23;46:3;49:12;
51:4;53:14;55:13
**ahold (2)**
28:22;30:20
**alcohol-related (1)**
8:14
**allows (1)**
20:2
**alone (1)**
16:20
**always (1)**
31:15
**Amanda (3)**
7:15;11:16,17
**Amended (1)**
43:20
**answered (10)**
23:18;31:23;33:6;
36:18;38:5;46:3,5,8,
16;51:4
**anxiety (1)**
54:25
**anymore (1)**
10:20
**anyways (1)**
47:5
**apologize (1)**
5:20
**appreciate (1)**
7:21
**approximate (1)**
21:8
**approximately (3)**
23:13;50:2,19
**approximation (1)**
52:11
**April (1)**
44:15
**area (2)**
14:4;29:20
**around (2)**
17:1;46:22
**arrangements (2)**
18:10;24:22
**articulate (1)**
45:15
**Ashley (5)**
17:22,23,24;18:2;
54:10
**Aspirin (4)**
55:3,5,9,23

**assisted-living (1)**
51:23
**assume (5)**
4:17;7:16;11:18;
44:24;47:19
**assuming (1)**
19:13
**attempt (3)**
23:14;24:22;25:1
**attempted (1)**
18:19
**attempting (1)**
17:13
**attempts (2)**
25:5;50:20
**attention (1)**
36:12
**attentive (1)**
36:13
**attorney (2)**
4:21;12:13
**audio (1)**
12:4
**automatically (1)**
10:13
**Avenue (4)**
6:4,8,15,16
**aware (3)**
33:18;34:2,5
**away (3)**
46:6,11,12

**B**

**babysitter (1)**
14:20
**back (19)**
13:24;14:14,15;
23:18,19,22;24:2,4,
14,15,17;25:10;
32:19;37:5;40:8;
46:21;47:7;53:6,18
**background (2)**
42:21;43:1
**Bad (1)**
14:7
**band (1)**
36:20
**bank (7)**
47:24;49:24;50:4,
6,8,23;51:14
**based (1)**
33:21
**basis (1)**
29:23
**battery (1)**
38:4
**battery's (1)**
38:6
**bear (2)**
42:23;52:21
**beginning (5)**
15:21;23:10;44:9,

**11;47:15**
**behalf (1)**
41:9
**behind (4)**
17:19;18:7,18;47:6
**belong (1)**
54:11
**better (1)**
17:16
**bills (1)**
39:5
**birth (1)**
5:22
**bit (1)**
47:18
**born (2)**
6:22,24
**both (1)**
12:24
**break (1)**
39:10
**breakdown (1)**
47:17
**Brendan (1)**
4:7
**bringing (1)**
41:12
**brought (2)**
39:4,6
**Buffalo (1)**
4:8
**building (1)**
47:14
**bunch (1)**
37:12

**C**

**calculate (1)**
52:10
**California (2)**
6:25;10:25
**call (36)**
14:21;15:12,19;
16:21;21:17;23:13,
17,24,25,25;24:1,4,
21;26:14;27:23;
28:20,21,25;29:3,6,7,
15,18,24;30:8;32:1;
33:2,13;34:2;36:12;
37:3,10,10;38:5;45:9,
9
**called (28)**
4:2;13:14;21:20;
23:18,19,22;24:2,4,
14,15,17;28:20;
29:10;30:5,7,20,24;
31:7,10;32:12;41:12,
13;47:2,25;48:13,24;
49:2,10
**calling (13)**
13:13;17:18;21:3,
6,12,13,14;22:19;

**24:13,18;34:17;**
**35:12;44:24**
**calls (53)**
14:11,22;15:1,9,16,
25;16:3,12,17,19;
18:24;19:2,20,23,24;
21:2,19;22:8,18,21,
23;23:2,8,20;31:23,
25;32:2,9,14,15,21;
33:12;34:22;35:1,2,4,
6,18,19;36:8;37:9,12,
19;38:14;39:2,4,4;
45:25;46:11;51:1,2;
53:2;54:22
**came (2)**
9:25;26:23
**can (28)**
5:7;16:7,16,21;
21:7;26:3,8;27:13;
31:19;32:3;34:15,23;
35:9;38:21;39:10;
43:7;45:11,23;46:3,
25;48:25;49:6;51:4;
52:19;53:12,15,18;
54:4
**capacity (2)**
37:1,21
**car (1)**
36:19
**care (1)**
46:7
**carrier (1)**
14:10
**carry (1)**
26:21
**case (5)**
9:11,13;10:19;
40:20;42:6
**caused (5)**
36:8;47:5,13,24;
48:3
**cell (12)**
13:24;14:2;21:6,
14;30:3,3;31:10,11;
36:20;38:4,9;40:19
**cellular (3)**
21:4;37:1,25
**certain (1)**
49:8
**changed (1)**
14:12
**charge (2)**
19:21;35:20
**charged (1)**
50:18
**charges (16)**
19:9;25:18;26:11,
15,19,20,24;27:3,8,
14,15,20;28:4;35:25;
36:4;45:10
**charging (2)**
10:7,8
**chart (1)**

Case: 3:19-cv-00036-jdp   Document #: 19-1   Filed: 12/13/19   Page 61 of 67

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

19:2
**checking (3)**
18:16,20;50:11
**checks (1)**
10:21
**children (3)**
11:8;14:21;46:13
**Christmas (1)**
23:11
**City (2)**
10:23,24
**claim (11)**
41:3,10,20;42:1,14,
18;43:4,11,13;49:20;
55:22
**claiming (1)**
55:23
**class (4)**
9:16,18;10:10,12
**clean (2)**
39:16,19
**cleaner (2)**
5:20;42:24
**clear (4)**
15:15;19:10;45:14;
49:6
**closer (6)**
16:9,10,11;17:8;
42:25;43:2
**code (2)**
14:4;29:20
**collect (1)**
17:13
**collecting (1)**
17:15
**Collection (21)**
13:11,12,14,17;
14:24;15:2,10;17:18;
18:25;19:11;28:18;
30:9,10,14,24;31:14;
33:5;34:22;39:7;
44:23;54:14
**Collections (1)**
54:18
**collector (1)**
22:2
**coming (2)**
19:3;49:14
**commenced (2)**
4:9;19:13
**communicate (2)**
32:23;33:10
**communicating (7)**
32:6,8,19;33:1,4,5,
8
**communication (1)**
4:25
**communications (1)**
54:22
**company (5)**
9:15,20;13:12;
47:22;53:8
**complaint (6)**

11:25;20:10,20,22;
25:24;41:14
**concrete (1)**
34:10
**conduct (2)**
21:3;55:10
**confirm (1)**
41:24;43:6,7
**confirming (2)**
41:25;42:17
**connected (1)**
37:10
**consistent (3)**
35:6,18,19
**constant (2)**
37:7,23
**constantly (2)**
35:12;36:14
**Consumer (1)**
41:4
**contact (1)**
19:5
**contacted (4)**
19:14,22;28:11;
49:16
**contacting (2)**
19:8;35:13
**contending (1)**
13:20
**continue (1)**
4:20
**continued (2)**
32:1,2
**continuously (1)**
48:4
**contractor (2)**
10:4,5
**conversation (18)**
21:16;22:12,13;
23:4,21;24:5,11;
26:9;27:4,9,10,12;
31:13,18,20;33:19,
20;44:25
**conversations (1)**
25:1
**convicted (1)**
8:5
**cook (1)**
52:1
**correctly (3)**
25:15;27:19;29:25
**cost (3)**
38:20,21;51:6
**count (1)**
52:16
**Country (2)**
51:21,22
**County (2)**
6:25;8:20
**Court (6)**
4:10,23;42:22;
43:2;45:15;53:16
**courts (1)**

8:9
**covered (1)**
46:15
**CR (3)**
9:14,19,25
**credit (4)**
39:17,19;50:15,17
**creditor (1)**
13:6
**criminal (20)**
19:9,15,17,20;
25:18;26:11,15,19,
20,24;27:3,8,14,15,
20;28:4;35:20,24;
36:4;45:10
**Crosscheck (3)**
13:5;14:23;47:22
**current (1)**
53:10
**currently (3)**
6:1;51:18,19

## D

**damages (6)**
38:13,16;39:1;
45:24;46:15;55:24
**data (1)**
38:8
**date (15)**
5:22;20:24;21:8;
23:9;31:19;33:12,19,
23;48:17;49:3,4,5,8,
15,18
**dated (1)**
44:15
**dates (1)**
44:22
**day (7)**
16:18,21;29:5;
35:1,3;48:2;52:3
**days (2)**
16:19;35:1
**deal (2)**
38:18;46:14
**dealing (4)**
46:10,12,12,13
**debit (1)**
50:20
**debt (6)**
13:13;17:12,15;
28:13,23;30:15
**December (6)**
21:9;22:21;23:3,8;
31:25;45:3
**Decreased (1)**
38:4
**defendant (4)**
9:2;22:18;25:12;
28:11
**defendants (1)**
4:9
**Defendant's (3)**

21:2;34:11;43:21
**deferment (4)**
8:9,18;36:1,4
**definitely (1)**
22:14
**delay (1)**
5:17
**delete (1)**
37:4
**demand (1)**
22:17
**demanded (2)**
21:3;44:23
**deposition (5)**
8:3;20:7;43:18;
51:8;52:3
**describe (3)**
34:23;35:9;45:23
**Despite (1)**
22:16
**details (1)**
7:20
**development (2)**
7:18;9:7
**different (1)**
48:16
**Diminished (2)**
37:25;38:8
**direct (1)**
31:3
**directive (2)**
21:22;49:20
**directly (1)**
18:15
**disclosed (2)**
28:12;30:15
**disclosing (1)**
34:17
**discounted (1)**
17:25
**discuss (1)**
24:16
**dispute (4)**
23:15,16;25:6,9
**distraction (1)**
36:7
**distress (2)**
35:9,10
**District (2)**
4:10,10
**document (8)**
20:13,16,20;43:25;
44:4,6;45:18,21
**documents (1)**
11:23
**done (4)**
19:19,19;22:10;
56:5
**down (10)**
4:24;16:24;37:13,
22,24;38:6,20,20;
51:10,13
**draw (1)**

49:7
**drive (3)**
38:20,20;51:10
**driving (2)**
9:24;36:19
**Due (1)**
21:1
**duly (1)**
4:2
**during (3)**
24:21;27:19;33:16

## E

**earlier (4)**
25:17;44:25;45:1;
54:21
**early (5)**
13:25;15:3;39:20,
24;53:3
**earned (1)**
52:12
**economic (4)**
46:18;50:25;51:14;
52:18
**effect (1)**
5:21
**either (1)**
10:24
**electronic (1)**
56:9
**else (7)**
12:1;34:20;35:5,
21,23;51:15;52:21
**embarrassment (2)**
35:11,13
**emotional (5)**
35:8,9;38:16,17;
39:1
**emotionally (1)**
35:22
**employed (4)**
51:18,19;53:3,6
**employer (1)**
53:4
**employment (1)**
10:3
**end (3)**
19:25;40:9;47:15
**ended (1)**
23:21
**ending (1)**
15:17
**England (3)**
9:14,19,25
**enough (8)**
5:12;17:11;18:21;
47:8;48:15;49:9,11,
17
**entities (1)**
54:15
**ERICK (6)**
4:1;11:21;30:25,

Case: 3:19-cv-00036-jdp   Document #: 19-1   Filed: 12/13/19   Page 62 of 67

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

25;54:2;55:16
**estimate (3)**
  16:7,24,25
**estimated (2)**
  17:6,6
**etcetera (2)**
  5:3;52:6
**even (3)**
  10:13;47:5,10
**event (2)**
  19:5,9
**events (1)**
  19:7
**exact (1)**
  16:6
**exactly (1)**
  30:12
**EXAMINATION (3)**
  4:4;54:7;55:20
**excessive (1)**
  19:24
**excessively (1)**
  41:13
**excuse (1)**
  34:8
**exes (1)**
  7:16
**ex-girlfriend (1)**
  7:9
**Exhibit (10)**
  20:4,7,9;25:10;
  43:15,18,19;44:1;
  45:13,17
**exhibits (1)**
  56:9
**expect (1)**
  5:5
**experiencing (1)**
  54:25
**explain (1)**
  18:1
**explained (1)**
  47:3
**extent (3)**
  24:5,8;31:12

**F**

**fact (6)**
  18:6;35:25;41:12,
  14;47:3;49:11
**fair (5)**
  4:18;15:25;16:14;
  17:11;33:21
**fall (4)**
  13:24;14:15;18:7;
  36:16
**far (2)**
  9:5;41:21
**fast (1)**
  5:12
**fee (1)**
  49:24

**fees (7)**
  47:14;50:3,4,4,19,
  23;51:15
**fell (2)**
  17:19;18:18
**felonies (1)**
  8:22
**felony (4)**
  8:6,10,11;35:25
**few (3)**
  24:14;53:25;54:3
**figure (1)**
  29:25
**file (2)**
  10:15;26:11
**filed (2)**
  20:22;42:9
**finally (2)**
  5:5;19:18
**finances (1)**
  39:5
**fingers (1)**
  52:17
**finish (1)**
  5:8
**firm (2)**
  4:7;13:3
**first (7)**
  4:2;5:8;19:7;20:17,
  19;48:18,22
**fix (3)**
  47:1,12;48:5
**fixed (1)**
  47:13
**flip (3)**
  20:25;34:7;44:14
**flipping (3)**
  44:20;45:13,17
**following (1)**
  29:9
**follows (1)**
  4:3
**follow-up (1)**
  55:19
**Fontana (1)**
  10:25
**forgot (1)**
  12:20
**form (2)**
  10:1;55:13
**found (4)**
  9:11,16;30:5;48:23
**Four (2)**
  11:11;16:17
**Friedman (1)**
  4:8
**frustrated (2)**
  32:6,12
**function (1)**
  28:8
**functionality (1)**
  38:1
**funds (9)**

47:7,25;48:16,23,
24,25;49:2;50:9,21
**furniture (7)**
  17:19,21,22,24;
  18:2,3;54:10
**further (5)**
  23:4;47:6;53:19;
  55:20;56:5
**future (1)**
  49:15

**G**

**gas (2)**
  51:10,12
**gave (1)**
  13:19
**generally (2)**
  21:13;37:19
**gig (2)**
  37:11,13
**gigabytes (1)**
  37:8
**given (2)**
  8:3;43:11
**giving (1)**
  5:9
**goes (2)**
  34:13;35:11
**Good (1)**
  4:6
**Graeber (1)**
  7:15
**G-R-A-E-B-E-R (1)**
  7:15
**Great (1)**
  54:6
**guess (6)**
  17:14;33:21;38:10;
  40:25;48:20;51:17
**guesstimates (1)**
  16:16
**guilty (1)**
  8:5

**H**

**half (1)**
  6:6
**hang (2)**
  32:4,10
**hanging (2)**
  32:18,21
**happen (1)**
  25:25
**happened (7)**
  24:9;26:4,5;31:18;
  48:18,19,22
**happening (1)**
  49:16
**harassed (1)**
  19:18
**harm (6)**

34:11,15,23;46:18;
50:25;52:18
**head (2)**
  4:22;52:1
**headache (1)**
  55:4
**headaches (2)**
  55:1,4
**hear (3)**
  4:14;42:22;54:4
**heard (2)**
  13:10;33:6
**hearing (1)**
  16:25
**heats (2)**
  37:23,24
**help (2)**
  20:23;39:16
**hey (7)**
  21:19;24:3;29:15;
  48:1,14,24;49:17
**high (1)**
  16:15
**higher (1)**
  22:25
**highly (1)**
  24:6
**hire (1)**
  39:19
**hired (1)**
  39:16
**Hit (1)**
  8:13
**holding (1)**
  36:13
**home (3)**
  18:4,5;51:23
**honest (1)**
  8:7
**hotel (1)**
  5:21
**hour (1)**
  52:14
**hours (2)**
  29:14;52:14
**house (1)**
  14:20
**Humboldt (1)**
  6:25
**hung (4)**
  23:19;24:2,15;
  33:11
**hurt (1)**
  35:22
**hypothetically (1)**
  29:13

**I**

**Ibuprofen (3)**
  55:5,9,24
**idea (1)**
  54:18

**identification (2)**
  20:4;43:15
**identified (2)**
  7:25;33:11
**identify (1)**
  33:6
**ignored (1)**
  49:20
**ignoring (1)**
  31:22
**immediately (2)**
  23:22;24:4
**impressed (1)**
  54:2
**inattentive (1)**
  36:11
**incarcerated (4)**
  25:14;26:18;27:1;
  45:7
**incarceration (1)**
  26:24
**incessant (1)**
  21:2
**incident (1)**
  8:14
**including (1)**
  34:11
**increased (3)**
  36:6,9,22
**incurred (5)**
  35:8,10;36:6,10;
  49:23
**independent (2)**
  10:4,5
**indicate (4)**
  23:12;25:4;26:17;
  39:15
**indicated (6)**
  10:9;20:13;25:17;
  27:2;30:23,24
**indicates (2)**
  25:12;34:10
**inform (1)**
  28:21
**initiate (1)**
  23:4
**initiated (3)**
  9:1;21:18;41:3
**injury (2)**
  36:7,9
**injury's (1)**
  36:21
**insufficient (2)**
  47:25;50:21
**Interrogatories (1)**
  43:22
**Interrogatory (2)**
  44:20,22
**intimidated (1)**
  25:13
**intimidating (1)**
  45:6
**into (3)**

Case: 3:19-cv-00036-jdp   Document #: 19-1   Filed: 12/13/19   Page 63 of 67

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

13:25;14:16;37:20
**introduced (1)**
  13:17
**invaded (1)**
  34:16
**invasion (1)**
  34:12
**involved (1)**
  9:12
**irritated (8)**
  19:22;24:6,7;31:7,
  8,9,20,24
**irritation (2)**
  31:17;34:25

**J**

**jail (3)**
  26:21,22;27:5
**January (6)**
  15:21,22;16:1,5;
  20:22;44:17
**jive (1)**
  41:5
**job (4)**
  22:1;28:8;46:12;
  53:10
**join (1)**
  10:14
**joined (1)**
  10:12
**July (1)**
  53:11

**K**

**keep (2)**
  18:24;19:2
**kept (1)**
  47:14
**kick (1)**
  5:13
**kids (1)**
  35:3
**kind (3)**
  5:1;38:25;49:23
**knew (2)**
  48:20;49:14
**knows (1)**
  5:2

**L**

**Lake (2)**
  10:23,24
**landline (1)**
  14:18,19,24
**landlines (1)**
  14:15
**last (5)**
  12:15,20;15:3,19;
  44:14
**late (3)**

39:20,24;53:2
**later (1)**
  52:16
**law (3)**
  4:7;13:3;20:2
**lawsuit (13)**
  4:9,13;8:24;9:1,14,
  23;10:16;19:14;20:1;
  41:3;44:12,16;55:25
**lawyer (1)**
  19:6
**lawyers (1)**
  41:9
**learn (1)**
  28:18
**leased (1)**
  9:24
**least (5)**
  22:22,24;25:12,24;
  28:10
**Leather (4)**
  6:8,14,15,16
**left (1)**
  16:20
**legal (1)**
  42:12
**less (2)**
  17:2;22:17
**life (3)**
  7:18;38:4;46:11
**likewise (2)**
  5:9,15
**limited (1)**
  34:12
**Lincoln (1)**
  8:21
**Lippes (1)**
  4:7
**listen (2)**
  12:4;47:9
**listening (3)**
  32:9,17,21
**litigation (10)**
  11:1;25:13,19;
  26:13;27:8,10,20,23;
  45:6,10
**LITTLE (29)**
  4:5,7;12:18;20:5,8,
  12;39:12,14;41:23;
  42:4,16;43:9,10,16,
  19,24;46:9;47:18;
  51:7;53:1,14,18,23;
  55:13,17,18,21;56:2,
  6
**live (2)**
  11:13;36:19
**lived (2)**
  6:5,20
**LLC (2)**
  13:5,8
**loads (1)**
  37:9
**long (8)**

5:5;6:5,11,20;14:6,
  8;24:11;30:12
**longer (2)**
  7:11;14:18
**look (1)**
  46:21
**looking (5)**
  7:22;19:25;28:22;
  30:20,25
**lose (2)**
  37:20,22
**loses (1)**
  37:6
**losing (1)**
  52:8
**loss (2)**
  37:1;51:14
**lost (1)**
  37:17
**lower (1)**
  17:23

**M**

**maintenance (1)**
  51:12
**makes (2)**
  5:24;36:5
**making (1)**
  43:3
**man (3)**
  21:24;28:6,7
**manager (1)**
  22:2
**man's (1)**
  28:8
**many (5)**
  9:4;11:10;16:3;
  21:5;37:8
**marked (5)**
  20:4,6;43:15,17;
  44:19
**married (2)**
  11:4,6
**materials (1)**
  11:23
**math (1)**
  52:16
**Mathias (1)**
  4:8
**may (2)**
  5:16;17:16
**maybe (2)**
  22:14;42:25
**mean (6)**
  24:8;35:13;36:11;
  38:5;42:13;46:7
**meaning (8)**
  13:16;19:10;24:8;
  36:23;44:11;46:19;
  47:18;51:8
**medical (1)**
  38:25

**medicine (1)**
  55:4
**memory (6)**
  37:5,6,9,16,20,22
**mental (2)**
  38:16,17
**message (1)**
  31:14
**met (2)**
  13:1,3
**might (1)**
  37:13
**mind (1)**
  33:1
**mine (1)**
  31:13
**minors (1)**
  11:18
**minute (1)**
  42:23
**minutes (4)**
  23:13,18;24:14;
  29:14
**misdemeanor (2)**
  8:6,10
**misdemeanors (1)**
  8:22
**missed (2)**
  23:25;37:10
**missing (1)**
  51:16
**Mister (1)**
  12:15
**Mm-hmm (2)**
  38:12;48:10
**mm-hmms (1)**
  5:1
**mom (3)**
  28:16,25;29:3;
  30:7,10,22;31:21,24;
  32:12;33:20,23;
  35:14;38:15
**Monday (3)**
  29:8,9,12
**monetary (1)**
  55:24
**money (20)**
  10:2;18:19,20,21;
  30:21;31:1,9;34:18;
  38:21;46:19,25;47:1,
  4,24;49:7,9,12,17,21;
  55:6
**Month (3)**
  6:6;37:12;48:9
**monthly (2)**
  18:13,14
**months (1)**
  44:16
**more (10)**
  7:20;17:2;25:25;
  26:5;36:4,14,24;
  37:19;38:21;47:14
**Moreover (1)**

28:10
**morning (8)**
  5:6,18;12:24;
  33:22;38:11;42:5;
  46:1;50:24
**mother (13)**
  11:16,17;15:13;
  19:8,14,22;28:12,19;
  30:16;33:13;34:3,17;
  54:11
**mother's (1)**
  28:14;54:13,19
**mouth (1)**
  17:4
**move (1)**
  42:25
**moved (4)**
  7:16;40:6,10;43:2
**moving (1)**
  45:5
**much (4)**
  7:11;29:2;37:16;
  38:18
**multiple (3)**
  16:18,20;35:2
**multiples (1)**
  34:25
**myself (1)**
  10:15

**N**

**name (10)**
  4:6;7:12;11:20;
  12:15,20;13:19;18:1;
  28:3,14;40:15
**Nate (4)**
  12:15,19;42:20;
  56:3
**need (4)**
  4:15;21:19;43:12;
  46:6
**needed (2)**
  55:5,10
**never-ending (1)**
  36:8
**new (1)**
  7:22
**nine (1)**
  14:9
**nods (1)**
  4:23
**noise (1)**
  43:1
**normally (1)**
  26:21
**northern (1)**
  50:17
**nos (1)**
  5:2
**notes (1)**
  52:20
**November (1)**

Case: 3:19-cv-00036-jdp    Document #: 19-1    Filed: 12/13/19    Page 64 of 67

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

47:15
**number (35)**
14:2,6,8,9,17,20;
15:7,10,11,17;16:6,9;
17:5,6,6,10;20:25;
22:25;29:17,19,20,
24;30:1,2;39:23;
40:1,2,3,5,7,11,13,14;
45:5;54:19
**numbers (4)**
16:16;37:4;54:11,
14

**O**

**oath (1)**
4:3
**Objection (2)**
46:2;51:3
**Objections (1)**
43:21
**obviously (1)**
31:3
**occasion (5)**
25:12,24;26:1,3;
28:11
**occur (1)**
27:16
**occurred (1)**
27:9
**October (1)**
47:15
**off (4)**
26:23;52:3;53:15;
56:6
**off-the-record (1)**
53:13
**old (1)**
5:24
**once (5)**
21:7;22:14;26:4,5;
35:11
**one (35)**
5:14;8:25;9:5;
12:21;13:10;16:21;
17:3,24,25;19:7;
25:12,24;26:1,1,3,12;
27:9,10,16,19;28:10;
34:14;35:22;40:22;
42:20,23;45:12,20;
46:5;47:12;49:1;
52:21;54:1;55:11,18
**only (5)**
15:15;22:7;26:11;
27:15;37:8
**opportunity (1)**
48:5
**Optio (3)**
13:8;14:23;44:23
**order (2)**
52:2;56:8
**others (1)**
34:5

**Otherwise (1)**
4:16
**out (28)**
5:6;9:11,16;10:9,
21;19:23;21:18;
22:12;23:3,14;28:19;
29:4,8,15,25;30:2,5;
31:11,21,24;33:23;
48:8,14,23;49:8,10;
54:25;55:6
**out-of-pocket (1)**
46:19
**outrageous (1)**
21:2
**outstanding (1)**
24:23
**over (7)**
5:11;16:8,9;18:11;
37:6,12;52:20
**overdraw (1)**
47:25
**overdrawn (1)**
48:4
**over-the-counter (1)**
55:3
**overwhelmed (1)**
19:23
**owed (5)**
30:15,21,25;31:8;
34:17
**owes (1)**
28:12
**own (5)**
7:1;10:16;23:4;
45:23;46:16

**P**

**page (8)**
20:25;34:7,8;44:3,
14,14,20;45:5
**paragraph (7)**
21:1,1;22:16;
25:10;28:10;34:7,8
**paraphrasing (1)**
31:4
**part (9)**
10:10;21:15;33:8;
35:16;36:4;41:11,14;
47:9;55:22
**particular (2)**
43:13;44:4
**party (2)**
8:24;11:2
**passed (2)**
29:2;42:24
**pay (3)**
47:7;51:10;52:8
**paying (3)**
10:6,7;36:11
**payment (9)**
18:9,13,14;48:1,3,
7,13,15,16

**payments (3)**
17:19;18:7,18
**pending (3)**
10:19,20,22
**period (2)**
16:4;33:16
**person (5)**
5:14;13:1,3;22:2;
28:3
**personal (5)**
17:6;30:3;36:7,9;
46:11
**phone (74)**
4:22;5:16;13:24;
14:2,11,17,20;15:12;
16:17,19,21;19:20,
23,24;20:9;21:4,6,14,
17;22:18;23:25;24:1;
28:20,21;29:6,22;
30:1,2,3,3,6;31:10,
11,23;32:14;33:6,15;
34:25;35:2,4,6,18,19;
36:8,12,12,15,17,18,
20,24;37:1,3,6,8,20,
22,23;38:1,4,9;39:2,
4,4;40:3,5,14;41:9;
43:2;44:24;54:10,14,
19,21
**pick (1)**
23:24
**picked (1)**
24:1
**picking (1)**
33:2
**pieces (1)**
11:1
**pin (1)**
16:24
**Pinkie (1)**
28:15
**place (3)**
7:23;42:18;43:4
**plaintiff (8)**
9:1,9,22;21:3;
22:17;25:13;34:10;
45:7
**Plaintiff's (3)**
22:16;28:11;43:20
**play (1)**
41:20
**please (3)**
4:16;43:6;49:18
**pled (1)**
8:5
**plus (1)**
26:24
**pocket (1)**
55:7
**point (3)**
25:19;27:24;29:13
**Portage (1)**
38:21
**Portsmouth (1)**

28:17
**position (1)**
23:20
**positive (1)**
22:11
**possible (5)**
27:11,22;39:9;
44:6;55:12
**preparation (5)**
11:24;12:5,8,11;
20:14
**press (2)**
26:15;27:3
**previous (1)**
35:24
**previously (2)**
12:25;46:8
**prior (7)**
6:13;14:6,13;
26:13;27:11,23;
33:13
**prison (1)**
26:22
**privacy (2)**
34:12,16
**Probably (3)**
16:11;17:8,16
**program (1)**
8:18
**pronounce (1)**
12:15
**property (1)**
7:2
**prosecution (2)**
19:16,17
**Protection (1)**
41:5
**provide (2)**
54:10,13
**pull (1)**
48:25
**pulled (2)**
48:25;49:4
**purchase (5)**
17:21;18:3;54:9;
55:6,23
**purchased (1)**
17:20
**purportedly (1)**
26:18
**purposes (1)**
20:7
**pursue (2)**
26:19,20
**put (1)**
17:4

**Q**

**Qualia (43)**
13:11,12;14:24;
15:2,10,16,20;17:12,
17;18:25;19:10;21:6,

16,18,21;23:3,14;
25:1,18,19;26:7;
28:18;31:15,21,25;
32:1,7;33:5,14,15,23;
39:7,15;40:17;41:13;
44:23;47:18,22;
49:16;54:14,18,22;
55:10
**Qualia's (4)**
23:7,12;25:4;31:22
**Quality (10)**
13:14,16,17;17:23;
30:9,10,14,23;31:14,
15
**quantify (1)**
37:16
**quick (1)**
39:11
**quicker (1)**
38:6
**quickly (2)**
5:7;44:19
**quote (1)**
31:3

**R**

**reach (3)**
21:18;23:3;31:24
**reached (8)**
10:9;23:14;28:19;
29:4,8,14;31:21;
33:23
**read (1)**
25:15
**reads (1)**
21:1
**real (1)**
39:10
**really (1)**
42:11
**reason (4)**
4:15;17:15;23:15;
26:11
**recall (37)**
8:23;11:3;14:17,
19;16:22;18:12;
20:21,23;21:7,15,25;
22:7;23:6;24:20;
25:3,7,8,23;26:3,12;
27:13;28:7;29:25;
30:12;32:25;33:17;
34:20;39:18;40:18;
41:11;44:2,5,18;
52:19;54:12;55:9,11
**receive (1)**
14:22
**received (22)**
15:9,12,16,20;16:4,
17,19;22:17,22;
28:20,21,24;29:3,6,7,
12,18,23;30:1,7;
38:15,15

Case: 3:19-cv-00036-jdp   Document #: 19-1   Filed: 12/13/19   Page 65 of 67

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

**receiving (2)**
15:1;33:13
**recent (4)**
7:17;9:7,10,10
**Recess (3)**
39:13;52:24;53:17
**recollection (5)**
28:1;34:1;41:6;
44:8;45:2
**record (12)**
19:2;23:16;25:6;
42:2,5,9,15,15;45:14;
53:15,19;56:7
**recordings (2)**
12:5;18:24
**records (5)**
23:7,12;25:4;
40:19;41:1
**Redline (1)**
53:7
**reflect (1)**
23:7
**related (3)**
8:12;34:23;55:10
**relayed (1)**
31:13
**relevant (1)**
7:13
**remember (14)**
18:9,11;21:5,21;
24:5,10,11,12,13;
26:12;30:22;31:12,
12;33:19
**remembered (1)**
31:17
**remind (1)**
4:25
**remove (1)**
10:15
**rent (1)**
7:4
**repeated (1)**
4:15
**reporter (5)**
4:23;42:22;43:3;
45:15;53:16
**represent (1)**
4:8
**representation (1)**
19:6
**requested (1)**
22:5
**reside (7)**
6:1,7,11,17;7:6,11;
28:16
**resolution (1)**
23:5
**resolve (4)**
23:15;24:22;25:2,5
**respond (2)**
32:22,23
**response (1)**
24:19

**responses (1)**
4:21
**responsibilities (1)**
46:14
**restroom (1)**
39:10
**result (8)**
21:17;34:11;38:14;
39:1;45:25;49:23;
50:25;55:24
**resulting (1)**
36:7
**return (1)**
33:3
**returned (1)**
23:25
**review (1)**
20:16
**reviewed (3)**
11:23;20:13;41:1
**rid (1)**
40:8
**ridiculous (1)**
35:7
**RIGBY (8)**
4:1,6;11:21;40:16;
42:7,12;46:3;53:20
**right (9)**
24:4,14,15;31:6;
36:1;42:10;52:23;
53:21;54:4
**Ripco (4)**
50:10,10,12,18
**R-I-P-C-O (1)**
50:12
**risk (3)**
36:6,9,14
**Road (2)**
6:18,18
**role (1)**
28:8
**run (1)**
8:13

**S**

**Salt (2)**
10:23,24
**same (7)**
26:14;27:9,10;
29:5;38:2;45:5;53:3
**saw (1)**
20:19
**saying (5)**
17:1;33:2;45:18;
48:6,7
**scheduled (2)**
48:7,13
**second (6)**
5:16;19:8;35:16;
42:20;48:19;52:22
**seeing (1)**
44:18

**sending (1)**
10:21
**sense (1)**
36:5
**separate (1)**
10:16
**September (4)**
15:3,5;16:1,4
**series (1)**
4:12
**Services (18)**
13:11,12,15,18;
14:23,24;15:2,10;
18:25;30:9,11,15,24;
31:14;33:5;36:22;
39:7;44:23
**set (1)**
56:3
**setting (1)**
25:8
**settle (2)**
13:13;28:22
**settled (2)**
9:11;10:20
**several (1)**
44:16
**shape (1)**
10:1
**shorting (1)**
10:1
**shoulder (1)**
4:23
**show (2)**
20:6;43:17
**shows (1)**
44:14
**shrugs (1)**
4:23
**sign (1)**
44:3
**similar (1)**
45:18
**single (3)**
34:2;35:1;45:8
**sister's (2)**
40:14,15
**sit (3)**
17:7;22:6;52:2
**situation (2)**
5:18;42:10
**slip (1)**
5:1
**slows (2)**
37:22,24
**Solutions (2)**
13:8;14:23
**someone (6)**
9:2;10:9;29:9;
33:1;39:16,19
**Sometime (2)**
21:9;45:2
**somewhat (2)**
7:17;10:3

**somewhere (2)**
23:10;46:22
**sorry (4)**
35:16;41:19;42:20;
43:1
**sought (1)**
38:24
**sound (1)**
23:9
**South (3)**
6:4;7:1;11:14
**space (1)**
38:8
**speak (6)**
4:16;5:14;12:11,
22;24:16;33:14
**speaks (2)**
36:23;42:3
**specific (6)**
20:24;28:1;44:7;
45:1,21;49:4
**specifically (5)**
24:17;26:25;39:3,
6;45:12
**spoke (9)**
12:24;13:22;21:21;
24:12;30:22;40:17;
47:23;54:15,16
**Sprint (1)**
14:11
**stable (1)**
47:8
**start (2)**
15:1;53:10
**started (7)**
9:24;37:11;41:3;
44:11,16;46:24;
47:11
**stating (1)**
25:14
**still (11)**
8:2;14:19;32:14,
15;36:1,13;41:20;
47:4;48:2;49:3,21
**stipulate (2)**
42:8,13
**stipulation (3)**
42:18;43:4,8
**stop (21)**
21:3,6,12,13,14,19;
22:8,18,21;23:2,8,21;
24:13,18;31:25;
33:13;44:24;46:25;
47:11,23;48:1
**stopped (1)**
24:3
**storage (2)**
37:3;38:8
**store (2)**
17:22,24
**Street (1)**
6:14
**stress (6)**

**34:25;38:17,25;
39:5;46:5,10
stressed (4)**
19:23;22:12;54:23,
25
**strike (3)**
14:6;39:22;50:7
**stuff (1)**
4:24
**subject (2)**
28:12;55:16
**submitted (1)**
20:18
**subpoenaed (1)**
40:20
**substance (1)**
26:8
**sue (5)**
25:20,25;26:8,10,
15
**sued (1)**
9:2
**suffered (7)**
34:10,15;38:13;
39:1;45:24;46:18;
50:24
**sum (1)**
26:8
**supervisor (7)**
22:3,4,5;24:2,12,
16,21
**supervisor's (1)**
24:19
**Supplemental (1)**
43:20
**supposed (4)**
18:13,14;49:7,7
**sure (12)**
17:3,3;27:7,18;
31:16;37:15;38:23;
42:6;43:3;45:19;
48:6,21
**sworn (1)**
4:3

**T**

**Tabitha (2)**
40:16,17
**table (1)**
5:13
**talk (3)**
5:1,12;36:15
**talked (6)**
11:2;27:22;33:18;
38:10;45:25;50:23
**talking (5)**
5:11;9:8;27:24;
36:17;45:8
**TCPA (5)**
41:16,25;42:14,18;
43:4
**Teddy (3)**

Case: 3:19-cv-00036-jdp   Document #: 19-1   Filed: 12/13/19   Page 66 of 67

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

12:20,23;13:1
**telephone (29)**
  14:10,22;15:1,9,16,
  19;16:3;18:24;22:23;
  23:13;27:23;28:24;
  29:3,18,24;34:22;
  36:22;38:14;39:15,
  23;40:1,2;41:4;45:9,
  9,25;50:25;51:2;53:2
**Ten (1)**
  6:21
**terms (1)**
  18:9
**Terrace (2)**
  51:21,22
**testified (2)**
  4:3;54:21
**testimony (11)**
  11:24;12:5,9,12;
  16:23;20:14;27:18;
  32:5,11;33:22;44:25
**theft (1)**
  26:21
**thinking (1)**
  22:12
**Thirty-one (1)**
  5:25
**though (2)**
  22:6;47:10
**thought (5)**
  41:15;46:4,16;
  48:22;49:9
**threat (5)**
  27:7,8,15;35:19;
  45:10
**threaten (1)**
  25:19
**threatened (15)**
  19:15,17,21;25:13,
  18,25;26:10,13,14,
  18;27:13,19,20;28:3;
  45:6
**threatening (2)**
  19:9;26:24
**three (1)**
  16:17
**times (8)**
  9:4;16:18;18:23;
  21:5;44:22;47:11;
  52:13,14
**tired (1)**
  19:17
**title (2)**
  22:1;28:8
**today (21)**
  4:13;5:24;11:24;
  12:6,9,12;20:14,17;
  22:6;37:12;44:25;
  45:1;51:11,15,16;
  52:3,8,12;54:16,21;
  55:22
**together (1)**
  7:17

**told (8)**
  8:7,8;24:17;30:11;
  31:8,9;40:25;48:24
**Tomahawk (11)**
  6:2,4,9,19,20;7:1;
  8:2;11:13,14;40:10;
  51:23
**took (1)**
  55:9
**total (1)**
  46:21
**toward (3)**
  15:21;23:10;39:6
**towards (1)**
  9:14
**Transportation (1)**
  53:7
**treatment (1)**
  38:25
**triggered (2)**
  19:5,18
**trip (1)**
  36:16
**truck (2)**
  9:24,25
**trucking (3)**
  9:14,19;53:8
**true (1)**
  18:6
**try (8)**
  5:2,6,7,10,13;
  12:21;13:13;50:9
**trying (4)**
  16:24;29:25;50:6;
  52:10
**turn (1)**
  34:7
**Turning (1)**
  25:10
**turns (1)**
  49:10
**twice (1)**
  22:14
**two (5)**
  5:17;11:17;16:19;
  19:7;47:14
**type (1)**
  9:13

**U**

**uh-huhs (1)**
  5:2
**under (1)**
  5:13
**underlying (1)**
  17:12
**understood (2)**
  4:17;47:10
**undue (1)**
  46:5
**union (2)**
  50:15,17

**universal (1)**
  15:25
**unless (1)**
  46:21
**up (28)**
  4:16;5:1;9:25;
  16:12;20:17;23:19,
  24;24:1,2,15;25:8;
  32:4,10,18,22;33:2,
  11;37:3,23,24;39:4,6,
  16,19;41:12;47:15;
  49:6,14
**upset (2)**
  30:5,17
**use (6)**
  14:21;36:22;37:7,
  23;38:7;39:10
**used (4)**
  14:13;39:23;40:7,
  11
**uses (1)**
  39:22
**using (3)**
  40:2,3;50:8
**Utah (2)**
  10:23,24

**V**

**vacation (1)**
  52:6
**vacuum (3)**
  5:20;42:21,24
**vehicle (1)**
  51:12
**verbal (2)**
  4:20,25
**verification (1)**
  44:3
**verify (1)**
  32:4
**Verizon (2)**
  14:13,14
**version (1)**
  56:9
**versus (1)**
  33:25
**videos (1)**
  12:8
**violation (1)**
  41:4
**Virginia (1)**
  28:17
**Volheim (23)**
  4:22;5:15;12:16,
  19,22;13:1;20:8,11;
  41:23;42:2,8;43:7,19,
  23;46:2;51:3;53:23,
  25;54:6,8;55:15;
  56:4,8
**voluntarily (1)**
  10:15

**W**

**W6095 (1)**
  6:18
**W-A-D-D-E-L (1)**
  6:18
**Wadell (1)**
  6:18
**waiting (1)**
  5:12
**watch (1)**
  12:8
**Wausau (1)**
  17:22
**way (8)**
  10:1;17:17;26:1,
  23;29:9;38:19;40:22;
  47:1
**ways (1)**
  34:19
**week (1)**
  35:2
**weren't (2)**
  7:16;10:6
**West (5)**
  6:8,13,14,15,16
**Western (1)**
  4:10
**Wexler (1)**
  4:8
**What's (6)**
  5:22;6:3;19:5;
  20:6;29:23;43:17
**whole (1)**
  51:5
**Wisconsin (10)**
  4:11;6:2,19,22;
  8:16;17:22;40:6,10;
  50:17;51:24
**withdraw (10)**
  18:19,21,22;47:2,
  9;49:12,15,18;50:6,9
**withdrawing (3)**
  46:25;47:11,23
**withdrawn (7)**
  18:15;41:9;42:1,
  14,19;43:5,11
**withdrew (4)**
  47:5,13;48:2;49:21
**within (5)**
  23:17;24:13;35:1,
  1,2
**without (1)**
  56:9
**witness (8)**
  4:2;39:9;46:4;
  51:5;53:12,21;54:5;
  55:14
**woman (2)**
  21:24;28:6
**Wood (1)**
  28:15

**words (4)**
  17:4;26:22;45:23;
  46:16
**work (8)**
  5:17;29:22;30:6;
  31:10,11;35:3;51:16;
  52:4
**worked (1)**
  52:12
**working (1)**
  51:20
**worry (1)**
  46:6
**written (1)**
  20:17
**wrong (1)**
  13:19

**Y**

**year (4)**
  6:12;15:3;18:11;
  53:11
**years (2)**
  6:21;14:9
**Yep (2)**
  15:6;50:13
**yielded (1)**
  27:4

**1**

**1 (4)**
  20:4,7,9;25:10
**10 (3)**
  29:14;37:11;44:20
**10:15 (1)**
  56:10
**100 (3)**
  16:8,9,10
**11 (1)**
  45:5
**12/23/1987 (1)**
  5:23
**12th (1)**
  23:8
**14 (1)**
  52:13
**150 (4)**
  16:10,11,14;17:1
**16th (1)**
  20:22
**17 (1)**
  21:1
**18 (6)**
  16:4;22:16,22;
  32:1;45:3;53:2
**18th (1)**
  44:15
**19 (3)**
  16:5;25:10;53:3
**1st (2)**
  48:8,15

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

**2**

**2 (6)**
43:15,18,20;44:1;
45:13,17
**20 (6)**
22:17,22,25;23:13,
18;28:10
**200 (3)**
16:12,15;17:8
**2009 (1)**
40:8
**2010 (2)**
40:8,9
**2018 (11)**
13:24;14:16;15:5;
16:1;21:10;23:3,8;
33:25;39:20,24;
47:16
**2019 (10)**
13:25;14:16;15:23;
16:1;20:23;33:25;
39:20,24;44:15;
53:11
**23 (1)**
34:8
**277-1467 (2)**
39:24;40:1

**3**

**3 (1)**
20:25
**319 (2)**
29:19,20

**4**

**4 (2)**
34:7,8
**423 (2)**
6:8,13
**4260 (3)**
15:7,11,17

**6**

**6 (2)**
29:14;44:20
**642-3875 (1)**
40:13

**7**

**715 (1)**
14:5
**757 (3)**
39:24;40:1,13
**757-319 (1)**
29:21

**8**

**8 (3)**
44:14;52:13,14

**9**

**9 (1)**
37:13
**9.8 (1)**
37:13
**904 (2)**
6:4;7:1
**966-4260 (1)**
14:3