**In The Matter Of:**

*Erik D. Rigby vs.*
*Crosscheck Solutions, LLC, et al.*

---

*Deposition of Erick Rigby*
*October 18, 2019*

---

Case: 3:19-cv-00036-jdp   Document #: 24   Filed: 12/16/19   Page 2 of 24

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 1

```
1              UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF WISCONSIN
                    MADISON DIVISION
3  = = = = = = = = = = = = = = = = = = = = = = = =
4    ERICK D. RIGBY,
5                         Plaintiff,
6       -vs-          Case No. 3:19-cv-00036
7    CROSSCHECK SERVICES, LLC d/b/a
     OPTIO SOLUTIONS, LLC d/b/a
8    QUALIA COLLECTION SERVICES,
9                         Defendant.
10 = = = = = = = = = = = = = = = = = = = = = = = =
11
12               Deposition of:
13                 ERICK RIGBY
14            Portage, Wisconsin
                October 18, 2019
15
16       Reported by:  Paula Wondra
17
18
19
20
21
22
23
24
25
```

Page 2

```
1        DEPOSITION of ERICK RIGBY, called as a witness,
2  taken at the instance of the Defendant, under the
3  provisions of Chapter 804 of the Wisconsin Statutes,
4  pursuant to Notice, before Paula Wondra, a Notary
5  Public in and for the State of Wisconsin, at
6  Comfort Suites Wisconsin Dells Area, N5780 Kinney
7  Road, City of Portage, and State of Wisconsin, on the
8  18th day of October, 2019, commencing at 9:06 a.m.
9
10            A P P E A R A N C E S
11
12 NATHAN C. VOLHEIM, Attorney,
   ATLAS CONSUMER LAW
13    2500 South Highland Avenue, Suite 200, Lombard,
      Illinois 60148, appearing via telephone on behalf of
14    the Plaintiff.
         Nvolheim@sulaimanlaw.com    312-313-1613
15
16 BRENDAN H. LITTLE, Attorney,
   LIPPES MATHIAS WEXLER FRIEDMAN, LLP
17    50 Fountain Plaza, Suite 1700, Buffalo, New York
      14202, appearing on behalf of the Defendant.
18       Blittle@lippes.com      716-853-5100
19
20
21
22
23
24
25
```

Page 3

```
1                  I N D E X
2
3  WITNESS                              Page(s)
4    ERICK RIGBY
5      EXAMINATION BY MR. LITTLE              4
6      EXAMINATION BY MR. VOLHEIM            54
7      FURTHER EXAMINATION BY MR. LITTLE     55
8
9               E X H I B I T S
10   No.       Description               Page
11   Exh 1     Complaint                   20
12   Exh 2     Plaintiff's Amended         43
               Supplemental Answer and
13             Objections to Defendant's
               Interrogatories
14
15             (Exhibits retained by Mr. Little)
16 (Original transcript filed with Mr. Little and copies
17            provided to both counsel)
18
19
20
21
22
23
24
25
```

Page 4

```
1            ERICK RIGBY,
2     called as a witness, being first duly
3     sworn, testified on oath, as follows:
4            EXAMINATION
5  BY MR. LITTLE:
6  Q  Good afternoon, Mr. Rigby.  My name is
7     Brendan Little.  I'm with the law firm of Lippes
8     Mathias Wexler Friedman in Buffalo.  I represent
9     the defendants in a lawsuit that you commenced in
10    the U.S. District Court for the Western District
11    of Wisconsin.
12        I'm going to ask you a series of questions
13    today about the lawsuit.  If at any time you don't
14    understand my question, didn't hear my question,
15    or need the question repeated for any reason,
16    please speak up and ask me to do so.  Otherwise
17    I'm going to assume you've understood the question
18    as asked.  Is that fair?
19 A  Yes.
20 Q  Okay.  I also ask you to continue to give verbal
21    responses to my questions.  Your attorney,
22    Mr. Volheim, is on the phone; so he can't see head
23    nods and shoulder shrugs.  And our court reporter
24    can't take that stuff down, so we've got to have
25    verbal communication.  So I'll remind you if you
```

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 5

1 slip up.  I -- we kind of talk mm-hmms and
2 uh-huhs, and try -- but yes, nos, I don't knows,
3 etcetera, okay?
4 A  Yes.
5 Q  And finally, I don't expect this to be too long
6 this morning.  I'm going to try to get you out of
7 here as quickly as I can.  But try to let me
8 finish my question first before you give your
9 answer.  And likewise, when you're giving your
10 answer, I'm not going to try to ask another
11 question so we're not talking over each other.  I
12 talk fast enough already, so I'm waiting for her
13 to kick me under the table; but try to let
14 one person speak at a time.
15      And likewise, if Mr. Volheim is going to say
16 something from the phone, there may be a second or
17 two delay; so we're going to have to work with the
18 situation that we have this morning.
19 A  I understand.
20 Q  And I apologize for the vacuum cleaner.  It's an
21 added effect here in the hotel.
22      What's your date of birth?
23 A  ██/1987.
24 Q  That makes you how old today?
25 A  Thirty-one.

Page 6

1 Q  And where do you currently reside?
2 A  Tomahawk, Wisconsin.
3 Q  What's the address?
4 A  904 South Tomahawk Avenue.
5 Q  How long have you lived there?
6 A  Month and a half.
7 Q  And where did you reside before that?
8 A  423 West Leather Avenue.
9 Q  Is that also in Tomahawk?
10 A  Yes.
11 Q  And how long did you reside there?
12 A  A year.
13 Q  And prior to the 423 West -- what did you say?
14      West Leather Street?
15 A  West Leather Avenue.
16 Q  West Leather Avenue.
17      Where did you reside before --
18 A  W6095 Wadell Road, W-A-D-D-E-L [sic], Road,
19 Tomahawk, Wisconsin.
20 Q  How long have you lived in Tomahawk?
21 A  Ten years.
22 Q  Were you born in Wisconsin?
23 A  No.
24 Q  Where were you born?
25 A  Humboldt County, California.

Page 7

1 Q  The 904 South Tomahawk address, do you own that
2 property?
3 A  No.
4 Q  Do you rent it?
5 A  Yes.
6 Q  Do you reside there with anyone?
7 A  Yes.
8 Q  Who is that?
9 A  My ex-girlfriend.
10 Q  Okay.
11 A  I am not going to reside there too much longer.
12 Q  Okay.  What is her name?
13 A  Is that relevant?
14 Q  It is.
15 A  Okay.  Amanda Graeber, G-R-A-E-B-E-R.
16 Q  I assume you weren't exes when you moved in
17 together, and this is somewhat of a recent
18 development in your life?
19 A  Yes.
20 Q  I don't want any more details.
21 A  I appreciate it.
22 Q  Do you have -- are you actively looking for a new
23 place or --
24 A  Yes.
25 Q  Okay.  So you haven't identified where you're

Page 8

1 going?
2 A  No.  It'll still be in Tomahawk.
3 Q  Okay.  Have you ever given a deposition before?
4 A  No.
5 Q  Have you ever been convicted or pled guilty to a
6 misdemeanor or a felony?
7 A  The honest answer is yes.  The answer I was told
8 to give is no, and the answer I was told to give
9 was by the courts because I'm in a deferment.
10 Q  And is it a felony or a misdemeanor?
11 A  Felony.
12 Q  And what is it related to?
13 A  Hit and run.
14 Q  Was it an alcohol-related incident?
15 A  No.
16 Q  Was it here in Wisconsin?
17 A  Yes.
18 Q  And you're actively in the deferment program?
19 A  Yes.
20 Q  Which county?
21 A  Lincoln.
22 Q  Any other misdemeanors or felonies?
23 A  Not that I recall.
24 Q  Okay.  Have you ever been a party to a lawsuit
25 before, other than this one, whether you were the

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

---

Page 9

1  plaintiff and initiated the lawsuit or you were a
2  defendant and someone sued you?
3  A  Yes.
4  Q  And how many times?
5  A  As far as I know, one.
6  Q  Okay.
7  A  And this is a recent development for me as well.
8  Q  Okay.  Is this -- you're talking --
9  A  I am a plaintiff I believe it is.
10  Q  Okay.  And when you say "recent," how recent?
11  A  I found out just before the case was settled that
12     I was involved in it.
13  Q  Okay.  What type of case was it?
14  A  It was a lawsuit towards C.R. England trucking
15     company.
16  Q  And when you say you found out, was it a class
17     action?
18  A  It was a class action.
19  Q  What were the -- and C.R. England is a trucking
20     company?
21  A  Yes.
22  Q  And tell me, why were you a plaintiff to that
23     lawsuit?
24  A  Because when I started driving truck, I leased a
25     truck from C.R. England; and it came up that they

---

Page 10

1  were in some way, shape, or form shorting us
2  money.
3  Q  So it has somewhat to do with your employment, if
4     you will?  Are you an independent contractor?
5  A  I was an independent contractor.  They were --
6     they weren't paying what they should have been
7     paying, and then they were charging us where they
8     shouldn't have been charging us.
9  Q  So someone reached out to you and indicated that
10     you could be a part of the class action?
11  A  Correct.
12  Q  And you joined that class action?
13  A  I was -- I was automatically in it.  I didn't even
14     have to ask to join or -- they said I could
15     voluntarily remove myself if I wanted to file my
16     own separate lawsuit.
17  Q  But you did not do so?
18  A  I did not do so.
19  Q  Do you know where the case is pending?
20  A  It's not pending anymore.  It settled, and they're
21     sending out checks.
22  Q  Do you know where it was pending?
23  A  I believe it was in Salt Lake City, Utah.  It was
24     either Salt Lake City, Utah, or it was in
25     California.  Fontana, I believe.

---

Page 11

1  Q  Any other pieces of litigation that you've been a
2     party to other than what we talked about already?
3  A  Not that I recall.
4  Q  Are you married, sir?
5  A  No.
6  Q  Have you ever been married?
7  A  No.
8  Q  Do you have any children?
9  A  Yes.
10  Q  How many?
11  A  Four.
12  Q  And where -- I don't want --
13  A  They all live in Tomahawk with me.
14  Q  Okay.  At the South Tomahawk address?
15  A  Correct.
16  Q  Is Amanda their mother?
17  A  Amanda is the mother of two of them.
18  Q  And they're all minors, I assume?
19  A  Yes.
20  Q  Have you ever gone by any other name other than
21     Erick Rigby?
22  A  No.
23  Q  Have you reviewed any documents or other materials
24     in preparation for your testimony today?
25  A  The complaint.

---

Page 12

1  Q  Anything else?
2  A  The address on how to get here.
3  Q  Okay.  Me too.
4     Have you -- did you listen to any audio
5     recordings in preparation for your testimony
6     today?
7  A  No.
8  Q  Did you watch any videos in preparation for your
9     testimony today?
10  A  No.
11  Q  Did you speak with anyone in preparation for your
12     testimony today?
13  A  My attorney.
14  Q  And who is that?
15  A  Mister -- I can't pronounce his last name.  Nate.
16        MR. VOLHEIM:  That's okay.  That's
17     okay.
18  BY MR. LITTLE:
19  Q  Nate Volheim?
20  A  Yes.  And Teddy -- I forgot his last name.
21  Q  I won't try that one.
22     And when did you speak with Mr. Volheim and
23     Teddy?
24  A  I spoke with both of them this morning as well as
25     previously.

---

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 13

1  Q  Have you ever met Mr. Volheim or Teddy in person?
2  A  No.
3  Q  Have you met anyone from their law firm in person?
4  A  No.
5  Q  Who is Crosscheck, LLC, if you know?
6  A  I don't know who they are.  They are a creditor is
7     all I know.
8  Q  What about Optio Solutions, LLC?  Do you know who
9     they are or it is?
10 A  I've never heard that one.
11 Q  Okay.  Qualia Collection Services?
12 A  Qualia Collection Services is the company that has
13    been calling me to try to settle a debt; but when
14    they called me, it was Quality Collection
15    Services.
16 Q  When you say "it was Quality," meaning --
17 A  They introduced themselves as Quality Collection
18    Services.
19 Q  So they gave you the wrong name is what you're
20    contending?
21 A  Yes.
22 Q  Okay.  And that was each time you spoke to them?
23 A  Yes.
24 Q  Did you have a cell phone back in fall of 2018 and
25    into early 2019?

Page 14

1  A  Yes.
2  Q  And what was that cell phone number?
3  A  966-4260.
4  Q  And the area code?
5  A  715.
6  Q  How long had you had that number prior -- strike
7     that.  Bad question.
8        How long had you had that number?
9  A  I've had that number for nine years.
10 Q  And who was the carrier for that telephone?
11 A  At the time of these phone calls, it was Sprint.
12 Q  Has that since changed?
13 A  Yes.  And it used to be Verizon prior to that, so
14    it's back to Verizon now.
15 Q  Did you have any landlines back in the fall of
16    2018 and into 2019?
17 A  I did.  I do not recall the phone number.
18 Q  You no longer have the landline?
19 A  I still have the landline.  I don't recall the
20    phone number.  It is at the house for a babysitter
21    or my children to use to call.
22 Q  Did you receive any telephone calls from
23    Crosscheck Services or Optio Solutions or
24    Qualia Collection Services on the landline?
25 A  Not that I know of.

Page 15

1  Q  When did you start receiving telephone calls from
2     Qualia Collection Services?
3  A  As early as September of last year, I believe it
4     was.
5  Q  So September 2018?
6  A  Yep.
7  Q  And those were on the 4260 number?
8  A  Yes.
9  Q  Have you ever received any telephone calls from
10    Qualia Collection Services on any number other
11    than the 4260 number?
12 A  I have not received a phone call from them.  My
13    mother did.
14 Q  Okay.  We'll get there.
15       So just so we're clear, the only time you
16    received telephone calls from Qualia was at the
17    number ending in 4260?
18 A  Correct.
19 Q  And when was the last telephone call that you
20    received from Qualia?
21 A  I believe in January, toward the beginning of
22    January.
23 Q  2019?
24 A  Yes.
25 Q  So the universal calls, is it fair to say, are

Page 16

1     from September of 2018 to January of 2019?
2  A  Yes.
3  Q  And do you know how many telephone calls that you
4     received in that time period, September of '18 to
5     January of '19?
6  A  I cannot give you an exact number.
7  Q  Can you estimate for me?
8  A  I would say well over 100.
9  Q  And that number well over 100, would it be closer
10    to 100 or closer to 150?
11 A  Probably closer to 150.
12 Q  Do you think they got up to 200 calls?
13 A  Could have.
14 Q  So it's fair to say it's about 150, and it could
15    be as high as 200?
16 A  My numbers are guesstimates, and I can tell you
17    that I received between three and four phone calls
18    a day multiple times.  And then there was other
19    days that I received two phone calls, and they
20    left me alone then.  But it was multiple.  It was
21    never just one phone call in a day that I can
22    recall.
23 Q  So I understand that your testimony is it's an
24    estimate, but I'm just trying to pin down that
25    estimate, you know.  So I think what I'm hearing

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

---

Page 17

1   you are saying is that it's around 150, could be
2   more, could be less?
3   A   Sure.  I'll say sure to that one.
4   Q   Yeah, I don't want to put words in your mouth.
5   A   I understand.  I cannot give you a number.  My
6       estimated number is my personal estimated number.
7       If I had to sit here and say it, I would say it's
8       probably closer to 200.
9   Q   Okay.
10  A   That's the number I would have to give you.
11  Q   Okay.  Fair enough.
12      What was the underlying debt that Qualia was
13      attempting to collect, if you know?
14  A   I guess I don't understand the question.  What was
15      the reason that they were collecting a debt?
16  Q   That probably would be -- well, may be a better
17      question.  Let me ask it this way.  Why was Qualia
18      Collection calling you, if you know?
19  A   Because I fell behind on payments for furniture
20      that I purchased.
21  Q   And where did you purchase the furniture?
22  A   Ashley Furniture store in Wausau, Wisconsin.  I
23      believe it was Ashley -- it was a lower quality.
24      The one store which is Ashley Furniture, and then
25      it was the discounted one.  I don't know how to

Page 18

1       explain what the name of it was, but it was
2       through Ashley Furniture.
3   Q   Okay.  And what did you purchase that furniture
4       for?  Your home?
5   A   My home, yes.
6   Q   Is there any -- is it, in fact, true that you did
7       fall behind on the payments?
8   A   Yes.
9   Q   Do you remember what the payment terms or
10      arrangements were?
11  A   Being well over a year, no, I cannot remember
12      them.  I do not recall them.
13  Q   Were you supposed to make a monthly payment or --
14  A   Yes.  It was a monthly payment that was supposed
15      to be directly withdrawn from my account.
16  Q   From your checking account?
17  A   Yes.
18  Q   Okay.  And when you fell behind on the payments,
19      is that because they attempted to withdraw money
20      from the checking account and there was no money
21      there to withdraw or not enough money there to
22      withdraw?
23  A   At times, yes.  Yeah.  Go ahead.
24  Q   Did you keep any recordings of the telephone calls
25      that -- with Qualia Collection Services?

Page 19

1   A   No.
2   Q   Did you keep a record or a chart of the calls that
3       were coming in?
4   A   No.
5   Q   What's the event that triggered you to contact
6       your lawyer to get representation?
7   A   Well, it was actually two events.  The first one
8       was them contacting my mother, and the second
9       event was them threatening criminal charges.
10  Q   And just so we're clear, "them" meaning Qualia
11      Collection?
12  A   Correct.
13  Q   And I'm assuming that's why then you commenced a
14      lawsuit because they contacted your mother, and
15      they threatened -- did you say criminal
16      prosecution?
17  A   They threatened criminal prosecution.  I was tired
18      of being harassed.  It -- what finally triggered
19      me to say, okay, I'm done with this, I'm done with
20      the phone calls and everything was the criminal
21      charge that they threatened me with; and then they
22      contacted my mother.  I was already irritated and
23      stressed out and overwhelmed with the phone calls,
24      the excessive phone calls.
25  Q   What are you looking for at the end of this

Page 20

1       lawsuit?
2   A   Whatever the law allows.
3   Q   Have you -- oh, I'll get there.
4       (Exhibit No. 1 marked for identification.)
5   BY MR. LITTLE:
6   Q   Sir, I'm going to show you what's been marked as
7       Exhibit No. 1 for the purposes of this deposition.
8       MR. LITTLE:  Mr. Volheim, because
9       you're on the phone, Exhibit No. 1 is the
10      complaint.
11      MR. VOLHEIM:  Thank you.
12  BY MR. LITTLE:
13  Q   You indicated that you reviewed this document in
14      preparation for your testimony today?
15  A   Yes.
16  Q   When did you review that document?
17  A   Today and when it was first written up and
18      submitted.
19  Q   Okay.  When is the first time you saw this
20      document then, the complaint?
21  A   I don't recall.
22  Q   If the complaint was filed on January 16th of
23      2019, does that help you recall when --
24  A   I can't give you a specific date or time.
25  Q   Actually, if you flip to page number 3 and

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 21

1 paragraph 17, the paragraph reads, "Due to
2 Defendant's incessant calls and outrageous
3 conduct, Plaintiff demanded that it stop calling
4 his cellular phone."
5     Do you remember -- well, how many times did
6 you ask Qualia to stop calling your cell phone?
7 A  I can recall once.
8 Q  And do you know the approximate date when you --
9 A  Sometime in December.
10 Q  Of 2018?
11 A  Yes.
12 Q  And when you asked them to stop calling, did you
13     ask them to stop calling generally; or did you
14     say, stop calling my cell phone?
15 A  That part, I don't recall.
16 Q  When you had that conversation with Qualia, was
17     that as a result of a phone call that was
18     initiated to you; or did you reach out to Qualia
19     and say, hey, I need you to stop the calls?
20 A  They called me.
21 Q  Do you remember who you spoke with at Qualia when
22     you made that directive?
23 A  I do not.
24 Q  Do you know if it was a man or a woman?
25 A  I can't recall.

Page 22

1 Q  Do you know anything about the job title of the
2     person, whether it was a collector or a manager or
3     a supervisor or anything like that?
4 A  I believe it was a supervisor because I believe I
5     requested a supervisor.
6 Q  Okay.  As you sit here today, though, you believe
7     that's the only time that you recall asking the
8     calls to stop?
9 A  I believe -- I -- how do I say that?  I believe
10     I've done it -- I did it another time, but I'm not
11     positive on whether this was just from me being
12     stressed out thinking I had the conversation or
13     actually having the conversation.
14 Q  Okay.  So it was definitely once, but maybe twice?
15 A  Correct.
16 Q  And then paragraph 18 says, "Despite Plaintiff's
17     demand, Plaintiff has received not less than 20
18     phone calls from Defendant since asking it to stop
19     calling."
20 A  Correct.
21 Q  So after you asked the calls to stop in December
22     of '18, you received at least 20 additional
23     telephone calls?
24 A  At least, yes.
25 Q  Could the number be higher than 20?

Page 23

1 A  I can't give you an answer.
2 Q  Okay.  After you asked the calls to stop in
3     December of 2018, did you reach out to Qualia on
4     your own to initiate further conversation about a
5     resolution?
6 A  I don't recall.
7 Q  If Qualia's records reflect that you asked the
8     calls to stop on December 12th of 2018, would that
9     be -- does that date sound accurate to you?
10 A  Yes, somewhere toward the beginning.  It was just
11     before Christmas, so yeah.
12 Q  And if Qualia's records indicate that
13     approximately 20 minutes after that telephone call
14     you then reached out to Qualia in an attempt to
15     resolve the dispute, do you have any reason to
16     dispute that record?
17 A  After I asked them to not call me, within
18     20 minutes, they called me back, I answered, they
19     hung up, so I called them back.
20 Q  So it's your position that you asked the calls to
21     stop, and when that conversation ended, they
22     immediately called you back?
23 A  Correct.
24 Q  You did not pick up the call, and then you
25     returned the phone call after the missed call?

Page 24

1 A  And asked -- no.  I picked up the phone call, they
2     hung up, I called back, asked for a supervisor,
3     and said, hey, I stopped -- I asked you not to
4     call me, and immediately called me right back.
5     That conversation, I do remember to that extent, I
6     should say, because I was very irritated, highly
7     irritated and aggravated at that.
8 Q  What do you mean "to that extent"?  Meaning there
9     were other things that happened, you just don't
10     remember what was said?
11 A  I don't remember how long the conversation was.  I
12     don't remember what supervisor I spoke to.  I
13     remember I asked them to stop calling me.  Within
14     a few minutes, they called me right back; so I
15     called them right back after they hung up on me
16     and asked to speak to a supervisor to discuss why
17     they called me back after I specifically told them
18     to stop calling me.
19 Q  And what was the supervisor's response?
20 A  I can't recall that.
21 Q  Did you -- during that call with the supervisor,
22     did you make arrangements to attempt to resolve
23     the outstanding account?
24 A  No.
25 Q  Did you ever make any -- did you ever have any

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 25

1  conversations with Qualia about an attempt to
2  resolve this account?
3  A  I don't recall.
4  Q  If Qualia's records indicate that there was
5  attempts and there was an agreement to resolve
6  this account, would you dispute that record?
7  A  I don't recall. I don't know how -- I don't
8  recall setting up anything, so I would have to
9  dispute it.
10  Q  Okay. Turning back to Exhibit 1, paragraph 19.
11  A  Okay.
12  Q  It indicates, "On at least one occasion, Defendant
13  threatened litigation and intimidated Plaintiff by
14  stating that he would be incarcerated."
15  Did I read that correctly?
16  A  Yes.
17  Q  Okay. Now, you indicated to me earlier that
18  Qualia threatened criminal charges. Did -- at any
19  point, did Qualia threaten litigation that they
20  were going to sue you?
21  A  Yes.
22  Q  Okay. When was that?
23  A  I don't recall.
24  Q  And the complaint says on at least one occasion,
25  they threatened to sue you. Did it happen on more

Page 26

1  than one occasion, or do you know one way or the
2  other?
3  A  I can recall one occasion.
4  Q  Okay. But you cannot -- so it happened once, but
5  you don't know if it happened more than once?
6  A  Correct.
7  Q  When the -- when Qualia said they were going to
8  sue you, can you give me the sum and substance of
9  the conversation?
10  A  It went with the -- they threatened to sue me and
11  file criminal charges, and that's the only reason
12  I remember that one. That's why I can't recall if
13  they threatened litigation prior or after.
14  Q  So it was in the same call that they threatened to
15  sue you and press criminal charges?
16  A  Correct.
17  Q  Okay. So they didn't indicate that you would be
18  incarcerated; they just threatened purportedly
19  that they were going to pursue criminal charges?
20  A  They were going to pursue criminal charges of
21  theft, which normally would carry jail time so...
22  Q  Okay. But the words prison or jail time --
23  A  The way it came off to me is, yes, they were
24  threatening criminal charges plus incarceration.
25  Did they specifically say I was going to be

Page 27

1  incarcerated? No.
2  Q  Okay. So they indicated there was going to be --
3  they were going to press criminal charges; and
4  from that conversation, you yielded that that
5  could come with jail time?
6  A  Correct.
7  Q  And just to make sure I understand, the threat of
8  litigation and the threat of criminal charges
9  occurred one time in the same conversation?
10  A  One time in the same conversation. Litigation
11  prior, it is very possible that we've had that
12  conversation as well. Before or after. But the
13  time that I can recall is when they threatened me
14  with criminal charges as well.
15  Q  The threat of criminal charges, did that only
16  occur one time?
17  A  Correct.
18  Q  Okay. So to make sure I understand your testimony
19  correctly, during the one time they threatened
20  criminal charges, they also threatened litigation?
21  A  Yes.
22  Q  But it is possible that they also talked about
23  litigation prior to this telephone call that we've
24  been talking about at this point?
25  A  Yes.

Page 28

1  Q  But you don't have a specific recollection?
2  A  Correct.
3  Q  Do you know the name of the person that threatened
4  you with criminal charges?
5  A  I do not.
6  Q  Do you know if it was a man or a woman?
7  A  I want to say it was a man, but I can't recall.
8  Q  Do you know the man's title, job role, function?
9  A  No.
10  Q  Paragraph 20 says, "Moreover, on at least one
11  other occasion, Defendant contacted Plaintiff's
12  mother and disclosed that he owes the subject
13  debt."
14  What is your mother's name?
15  A  Pinkie Wood.
16  Q  And where does your mom reside?
17  A  Portsmouth, Virginia.
18  Q  And how did you learn that Qualia Collection
19  reached out to your mother?
20  A  After she received a phone call, she called to
21  inform me that she had received the phone call
22  from them looking to get ahold of me to settle a
23  debt.
24  Q  And do you know when you received the telephone
25  call from your mom?

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 29

1  A  I do not.

2  Q  Do you know how much time passed from when your

3     mom received the telephone call to when she

4     reached out to you?

5  A  I know it was same day, but I don't know when she

6     received the phone call.

7  Q  Okay.  So it wasn't that she received a call on a

8     Monday and then she reached out to you the

9     following Monday to say, oh, by the way, someone

10    called?

11 A  Correct.

12 Q  You believe that she received it on a Monday

13    hypothetically, and then at some point, whether it

14    was 10 minutes after or 6 hours after, she reached

15    out to you to say, hey, I got this call?

16 A  Yes.

17 Q  Okay.  And do you know what number that she

18    received the telephone call at?

19 A  I believe it would have been her 319 number.

20 Q  And that 319, is that an area code number?

21 A  No.  That's -- so it would be 757-319, which would

22    also be her work phone.

23 Q  And what's your basis for -- that she received a

24    telephone call at that number?

25 A  If I recall correctly, I was trying to figure out

Page 30

1     how they received that phone number because if I

2     give out her phone number to anybody, it's her

3     other cell phone, her personal cell phone.

4  Q  Okay.

5  A  And I got upset when I found out they called her

6     work phone.

7  Q  So your mom called you and said that she received

8     a call from whom?

9  A  Quality Collection Services.

10 Q  And then what did your mom say Quality Collection

11    Services told her?

12 A  That was so long ago, I don't recall exactly what

13    they said -- what she said.

14 Q  Okay.  Do you know whether Quality Collection

15    Services disclosed that you owed a debt to your

16    mother?

17 A  Yes, because that upset me.

18 Q  How do you know that?

19 A  Well, that's what she said.  She said that they

20    called and that they were looking to get ahold of

21    me because I owed them money.

22 Q  So you do remember then that when your mom spoke

23    to you, she indicated to you that Quality

24    Collection Services called her and indicated that

25    they were looking for Erick and that Erick owed

Page 31

1     them money?

2  A  Yes.

3  Q  And obviously that's not a direct quote, but I'm

4     paraphrasing, if you will.

5  A  Okay.

6  Q  Right?

7  A  I know that I got irritated when they called.  I

8     got irritated that they told her that I owed them

9     money.  I got irritated that they told her -- or

10    that they called her work cell phone because I

11    don't give her work cell phone out, and that's why

12    I remember it.  I do not remember the extent of

13    mine and her conversation.  She relayed the

14    message from Quality Collection Services.  I know

15    it's Qualia, but it was always said to be Quality.

16 Q  Sure.

17 A  And because of my irritation, I remembered that

18    this conversation happened.  I cannot tell you the

19    date, the time, nothing; but I can tell you that I

20    know I got irritated because of this conversation.

21 Q  Because Qualia reached out to your mom?

22 A  Yes.  Because I hadn't been ignoring Qualia's

23    phone calls.  I answered them.  So why would they

24    reach out to my mom?  That's why I got irritated.

25 Q  So you asked Qualia to stop the calls in December

Page 32

1     of '18, but Qualia continued to call you, and you

2     continued to answer the calls?

3  A  I would answer them and -- what can I do?  Just to

4     verify who it was, and then I'd hang up.

5  Q  So I believe your testimony was that you were

6     frustrated because you were communicating with

7     Qualia --

8  A  I was not communicating.  I was answering the

9     calls, listening to them tell me that it was them,

10    and then I would hang up.

11 Q  Okay.  But I think your testimony was that you

12    were frustrated that they called your mom

13    because --

14 A  I was still answering the phone calls.

15 Q  Still answering the calls?

16 A  Yes.

17 Q  And answering to you was listening to what they

18    had to say and then hanging up and not

19    communicating back with them?

20 A  Correct.

21 Q  When you were listening to the calls and hanging

22    up with them, did you ever respond -- you know,

23    communicate with them, respond to their questions,

24    say something to them?

25 A  I don't recall.

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Page 33

1  Q  Okay.  So in your mind, communicating with someone
2     is picking up their call but not saying anything
3     in return when they --
4  A  No.  That's not communicating.  I was not
5     communicating with Qualia Collection Services.  I
6     answered the phone, heard them identify themselves
7     after they asked for me.  That was the
8     communicating part.
9  Q  Okay.
10 A  Other than that, I did not communicate.  They
11    identified themselves, and I hung up.
12 Q  And after the date that you asked the calls to
13    stop and prior to your mother receiving a call,
14    did you ever -- did you speak with Qualia where
15    you actually said something to Qualia on the phone
16    during that time period?
17 A  I don't recall.
18 Q  And are you aware of -- we talked about you don't
19    remember the conversation -- the date of the
20    conversation between you and your mom.  And I
21    guess it would be then fair to say that, based on
22    your testimony this morning, you don't know the
23    date that Qualia reached out to your mom?
24 A  No.
25 Q  Do know if it was in 2018 versus 2019?

Page 34

1  A  No recollection.
2  Q  Are you aware of just a single call to your
3     mother?
4  A  Yes.
5  Q  You're not aware of any others?
6  A  No.
7  Q  If you could turn -- flip the page to paragraph 4
8     -- or excuse me, page 4, paragraph 23.
9  A  Okay.
10 Q  It indicates, "Plaintiff has suffered concrete
11    harm as a result of Defendant's actions, including
12    but not limited to, invasion of privacy."
13       And it goes on.  But we're going to take
14    these one at a time.
15       Can you tell me about the harm you suffered
16    or how your privacy was invaded?
17 A  By calling and disclosing to my mother that I owed
18    money.
19 Q  Okay.  Any other ways?
20 A  I can't recall anything else.
21 Q  Okay.  So then it says, "Aggravation that
22    accompanies collection telephone calls."
23       Can you describe to me the harm related with
24    that?
25 A  The stress, the irritation of multiples of phone

Page 35

1     calls within days -- within a single day, not just
2     within the week; it was multiple phone calls in a
3     day.  I'm at work, I'm with my kids, and I'm
4     getting these phone calls.
5  Q  Okay.  Anything else?
6  A  It's just consistent phone calls.  Those were
7     ridiculous.
8  Q  Okay.  It says that you incurred emotional
9     distress.  Can you describe to me the emotional
10    distress that you incurred?
11 A  Well, embarrassment.  And once again, it goes to
12    the aggravation of them calling constantly.
13 Q  And embarrassment would mean them contacting your
14    mom?
15 A  Yes.
16 Q  Okay.  And then, I'm sorry, the second part of
17    your answer was?
18 A  Was that just the consistent phone calls --
19    consistent phone calls.  The threat of the
20    criminal charge, that was aggravating because of
21    everything else I was already going through.  That
22    was emotionally -- that one hurt.
23 Q  Everything else you were going through because --
24 A  With a previous question you asked me of criminal
25    charges and the fact that I'm in a felony

Page 36

1     deferment right now.  At that time, I was still
2     going through that.
3  Q  Okay.
4  A  Part of my deferment is no more criminal charges.
5  Q  Makes sense.
6       Then it says that you incurred increased risk
7     of personal injury resulting from the distraction
8     caused by the never-ending phone calls.  Tell me
9     about the increased risk of personal injury that
10    you incurred.
11 A  Well, I mean, I'm inattentive because I'm paying
12    attention to the phone call.  I'm on the phone,
13    I'm holding it.  Am I still attentive?  Yes.  But
14    is it more risk?  Yes.  I'm constantly having to
15    talk on the phone.
16 Q  Okay.  So you could trip and fall while you're
17    talking on the phone?
18 A  Yes.  Yes.  Or if I answered the phone when I was
19    driving my car because, where I live, we don't
20    have a cell phone band.
21 Q  Okay.  And it says that your injury's also
22    increased use of the telephone services.  I think
23    that speaks for itself, meaning that you were on
24    the phone more than you wanted to be?
25 A  Yes.

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

---

Page 37

1  Q  Tell me about the loss of cellular phone capacity.
2     I don't know what that is.
3  A  Well, every phone call takes up storage just from
4     the numbers. But if you go through and delete
5     them, then you get some of your memory back. But
6     over time, your phone just loses memory from
7     constant use.
8  Q  So your phone only has so many gigabytes of
9     memory; and if you get calls in there, it loads a
10    missed call or connected call or whatever it is.
11    And so if you had, you know, I started with 10 gig
12    today and I got a bunch of calls over the month,
13    it might go down to 9 gig or 9.8 or whatever it
14    is?
15 A  Sure. Yes.
16 Q  Okay. Did you ever quantify how much memory you
17    actually lost from --
18 A  No, I did not.
19 Q  Okay. You just know generally that more calls
20    that come into your phone, you lose memory
21    capacity?
22 A  You lose memory. Your phone slows down because
23    you're having constant use. Your phone heats up.
24    When something heats up, it slows down.
25 Q  Okay. And then it says, "Diminished cellular

---

Page 38

1     phone functionality."
2     Is that the same thing?
3  A  Yes.
4  Q  Okay. Decreased battery life on your cell phone,
5     does that mean because you answered the call, the
6     battery's going to go down quicker?
7  A  Yes, because it's in use.
8  Q  And then, "Diminished space for data storage on
9     the cell phone."
10    I guess that's what we talked about already
11    this morning?
12 A  Mm-hmm.
13 Q  Okay. Have you suffered any other actual damages
14    as a result of these telephone calls that you
15    received or that your mom received?
16 A  My damages are emotional. I won't say mental. I
17    can't say mental. It's emotional. It's stress.
18    It's just taking too much time to deal with this
19    this way. And, you know, having to -- now having
20    to drive down here is cost. The drive down here
21    to Portage has cost me more money than I can
22    afford.
23 Q  So let me make sure I understand your answer.
24    Well, let me ask you this. Have you sought any
25    kind of medical treatment at all for the stress or

---

Page 39

1     the emotional damages you suffered as a result of
2     the phone calls?
3  A  I wouldn't say it's specifically because of the
4     phone calls. Do the phone calls get brought up?
5     Yes. Do the stress of my bills and finances get
6     brought up? Yes. Is it specifically toward
7     Qualia Collection Services? No.
8  Q  Okay.
9        THE WITNESS: Is it possible to
10       take a break so I can use the restroom real
11       quick?
12       MR. LITTLE: Absolutely.
13       (Recess.)
14 BY MR. LITTLE:
15 Q  Did you ever indicate to Qualia on the telephone
16    that you had hired someone to help you clean up
17    your credit?
18 A  Not that I recall.
19 Q  Did you ever hire someone to clean up your credit
20    in late 2018 or early 2019?
21 A  No.
22 Q  Do you know who uses -- strike that.
23       Do you know who used the telephone number
24    (757) 277-1467 in late 2018, early 2019?
25 A  Say that again.

---

Page 40

1  Q  The telephone number is (757) 277-1467. Do you
2     know who was using that telephone number?
3  A  I don't know who was using that phone number, no.
4  Q  Okay. What about -- it wasn't you?
5  A  It wasn't me. I haven't had that phone number
6     since I moved to Wisconsin.
7  Q  So it's a number that you used to have?
8  A  Yes, back in 2009, 2010. I think I got rid of it
9     at the end of 2010.
10 Q  Okay. But since you moved to Tomahawk, Wisconsin,
11    you haven't used that number?
12 A  No.
13 Q  What about the number (757) 642-3875?
14 A  That would be my sister's phone number.
15 Q  And your sister's name is?
16 A  Tabitha Rigby.
17 Q  Do you know if Qualia ever spoke to Tabitha?
18 A  Not that I recall.
19 Q  Do you know if your cell phone records have been
20    subpoenaed in this case?
21 A  No, I don't know.
22 Q  You don't know one way or the other if they have
23    or have not?
24 A  No.
25 Q  Okay. So I guess if I told you they would, you

---

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 41

1   have not reviewed those records?

2 A   No.

3 Q   **When this lawsuit started, you initiated a claim**

4   **for a violation of the Telephone Consumer**

5   **Protection Act. Does that jive with your**

6   **recollection?**

7 A   Yes.

8 Q   **Okay. And it's my understanding that you've --**

9   **your lawyers on your behalf have since withdrawn**

10   **that claim. Is that your understanding as well?**

11 A   No. I know nothing about that part. I recall

12   bringing up the fact that they had called me -- or

13   that Qualia had called me excessively, and that

14   was part of my complaint was the fact that I

15   thought that was against the --

16 Q   **TCPA?**

17 A   Yeah.

18 Q   **Yes?**

19 A   Yes. Yes. Sorry.

20 Q   **Okay. So you think that claim is still in play?**

21 A   As far as I know, yes.

22 Q   **Okay.**

23         **MR. LITTLE:** Mr. Volheim, I just

24   want to confirm so I don't have to ask the

25   questions. You are confirming that the TCPA

Page 42

1   claim has been withdrawn?

2         **MR. VOLHEIM:** I think the record

3   speaks for itself.

4         **MR. LITTLE:** Well, there is no

5   record before us this morning; so I just want

6   to make sure that is the case so I don't have

7   to ask Mr. Rigby about those questions.

8         **MR. VOLHEIM:** I will stipulate that

9   anything that was filed on the record is the

10   situation that I know of right now. I don't

11   really know what to tell you. You're asking

12   Mr. Rigby legal questions that he can't

13   answer. So I mean, did we stipulate that the

14   TCPA claim is withdrawn? That's on the

15   record. That's on the record.

16         **MR. LITTLE:** Okay. That's what I

17   was asking. I was confirming that the

18   stipulation was in place, that the TCPA claim

19   has been withdrawn. Are you agreeing to

20   that? I'm sorry. One second, Nate, because

21   there's a vacuum going on in the background;

22   and the court reporter can't hear you. So

23   bear with us for one minute. I'll let you

24   know when the vacuum cleaner has passed by.

25         Maybe if I move it closer to you.

Page 43

1   Sorry. There was some background noise here.

2   I moved the phone closer to the court

3   reporter. I was making sure that the

4   stipulation was in place that the TCPA claim

5   has been withdrawn. I'm asking you to

6   confirm that, please.

7         **MR. VOLHEIM:** I can confirm the

8   stipulation.

9         **MR. LITTLE:** Okay. Thank you.

10 BY MR. LITTLE:

11 Q   **Okay. Given that the claim has been withdrawn, I**

12   **don't need to ask you any questions about that**

13   **particular claim.**

14 A   Okay.

15         (Exhibit No. 2 marked for identification.)

16 BY MR. LITTLE:

17 Q   **Sir, I'm going to show you what's been marked as**

18   **Exhibit No. 2 for this deposition.**

19         **MR. LITTLE:** Mr. Volheim, Exhibit

20   No. 2 is Plaintiff's Amended Supplemental

21   Answer and Objections to Defendant's

22   Interrogatories.

23         **MR. VOLHEIM:** Thank you.

24 BY MR. LITTLE:

25 Q   **Sir, have you ever seen this document before,**

Page 44

1   **Exhibit No. 2?**

2 A   I don't recall, no.

3 Q   **Did you ever sign a verification page for this**

4   **particular document?**

5 A   I don't recall.

6 Q   **So it's possible that you've seen this document**

7   **before, but you don't have a specific**

8   **recollection?**

9 A   It would have been at the very beginning of all of

10   this. I don't -- yeah.

11 Q   **At the very beginning, meaning when you started**

12   **the lawsuit?**

13 A   Yes.

14 Q   **If you flip to the last page, page 8, it shows**

15   **that it's dated April 18th of 2019; so this would**

16   **be several months after your lawsuit started in**

17   **January.**

18 A   Then I don't -- I don't recall seeing this.

19 Q   **Okay. Quickly, since I marked it, I'll ask you,**

20   **flipping to page 6, Interrogatory No. 10.**

21 A   Okay.

22 Q   **This interrogatory asks the dates and times that**

23   **you demanded Optio or Qualia Collection Services**

24   **to stop calling your phone. I assume that your**

25   **testimony earlier today or our conversation**

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 45

1  earlier today, you don't have a specific
2  recollection, but you think it was sometime in
3  December of '18?
4 A  Yes.
5 Q  And moving on to number 11 on the same page,
6  "Threatened litigation and intimidating the
7  plaintiff that he would be incarcerated."
8  Again, we're talking about the single
9  telephone call that, in that telephone call, there
10  was a threat of criminal charges and litigation?
11 A  Yes. I can say I've seen something like this, but
12  I can't say it's specifically this one.
13 Q  So you're flipping through Exhibit No. 2, for the
14  record, just so we're clear, because we have to
15  articulate it to the court reporter.
16 A  Yes.
17 Q  You're flipping through Exhibit 2, and you're
18  saying you've seen a document similar to that
19  before, but you can't say for sure that --
20 A  It was this one.
21 Q  -- it was this specific document?
22 A  Yes.
23 Q  Okay. So can you, in your own words, describe to
24  me the actual damages that you suffered as a
25  result of the telephone calls we talked about here

Page 46

1  this morning?
2  MR. VOLHEIM: Objection. Asked and
3  answered. You can go ahead, Mr. Rigby.
4  THE WITNESS: I thought we already
5  answered that one. But undue stress, time
6  away from what I need to worry about and take
7  care of. Yeah. I mean, I believe we've
8  already -- we answered that previously.
9 BY MR. LITTLE:
10 Q  Okay. So it's the stress of dealing with the
11  calls and the time away from your personal life?
12 A  The time away from dealing with my job, dealing
13  with my children, dealing with the other
14  responsibilities that I have to deal with. We
15  already covered what the damages were, and I
16  thought I answered those in my own words as well
17  when you asked the questions about them.
18 Q  Okay. Have you suffered any economic harm,
19  meaning money out-of-pocket?
20 A  Yes. And that would have been -- I can't give you
21  a total unless I go back and look at it, but I
22  believe it was somewhere around $600.
23 Q  Okay.
24 A  Because when all of this started, they were
25  withdrawing money. I asked them to stop so I can

Page 47

1  fix it. That way they had the money in the
2  account to withdraw it from. I called and
3  explained to them what was going on on that fact
4  that the money wasn't there and they still
5  withdrew it anyways, which caused me to get even
6  further behind.
7  And I had to pay these funds back before I
8  could have the account stable enough for them to
9  withdraw. They wouldn't listen to that part.
10  Even though they said they understood, they didn't
11  stop withdrawing. And at those times, it started
12  with one; so I went to fix it. And before I could
13  get it fixed, they withdrew it again, which caused
14  me two more fees. And it just kept building that
15  up until the end of October, beginning of November
16  of 2018.
17 Q  So when you say -- I've got to breakdown that
18  answer a little bit. "They" meaning Qualia, I
19  assume?
20 A  Yes.
21 Q  Okay. And you --
22 A  Qualia, Crosscheck, whatever. That company of
23  whom I spoke with, they would not stop withdrawing
24  money from my bank account. It caused it to
25  overdraw for insufficient funds. When I called

Page 48

1  and said, hey, stop, I will make a payment on this
2  day, they still withdrew it before I could make
3  the payment, and they caused my account to
4  continuously be overdrawn. I didn't have the
5  opportunity to fix it.
6 Q  Let me make sure I understand what you're saying.
7  So you're saying that you had a payment scheduled
8  to come out of your account on the 1st of the
9  month?
10 A  Mm-hmm.
11 Q  Yes?
12 A  Yes.
13 Q  And you called before that payment was scheduled
14  to come out of your account and said, hey, I can't
15  make the payment on the 1st, there's not enough
16  funds, I'm going to make a payment on a different
17  date?
18 A  I didn't do that the first time this happened. I
19  did that the second time this happened.
20 Q  Okay. So you knew that I guess -- well, let me
21  make sure I understand. So --
22 A  The first time this happened, I thought I had the
23  funds in there. I found out I didn't have the
24  funds, so I called and told them, hey, I have the
25  funds in there now, you can pull it. They pulled

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 49

1 that one.
2     Then I called and said the funds are not
3 going to be here until this date, and they still
4 pulled it on this date. I don't have a specific
5 date.
6 Q Let me ask -- I think I can clear it up. So it
7 was supposed to draw -- the money was supposed to
8 come out of your account on a certain date. You
9 thought you had enough money in the account. It
10 turns out that you didn't. They called after
11 the fact and said, okay, now there is enough
12 money, go ahead and withdraw, and they did?
13 A Yes.
14 Q Then you knew coming up that they were going to
15 withdraw on a date in the future. In advance of
16 that happening, you contacted Qualia in advance to
17 say, hey, I'm not going to have enough money in my
18 account, please do not withdraw on this date?
19 A Yes.
20 Q And your claim is that they ignored your directive
21 and still withdrew the money?
22 A Yes.
23 Q And as a result of that, you incurred some kind of
24 fee with your bank?
25 A Yes.

Page 50

1 Q Okay. And it's my understanding that you have
2 approximately $600?
3 A Yes, in fees.
4 Q In fees. Bank fees?
5 A Correct.
6 Q Okay. What bank were they trying to withdraw --
7 strike that.
8     What account at what bank were they using to
9 try to withdraw funds?
10 A It would have been my Ripco account, my Ripco
11 checking account.
12 Q And Ripco, R-I-P-C-O?
13 A Yep.
14 Q Okay. Is that a --
15 A It's a credit union.
16 Q Okay. I'm not from here.
17 A Yeah, it's a credit union in northern Wisconsin.
18 Q Okay. And it would have been Ripco that charged
19 you approximately $600 in fees because of the
20 attempts to debit the account, but there were
21 insufficient funds?
22 A Correct.
23 Q Okay. Other than the bank fees that we talked
24 about this morning, have you suffered any other
25 economic harm as a result of these telephone

Page 51

1 calls?
2 A Of the telephone calls, no.
3     MR. VOLHEIM: Objection. Asked and
4 answered. You can go ahead.
5     THE WITNESS: For this whole thing
6 going on now, this is adding cost.
7 BY MR. LITTLE:
8 Q "This" meaning the deposition?
9 A Correct.
10 Q Okay. You had to pay for gas to drive down here
11 today?
12 A Gas, maintenance on my vehicle, all of that to
13 come down here, yes.
14 Q Okay. So for the economic loss, I have the bank
15 fees, your time here today. Anything else?
16 A I'm missing work today.
17 Q I didn't ask you this. I guess my question would
18 be, are you currently employed?
19 A Yes, I am currently employed.
20 Q Okay. And where are you working?
21 A Country Terrace.
22 Q And what is Country Terrace?
23 A It's an assisted-living home in Tomahawk,
24 Wisconsin.
25 Q And what do you do there?

Page 52

1 A I am the head cook.
2 Q And because -- so you -- in order to sit for your
3 deposition today, you had to take the day off of
4 work?
5 A Yes.
6 Q And you don't have vacation time, etcetera?
7 A No.
8 Q So you're losing your pay for today?
9 A Correct.
10 Q And because I'm trying to calculate all of this,
11 do you have an approximation as to what you would
12 have earned today if you would have worked?
13 A 8 times 14.
14 Q 8 hours times $14 an hour?
15 A Yes.
16 Q Okay. I'll do that math later. I won't count on
17 my fingers here.
18     Any other economic harm?
19 A Not that I can recall.
20 Q I'm just going to go over my notes to see if I
21 have anything else for you. Bear with me for one
22 second.
23 A All right.
24     (Recess.)
25

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 53

1 BY MR. LITTLE:
2 Q  At the time of these telephone calls in late '18
3     and early '19, were you employed by the same
4     employer?
5 A  No.
6 Q  Where were you employed back then?
7 A  Redline Transportation.
8 Q  Is that a trucking company?
9 A  Yes.
10 Q  When did you start your current job?
11 A  July of this year, of 2019.
12        THE WITNESS: Can I ask you an
13     off-the-record question?
14        MR. LITTLE: Yeah, go ahead. We
15     can go off the record.
16        COURT REPORTER: Yes.
17     (Recess.)
18        MR. LITTLE: We can go back on the
19     record. Okay. I have no further questions,
20     Mr. Rigby.
21        THE WITNESS: All right. Thank
22     you.
23        MR. LITTLE: Mr. Volheim, do you
24     have anything?
25        MR. VOLHEIM: Just very few. And

Page 54

1     actually, that would be one of my questions
2     too; so I'm impressed with that. Erick, I
3     just have very, very few questions for you.
4     Can you hear me all right?
5        THE WITNESS: Yes.
6        MR. VOLHEIM: Okay. Great.
7        EXAMINATION
8 BY MR. VOLHEIM:
9 Q  So when you made the purchase from
10     Ashley Furniture, did you provide any phone
11     numbers to them that belong to your mother?
12 A  I don't recall. I don't believe so.
13 Q  Okay. Did you ever provide any of your mother's
14     phone numbers to Qualia Collection or any of the
15     other entities that we spoke about -- that you
16     spoke about today?
17 A  No.
18 Q  Do you have any idea how Qualia Collections got
19     your mother's phone number?
20 A  I do not.
21 Q  You testified earlier today that you -- the phone
22     calls and your communications with Qualia made you
23     stressed; is that correct?
24 A  Yes.
25 Q  When you're stressed out or experiencing anxiety

Page 55

1     and things like that, do you ever get headaches?
2 A  Yes.
3 Q  Do you take any over-the-counter, like, Aspirin or
4     Advil or headache medicine when you get headaches?
5 A  Ibuprofen or Aspirin as needed.
6 Q  Okay. Did you purchase that with money out of
7     your pocket?
8 A  Yes.
9 Q  Do you recall if you took any ibuprofen or Aspirin
10     as needed related to any of the conduct by Qualia?
11 A  I can't recall that one.
12 Q  Is it possible that you did?
13        MR. LITTLE: Form. Go ahead.
14        THE WITNESS: Yes.
15        MR. VOLHEIM: I don't have any
16     other questions for you, Erick, subject to
17     whatever Mr. Little asks. Thank you.
18        MR. LITTLE: I just have one
19     follow-up question.
20        FURTHER EXAMINATION
21 BY MR. LITTLE:
22 Q  Are you -- as a part of your claim here today, are
23     you claiming that your purchase of Aspirin or
24     ibuprofen is monetary damages as a result of this
25     lawsuit?

Page 56

1 A  No.
2        MR. LITTLE: Okay. That's all I
3     have. All set, Nate?
4        MR. VOLHEIM: I don't have anything
5     further. Yeah, I'm done.
6        MR. LITTLE: Okay. We'll go off
7     the record.
8        MR. VOLHEIM: Our order will be an
9     electronic version without the exhibits.
10     (Adjourned at 10:15 a.m.)

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

Page 57

```
 1   STATE OF WISCONSIN     )
                            ) SS
 2   COUNTY OF DANE         )

 3

 4        I, Paula Wondra, a Notary Public in and for the

 5    State of Wisconsin, do hereby certify that the

 6    foregoing deposition was taken before me at

 7    Comfort Suites Wisconsin Dells Area, N5780 Kinney

 8    Road, City of Portage, and State of Wisconsin, on the

 9    18th day of October, 2019; that it was taken at the

10    request of the Defendant, upon verbal

11    interrogatories; that it was taken in shorthand by

12    me, a competent court reporter and disinterested

13    person, approved by all parties in interest and

14    thereafter converted to typewriting using

15    computer-aided transcription; that said deposition is

16    a true record of the deponent's testimony; that the

17    deposition was taken pursuant to Notice; that said

18    ERICK RIGBY before examination was sworn by me to

19    testify to the truth, the whole truth, and nothing

20    but the truth relative to said cause.

21                          Dated October 22nd, 2019

22

23                          _____

24                          Notary Public
                            In and for the State of Wisconsin

25
```



Case: 3:19-cv-00036-jdp   Document #: 24   Filed: 12/16/19   Page 17 of 24

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

**$**

**$14 (1)**
52:14
**$600 (3)**
46:22;50:2,19

**[**

**[sic] (1)**
6:18

**A**

**Absolutely (1)**
39:12
**accompanies (1)**
34:22
**account (19)**
18:15,16,20;24:23;
25:2,6;47:2,8,24;48:3,
8,14;49:8,9,18;50:8,10,
11,20
**accurate (1)**
23:9
**Act (1)**
41:5
**action (4)**
9:17,18;10:10,12
**actions (1)**
34:11
**actively (2)**
7:22;8:18
**actual (2)**
38:13;45:24
**actually (6)**
19:7;20:25;22:13;
33:15;37:17;54:1
**added (1)**
5:21
**adding (1)**
51:6
**additional (1)**
22:22
**address (4)**
6:3;7:1;11:14;12:2
**Adjourned (1)**
56:10
**advance (2)**
49:15,16
**Advil (1)**
55:4
**afford (1)**
38:22
**afternoon (1)**
4:6
**again (4)**
35:11;39:25;45:8;
47:13
**against (1)**
41:15
**aggravated (1)**

24:7
**aggravating (1)**
35:20
**Aggravation (2)**
34:21;35:12
**ago (1)**
30:12
**agreeing (1)**
42:19
**agreement (1)**
25:5
**ahead (6)**
18:23;46:3;49:12;
51:4;53:14;55:13
**ahold (2)**
28:22;30:20
**alcohol-related (1)**
8:14
**allows (1)**
20:2
**alone (1)**
16:20
**always (1)**
31:15
**Amanda (3)**
7:15;11:16,17
**Amended (1)**
43:20
**answered (10)**
23:18;31:23;33:6;
36:18;38:5;46:3,5,8,
16;51:4
**anxiety (1)**
54:25
**anymore (1)**
10:20
**anyways (1)**
47:5
**apologize (1)**
5:20
**appreciate (1)**
7:21
**approximate (1)**
21:8
**approximately (3)**
23:13;50:2,19
**approximation (1)**
52:11
**April (1)**
44:15
**area (1)**
14:4;29:20
**around (2)**
17:1;46:22
**arrangements (2)**
18:10;24:22
**articulate (1)**
45:15
**Ashley (5)**
17:22,23,24;18:2;
54:10
**Aspirin (4)**
55:3,5,9,23

**assisted-living (1)**
51:23
**assume (5)**
4:17;7:16;11:18;
44:24;47:19
**assuming (1)**
19:13
**attempt (3)**
23:14;24:22;25:1
**attempted (1)**
18:19
**attempting (1)**
17:13
**attempts (2)**
25:5;50:20
**attention (1)**
36:12
**attentive (1)**
36:13
**attorney (2)**
4:21;12:13
**audio (1)**
12:4
**automatically (1)**
10:13
**Avenue (4)**
6:4,8,15,16
**aware (3)**
33:18;34:2,5
**away (3)**
46:6,11,12

**B**

**babysitter (1)**
14:20
**back (19)**
13:24;14:14,15;
23:18,19,22;24:2,4,14,
15,17;25:10;32:19;
37:5;40:8;46:21;47:7;
53:6,18
**background (2)**
42:21;43:1
**Bad (1)**
14:7
**band (1)**
36:20
**bank (7)**
47:24;49:24;50:4,6,
8,23;51:14
**based (1)**
33:21
**basis (1)**
29:23
**battery (1)**
38:4
**battery's (1)**
38:6
**bear (2)**
42:23;52:21
**beginning (5)**
15:21;23:10;44:9,11;

47:15
**behalf (1)**
41:9
**behind (4)**
17:19;18:7,18;47:6
**belong (1)**
54:11
**better (1)**
17:16
**bills (1)**
39:5
**birth (1)**
5:22
**bit (1)**
47:18
**born (2)**
6:22,24
**both (1)**
12:24
**break (1)**
39:10
**breakdown (1)**
47:17
**Brendan (1)**
4:7
**bringing (1)**
41:12
**brought (2)**
39:4,6
**Buffalo (1)**
4:8
**building (1)**
47:14
**bunch (1)**
37:12

**C**

**calculate (1)**
52:10
**California (2)**
6:25;10:25
**call (36)**
14:21;15:12,19;
16:21;21:17;23:13,17,
24,25,25;24:1,4,21;
26:14;27:23;28:20,21,
25;29:3,6,7,15,18,24;
30:8;32:1;33:2,13;
34:2;36:12;37:3,10,10;
38:5;45:9,9
**called (28)**
4:2;13:14;21:20;
23:18,19,22;24:2,4,14,
15,17;28:20;29:10;
30:5,7,20,24;31:7,10;
32:12;41:12,13;47:2,
25;48:13,24;49:2,10
**calling (13)**
13:13;17:18;21:3,6,
12,13,14;22:19;24:13,
18;34:17;35:12;44:24
**calls (53)**

14:11,22;15:1,9,16,
25;16:3,12,17,19;
18:24;19:2,20,23,24;
21:2,19;22:8,18,21,23;
23:2,8,20;31:23,25;
32:2,9,14,15,21;33:12;
34:22;35:1,2,4,6,18,19;
36:8;37:9,12,19;38:14;
39:2,4,4;45:25;46:11;
51:1,2;53:2;54:22
**came (2)**
9:25;26:23
**can (28)**
5:7;16:7,16,21;21:7;
26:3,8;27:13;31:19;
32:3;34:15,23;35:9;
38:21;39:10;43:7;
45:11,23;46:3,25;
48:25;49:6;51:4;52:19;
53:12,15,18;54:4
**capacity (2)**
37:1,21
**car (1)**
36:19
**care (1)**
46:7
**carrier (1)**
14:10
**carry (1)**
26:21
**case (5)**
9:11,13;10:19;40:20;
42:6
**caused (5)**
36:8;47:5,13,24;48:3
**cell (12)**
13:24;14:2;21:6,14;
30:3,3;31:10,11;36:20;
38:4,9;40:19
**cellular (3)**
21:4;37:1,25
**certain (1)**
49:8
**changed (1)**
14:12
**charge (2)**
19:21;35:20
**charged (1)**
50:18
**charges (16)**
19:9;25:18;26:11,15,
19,20,24;27:3,8,14,15,
20;28:4;35:25;36:4;
45:10
**charging (2)**
10:7,8
**chart (1)**
19:2
**checking (3)**
18:16,20;50:11
**checks (1)**
10:21
**children (3)**

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Case: 3:19-cv-00036-jdp   Document #: 24   Filed: 12/16/19   Page 18 of 24

Deposition of Erick Rigby
October 18, 2019

11:8;14:21;46:13
**Christmas (1)**
23:11
**City (2)**
10:23,24
**claim (11)**
41:3,10,20;42:1,14,
18;43:4,11,13;49:20;
55:22
**claiming (1)**
55:23
**class (4)**
9:16,18;10:10,12
**clean (2)**
39:16,19
**cleaner (2)**
5:20;42:24
**clear (4)**
15:15;19:10;45:14;
49:6
**closer (6)**
16:9,10,11;17:8;
42:25;43:2
**code (2)**
14:4;29:20
**collect (1)**
17:13
**collecting (1)**
17:15
**Collection (21)**
13:11,12,14,17;
14:24;15:2,10;17:18;
18:25;19:11;28:18;
30:9,10,14,24;31:14;
33:5;34:22;39:7;44:23;
54:14
**Collections (1)**
54:18
**collector (1)**
22:2
**coming (2)**
19:3;49:14
**commenced (2)**
4:9;19:13
**communicate (2)**
32:23;33:10
**communicating (7)**
32:6,8,19;33:1,4,5,8
**communication (1)**
4:25
**communications (1)**
54:22
**company (5)**
9:15,20;13:12;47:22;
53:8
**complaint (6)**
11:25;20:10,20,22;
25:24;41:14
**concrete (1)**
34:10
**conduct (2)**
21:3;55:10
**confirm (3)**

41:24;43:6,7
**confirming (2)**
41:25;42:17
**connected (1)**
37:10
**consistent (3)**
35:6,18,19
**constant (2)**
37:7,23
**constantly (2)**
35:12;36:14
**Consumer (1)**
41:4
**contact (1)**
19:5
**contacted (4)**
19:14,22;28:11;
49:16
**contacting (2)**
19:8;35:13
**contending (1)**
13:20
**continue (1)**
4:20
**continued (2)**
32:1,2
**continuously (1)**
48:4
**contractor (2)**
10:4,5
**conversation (18)**
21:16;22:12,13;23:4,
21;24:5,11;26:9;27:4,
9,10,12;31:13,18,20;
33:19,20;44:25
**conversations (1)**
25:1
**convicted (1)**
8:5
**cook (1)**
52:1
**correctly (3)**
25:15;27:19;29:25
**cost (3)**
38:20,21;51:6
**count (1)**
52:16
**Country (2)**
51:21,22
**County (2)**
6:25;8:20
**Court (6)**
4:10,23;42:22;43:2;
45:15;53:16
**courts (1)**
8:9
**covered (1)**
46:15
**CR (3)**
9:14,19,25
**credit (4)**
39:17,19;50:15,17
**creditor (1)**

13:6
**criminal (20)**
19:9,15,17,20;25:18;
26:11,15,19,20,24;
27:3,8,14,15,20;28:4;
35:20,24;36:4;45:10
**Crosscheck (3)**
13:5;14:23;47:22
**current (1)**
53:10
**currently (3)**
6:1;51:18,19

**D**

**damages (6)**
38:13,16;39:1;45:24;
46:15;55:24
**data (1)**
38:8
**date (15)**
5:22;20:24;21:8;
23:9;31:19;33:12,19,
23;48:17;49:3,4,5,8,15,
18
**dated (1)**
44:15
**dates (1)**
44:22
**day (7)**
16:18,21;29:5;35:1,
3;48:2;52:3
**days (2)**
16:19;35:1
**deal (2)**
38:18;46:14
**dealing (4)**
46:10,12,12,13
**debit (1)**
50:20
**debt (6)**
13:13;17:12,15;
28:13,23;30:15
**December (6)**
21:9;22:21;23:3,8;
31:25;45:3
**Decreased (1)**
38:4
**defendant (4)**
9:2;22:18;25:12;
28:11
**defendants (1)**
4:9
**Defendant's (3)**
21:2;34:11;43:21
**deferment (2)**
8:9,18;36:1,4
**definitely (1)**
22:14
**delay (1)**
5:17
**delete (1)**
37:4

**demand (1)**
22:17
**demanded (2)**
21:3;44:23
**deposition (5)**
8:3;20:7;43:18;51:8;
52:3
**describe (3)**
34:23;35:9;45:23
**Despite (1)**
22:16
**details (1)**
7:20
**development (2)**
7:18;9:7
**different (1)**
48:16
**Diminished (2)**
37:25;38:8
**direct (1)**
31:3
**directive (2)**
21:22;49:20
**directly (1)**
18:15
**disclosed (2)**
28:12;30:15
**disclosing (1)**
34:17
**discounted (1)**
17:25
**discuss (1)**
24:16
**dispute (4)**
23:15,16;25:6,9
**distraction (1)**
36:7
**distress (2)**
35:9,10
**District (2)**
4:10,10
**document (8)**
20:13,16,20;43:25;
44:4,6;45:18,21
**documents (1)**
11:23
**done (4)**
19:19,19;22:10;56:5
**down (10)**
4:24;16:24;37:13,22,
24;38:6,20,20;51:10,13
**draw (1)**
49:7
**drive (3)**
38:20,20;51:10
**driving (1)**
9:24;36:19
**Due (1)**
21:1
**duly (1)**
4:2
**during (3)**
24:21;27:19;33:16

**E**

**earlier (4)**
25:17;44:25;45:1;
54:21
**early (5)**
13:25;15:3;39:20,24;
53:3
**earned (1)**
52:12
**economic (4)**
46:18;50:25;51:14;
52:18
**effect (1)**
5:21
**either (1)**
10:24
**electronic (1)**
56:9
**else (7)**
12:1;34:20;35:5,21,
23;51:15;52:21
**embarrassment (2)**
35:11,13
**emotional (5)**
35:8,9;38:16,17;39:1
**emotionally (1)**
35:22
**employed (4)**
51:18,19;53:3,6
**employer (1)**
53:4
**employment (1)**
10:3
**end (3)**
19:25;40:9;47:15
**ended (1)**
23:21
**ending (1)**
15:17
**England (3)**
9:14,19,25
**enough (6)**
5:12;17:11;18:21;
47:8;48:15;49:9,11,17
**entities (1)**
54:15
**ERICK (6)**
4:1;11:21;30:25,25;
54:2;55:16
**estimate (3)**
16:7,24,25
**estimated (2)**
17:6,6
**etcetera (2)**
5:3;52:6
**even (3)**
10:13;47:5,10
**event (2)**
19:5,9
**events (1)**
19:7

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

exact (1)
16:6
exactly (1)
30:12
EXAMINATION (3)
4:4;54:7;55:20
excessive (1)
19:24
excessively (1)
41:13
excuse (1)
34:8
exes (1)
7:16
ex-girlfriend (1)
7:9
Exhibit (10)
20:4,7,9;25:10;
43:15,18,19;44:1;
45:13,17
exhibits (1)
56:9
expect (1)
5:5
experiencing (1)
54:25
explain (1)
18:1
explained (1)
47:3
extent (3)
24:5,8;31:12

**F**

fact (6)
18:6;35:25;41:12,14;
47:3;49:11
fair (5)
4:18;15:25;16:14;
17:11;33:21
fall (4)
13:24;14:15;18:7;
36:16
far (2)
9:5;41:21
fast (1)
5:12
fee (1)
49:24
fees (5)
47:14;50:3,4,4,19,
23;51:15
fell (2)
17:19;18:18
felonies (1)
8:22
felony (4)
8:6,10,11;35:25
few (3)
24:14;53:25;54:3
figure (1)
29:25

file (2)
10:15;26:11
filed (2)
20:22;42:9
finally (2)
5:5;19:18
finances (1)
39:5
fingers (1)
52:17
finish (1)
5:8
firm (2)
4:7;13:3
first (7)
4:2;5:8;19:7;20:17,
19;48:18,22
fix (3)
47:1,12;48:5
fixed (1)
47:13
flip (3)
20:25;34:7;44:14
flipping (1)
44:20;45:13,17
following (1)
29:9
follows (1)
4:3
follow-up (1)
55:19
Fontana (1)
10:25
forgot (1)
12:20
form (2)
10:1;55:13
found (4)
9:11,16;30:5;48:23
Four (2)
11:11;16:17
Friedman (1)
4:8
frustrated (2)
32:6,12
function (1)
28:8
functionality (1)
38:1
funds (9)
47:7,25;48:16,23,24,
25;49:2;50:9,21
furniture (7)
17:19,21,22,24;18:2,
3;54:10
further (5)
23:4;47:6;53:19;
55:20;56:5
future (1)
49:15

**G**

gas (2)
51:10,12
gave (1)
13:19
generally (2)
21:13;37:19
gig (2)
37:11,13
gigabytes (1)
37:8
given (2)
8:3;43:11
giving (1)
5:9
goes (2)
34:13;35:11
Good (1)
4:6
Graeber (1)
7:15
G-R-A-E-B-E-R (1)
7:15
Great (1)
54:6
guess (6)
17:14;33:21;38:10;
40:25;48:20;51:17
guesstimates (1)
16:16
guilty (1)
8:5

**H**

half (1)
6:6
hang (2)
32:4,10
hanging (2)
32:18,21
happen (1)
25:25
happened (7)
24:9;26:4,5;31:18;
48:18,19,22
happening (1)
49:16
harassed (1)
19:18
harm (6)
34:11,15,23;46:18;
50:25;52:18
head (2)
4:22;52:1
headache (1)
55:4
headaches (2)
55:1,4
hear (3)
4:14;42:22;54:4
heard (2)
13:10;33:6
hearing (1)

16:25
heats (2)
37:23,24
help (2)
20:23;39:16
hey (7)
21:19;24:3;29:15;
48:1,14,24;49:17
high (1)
16:15
higher (1)
22:25
highly (1)
24:6
hire (1)
39:19
hired (1)
39:16
Hit (1)
8:13
holding (1)
36:13
home (3)
18:4,5;51:23
honest (1)
8:7
hotel (1)
5:21
hour (1)
52:14
hours (2)
29:14;52:14
house (1)
14:20
Humboldt (1)
6:25
hung (4)
23:19;24:2,15;33:11
hurt (1)
35:22
hypothetically (1)
29:13

**I**

Ibuprofen (1)
55:5,9,24
idea (1)
54:18
identification (2)
20:4;43:15
identified (2)
7:25;33:11
identify (1)
33:6
ignored (1)
49:20
ignoring (1)
31:22
immediately (2)
23:22;24:4
impressed (1)
54:2

inattentive (1)
36:11
incarcerated (4)
25:14;26:18;27:1;
45:7
incarceration (1)
26:24
incessant (1)
21:2
incident (1)
8:14
including (1)
34:11
increased (3)
36:6,9,22
incurred (5)
35:8;10;36:6,10;
49:23
independent (2)
10:4,5
indicate (4)
23:12;25:4;26:17;
39:15
indicated (6)
10:9;20:13;25:17;
27:2;30:23,24
indicates (2)
25:12;34:10
inform (1)
28:21
initiate (1)
23:4
initiated (3)
9:1;21:18;41:3
injury (2)
36:7,9
injury's (1)
36:21
insufficient (2)
47:25;50:21
Interrogatories (1)
43:22
Interrogatory (2)
44:20,22
intimidated (1)
25:13
intimidating (1)
45:6
into (3)
13:25;14:16;37:20
introduced (1)
13:17
invaded (1)
34:16
invasion (1)
34:12
involved (1)
9:12
irritated (8)
19:22;24:6,7;31:7,8,
9,20,24
irritation (2)
31:17;34:25

Case: 3:19-cv-00036-jdp   Document #: 24   Filed: 12/16/19   Page 20 of 24

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

## J

**jail (3)**
26:21,22;27:5
**January (6)**
15:21,22;16:1,5;
20:22;44:17
**jive (1)**
41:5
**job (4)**
22:1;28:8;46:12;
53:10
**join (1)**
10:14
**joined (1)**
10:12
**July (1)**
53:11

## K

**keep (2)**
18:24;19:2
**kept (1)**
47:14
**kick (1)**
5:13
**kids (1)**
35:3
**kind (3)**
5:1;38:25;49:23
**knew (2)**
48:20;49:14
**knows (1)**
5:2

## L

**Lake (2)**
10:23,24
**landline (3)**
14:18,19,24
**landlines (1)**
14:15
**last (5)**
12:15,20;15:3,19;
44:14
**late (3)**
39:20,24;53:2
**later (1)**
52:16
**law (3)**
4:7;13:3;20:2
**lawsuit (13)**
4:9,13;8:24;9:1,14,
23;10:16;19:14;20:1;
41:3;44:12,16;55:25
**lawyer (1)**
19:6
**lawyers (1)**
41:9
**learn (1)**

**28:18
leased (1)**
9:24
**least (5)**
22:22,24;25:12,24;
28:10
**Leather (4)**
6:8,14,15,16
**left (1)**
16:20
**legal (1)**
42:12
**less (2)**
17:2;22:17
**life (3)**
7:18;38:4;46:11
**likewise (2)**
5:9,15
**limited (1)**
34:12
**Lincoln (1)**
8:21
**Lippes (1)**
4:7
**listen (2)**
12:4;47:9
**listening (3)**
32:9,17,21
**litigation (10)**
11:1;25:13,19;26:13;
27:8,10,20,23;45:6,10
**LITTLE (29)**
4:5,7;12:18;20:5,8,
12;39:12,14;41:23;
42:4,16;43:9,10,16,19,
24;46:9;47:18;51:7;
53:1,14,18,23;55:13,
17,18,21;56:2,6
**live (2)**
11:13;36:19
**lived (2)**
6:5,20
**LLC (2)**
13:5,8
**loads (1)**
37:9
**long (8)**
5:5;6:5,11,20;14:6,8;
24:11;30:12
**longer (2)**
7:11;14:18
**look (1)**
46:21
**looking (5)**
7:22;19:25;28:22;
30:20,25
**lose (2)**
37:20,22
**loses (1)**
37:6
**losing (1)**
52:8
**loss (2)**

**37:1;51:14
lost (1)**
37:17
**lower (1)**
17:23

## M

**maintenance (1)**
51:12
**makes (2)**
5:24;36:5
**making (1)**
43:3
**man (3)**
21:24;28:6,7
**manager (1)**
22:2
**man's (1)**
28:8
**many (5)**
9:4;11:10;16:3;21:5;
37:8
**marked (5)**
20:4,6;43:15,17;
44:19
**married (2)**
11:4,6
**materials (1)**
11:23
**math (1)**
52:16
**Mathias (1)**
4:8
**may (2)**
5:16;17:16
**maybe (2)**
22:14;42:25
**mean (7)**
24:8;35:13;36:11;
38:5;42:13;46:7
**meaning (8)**
13:16;19:10;24:8;
36:23;44:11;46:19;
47:18;51:8
**medical (1)**
38:25
**medicine (1)**
55:4
**memory (6)**
37:5,6,9,16,20,22
**mental (2)**
38:16,17
**message (1)**
31:14
**met (2)**
13:1,3
**might (1)**
37:13
**mind (1)**
33:1
**mine (1)**
31:13

**minors (1)**
11:18
**minute (1)**
42:23
**minutes (4)**
23:13,18;24:14;
29:14
**misdemeanor (2)**
8:6,10
**misdemeanors (1)**
8:22
**missed (2)**
23:25;37:10
**missing (1)**
51:16
**Mister (1)**
12:15
**Mm-hmm (2)**
38:12;48:10
**mm-hmms (1)**
5:1
**mom (13)**
28:16,25;29:3;30:7,
10,22;31:21,24;32:12;
33:20,23;35:14;38:15
**Monday (3)**
29:8,9,12
**monetary (1)**
55:24
**money (20)**
10:2;18:19,20,21;
30:21;31:1,9;34:18;
38:21;46:19,25;47:1,4,
24;49:7,9,12,17,21;
55:6
**Month (3)**
6:6;37:12;48:9
**monthly (2)**
18:13,14
**months (1)**
44:16
**more (10)**
7:20;17:2;25:25;
26:5;36:4,14,24;37:19;
38:21;47:14
**Moreover (1)**
28:10
**morning (8)**
5:6,18;12:24;33:22;
38:11;42:5;46:1;50:24
**mother (13)**
11:16,17;15:13;19:8,
14,22;28:12,19;30:16;
33:13;34:3,17;54:11
**mother's (3)**
28:14;54:13,19
**mouth (1)**
17:4
**move (1)**
42:25
**moved (4)**
7:16;40:6,10;43:2
**moving (1)**

**45:5
much (4)**
7:11;29:2;37:16;
38:18
**multiple (3)**
16:18,20;35:2
**multiples (1)**
34:25
**myself (1)**
10:15

## N

**name (10)**
4:6;7:12;11:20;
12:15,20;13:19;18:1;
28:3,14;40:15
**Nate (4)**
12:15,19;42:20;56:3
**need (4)**
4:15;21:19;43:12;
46:6
**needed (2)**
55:5,10
**never-ending (1)**
36:8
**new (1)**
7:22
**nine (1)**
14:9
**nods (1)**
4:23
**noise (1)**
43:1
**normally (1)**
26:21
**northern (1)**
50:17
**nos (1)**
5:2
**notes (1)**
52:20
**November (1)**
47:15
**number (35)**
14:2,6,8,9,17,20;
15:7,10,11,17;16:6,9;
17:5,6,6,10;20:25;
22:25;29:17,19,20,24;
30:1,2;39:23;40:1,2,3,
5,7,11,13,14;45:5;
54:19
**numbers (4)**
16:16;37:4;54:11,14

## O

**oath (1)**
4:3
**Objection (2)**
46:2;51:3
**Objections (1)**
43:21

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

**obviously (1)**
31:3
**occasion (1)**
25:12,24;26:1,3;
28:11
**occur (1)**
27:16
**occurred (1)**
27:9
**October (1)**
47:15
**off (4)**
26:23;52:3;53:15;
56:6
**off-the-record (1)**
53:13
**old (1)**
5:24
**once (5)**
21:7;22:14;26:4,5;
35:11
**one (35)**
5:14;8:25;9:5;12:21;
13:10;16:21;17:3,24,
25;19:7;25:12,24;26:1,
1,3,12;27:9,10,16,19;
28:10;34:14;35:22;
40:22;42:20,23;45:12,
20;46:5;47:12;49:1;
52:21;54:1;55:11,18
**only (5)**
15:15;22:7;26:11;
27:15;37:8
**opportunity (1)**
48:5
**Optio (3)**
13:8;14:23;44:23
**order (2)**
52:2;56:8
**others (1)**
34:5
**Otherwise (1)**
4:16
**out (28)**
5:6;9:11,16;10:9,21;
19:23;21:18;22:12;
23:3,14;28:19;29:4,8,
15,25;30:2,5;31:11,21,
24;33:23;48:8,14,23;
49:8,10;54:25;55:6
**out-of-pocket (1)**
46:19
**outrageous (1)**
21:2
**outstanding (1)**
24:23
**over (7)**
5:11;16:8,9;18:11;
37:6,12;52:20
**overdraw (1)**
47:25
**overdrawn (1)**
48:4

**over-the-counter (1)**
55:3
**overwhelmed (1)**
19:23
**owed (5)**
30:15,21,25;31:8;
34:17
**owes (1)**
28:12
**own (5)**
7:1;10:16;23:4;
45:23;46:16

**P**

**page (8)**
20:25;34:7,8;44:3,
14,14,20;45:5
**paragraph (7)**
21:1,1;22:16;25:10;
28:10;34:7,8
**paraphrasing (1)**
31:4
**part (9)**
10:10;21:15;33:8;
35:16;36:4;41:11,14;
47:9;55:22
**particular (2)**
43:13;44:4
**party (2)**
8:24;11:2
**passed (2)**
29:2;42:24
**pay (3)**
47:7;51:10;52:8
**paying (3)**
10:6,7;36:11
**payment (9)**
18:9,13,14;48:1,3,7,
13,15,16
**payments (3)**
17:19;18:7,18
**pending (3)**
10:19,20,22
**period (2)**
16:4;33:16
**person (5)**
5:14;13:1,3;22:2;
28:3
**personal (5)**
17:6;30:3;36:7,9;
46:11
**phone (74)**
4:22;5:16;13:24;
14:2,11,17,20;15:12;
16:17,19,21;19:20,23,
24;20:9;21:4,6,14,17;
22:18;23:25;24:1;
28:20,21;29:6,22;30:1,
2,3,3,6;31:10,11,23;
32:14;33:6,15;34:25;
35:2,4,6,18,19;36:8,12,
12,15,17,18,20,24;

37:1,3,6,8,20,22,23;
38:1,4,9;39:2,4,4;40:3,
5,14,19;43:2;44:24;
54:10,14,19,21
**pick (1)**
23:24
**picked (1)**
24:1
**picking (1)**
33:2
**pieces (1)**
11:1
**pin (1)**
16:24
**Pinkie (1)**
28:15
**place (3)**
7:23;42:18;43:4
**plaintiff (8)**
9:1,9,22;21:3;22:17;
25:13;34:10;45:7
**Plaintiff's (3)**
22:16;28:11;43:20
**play (1)**
41:20
**please (3)**
4:16;43:6;49:18
**pled (1)**
8:5
**plus (1)**
26:24
**pocket (1)**
55:7
**point (3)**
25:19;27:24;29:13
**Portage (1)**
38:21
**Portsmouth (1)**
28:17
**position (1)**
23:20
**positive (1)**
22:11
**possible (5)**
27:11,22;39:9;44:6;
55:12
**preparation (5)**
11:24;12:5,8,11;
20:14
**press (2)**
26:15;27:3
**previous (1)**
35:24
**previously (2)**
12:25;46:8
**prior (7)**
6:13;14:6,13;26:13;
27:11,23;33:13
**prison (1)**
26:22
**privacy (2)**
34:12,16
**Probably (3)**

16:11;17:8,16
**program (1)**
8:18
**pronounce (1)**
12:15
**property (1)**
7:2
**prosecution (2)**
19:16,17
**Protection (1)**
41:5
**provide (2)**
54:10,13
**pull (1)**
48:25
**pulled (2)**
48:25;49:4
**purchase (5)**
17:21;18:3;54:9;
55:6,23
**purchased (1)**
17:20
**purportedly (1)**
26:18
**purposes (1)**
20:7
**pursue (2)**
26:19,20
**put (1)**
17:4

**Q**

**Qualia (43)**
13:11,12;14:24;15:2,
10,16,20;17:12,17;
18:25;19:10;21:6,16,
18,21;23:3,14;25:1,18,
19;26:7;28:18;31:15,
21,25;32:1,7;33:5,14,
15,23;39:7,15;40:17;
41:13;44:23;47:18,22;
49:16;54:14,18,22;
55:10
**Qualia's (4)**
23:7,12;25:4;31:22
**Quality (10)**
13:14,16,17;17:23;
30:9,10,14,23;31:14,15
**quantify (1)**
37:16
**quick (1)**
39:11
**quicker (1)**
38:6
**quickly (2)**
5:7;44:19
**quote (1)**
31:3

**R**

**reach (3)**

21:18;23:3;31:24
**reached (8)**
10:9;23:14;28:19;
29:4,8,14;31:21;33:23
**read (1)**
25:15
**reads (1)**
21:1
**real (1)**
39:10
**really (1)**
42:11
**reason (4)**
4:15;17:15;23:15;
26:11
**recall (18)**
8:23;11:3;14:17,19;
16:22;18:12;20:21,23;
21:7,15,25;22:7;23:6;
24:20;25:3,7,8,23;26:3,
12;27:13;28:7;29:25;
30:12;32:25;33:17;
34:20;39:18;40:18;
41:11;44:2,5,18;52:19;
54:12;55:9,11
**receive (1)**
14:22
**received (22)**
15:9,12,16,20;16:4,
17,19;22:17,22;28:20,
21,24;29:3,6,7,12,18,
23;30:1,7;38:15,15
**receiving (2)**
15:1;33:13
**recent (4)**
7:17;9:7,10,10
**Recess (3)**
39:13;52:24;53:17
**recollection (5)**
28:1;34:1;41:6;44:8;
45:2
**record (12)**
19:2;23:16;25:6;
42:2,5,9,15,15;45:14;
53:15,19;56:7
**recordings (2)**
12:5;18:24
**records (5)**
23:7,12;25:4;40:19;
41:1
**Redline (1)**
53:7
**reflect (1)**
23:7
**related (3)**
8:12;34:23;55:10
**relayed (1)**
31:13
**relevant (1)**
7:13
**remember (14)**
18:9;11;21:5,21;
24:5,10,11,12,13;

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Case: 3:19-cv-00036-jdp    Document #: 24    Filed: 12/16/19    Page 22 of 24

Deposition of Erick Rigby
October 18, 2019

26:12;30:22;31:12,12;
33:19
**remembered (1)**
31:17
**remind (1)**
4:25
**remove (1)**
10:15
**rent (1)**
7:4
**repeated (1)**
4:15
**reporter (5)**
4:23;42:22;43:3;
45:15;53:16
**represent (1)**
4:8
**representation (1)**
19:6
**requested (1)**
22:5
**reside (7)**
6:1,7,11,17;7:6,11;
28:16
**resolution (1)**
23:5
**resolve (4)**
23:15;24:22;25:2,5
**respond (1)**
32:22,23
**response (1)**
24:19
**responses (1)**
4:21
**responsibilities (1)**
46:14
**restroom (1)**
39:10
**result (8)**
21:17;34:11;38:14;
39:1;45:25;49:23;
50:25;55:24
**resulting (1)**
36:7
**return (1)**
33:3
**returned (1)**
23:25
**review (1)**
20:16
**reviewed (3)**
11:23;20:13;41:1
**rid (1)**
40:8
**ridiculous (1)**
35:7
**RIGBY (8)**
4:1,6;11:21;40:16;
42:7,12;46:3;53:20
**right (9)**
24:4,14,15;31:6;
36:1;42:10;52:23;
53:21;54:4

**Ripco (4)**
50:10,10,12,18
**R-I-P-C-O (1)**
50:12
**risk (3)**
36:6,9,14
**Road (2)**
6:18,18
**role (1)**
28:8
**run (1)**
8:13

**S**

**Salt (2)**
10:23,24
**same (7)**
26:14;27:9,10;29:5;
38:2;45:5;53:3
**saw (1)**
20:19
**saying (5)**
17:1;33:2;45:18;
48:6,7
**scheduled (2)**
48:7,13
**second (6)**
5:16;19:8;35:16;
42:20;48:19;52:22
**seeing (1)**
44:18
**sending (1)**
10:21
**sense (1)**
36:5
**separate (1)**
10:16
**September (4)**
15:3,5;16:1,4
**series (1)**
4:12
**Services (18)**
13:11,12,15,18;
14:23,24;15:2,10;
18:25;30:9,11,15,24;
31:14;33:5;36:22;39:7;
44:23
**set (1)**
56:3
**setting (1)**
25:8
**settle (2)**
13:13;28:22
**settled (2)**
9:11;10:20
**several (1)**
44:16
**shape (1)**
10:1
**shorting (1)**
10:1
**shoulder (1)**

4:23
**show (2)**
20:6;43:17
**shows (1)**
44:14
**shrugs (1)**
4:23
**sign (1)**
44:3
**similar (1)**
45:18
**single (3)**
34:2;35:1;45:8
**sister's (2)**
40:14,15
**sit (3)**
17:7;22:6;52:2
**situation (2)**
5:18;42:10
**slip (1)**
5:1
**slows (2)**
37:22,24
**Solutions (2)**
13:8;14:23
**someone (6)**
9:2;10:9;29:9;33:1;
39:16,19
**Sometime (2)**
21:9;45:2
**somewhat (2)**
7:17;10:3
**somewhere (2)**
23:10;46:22
**sorry (4)**
35:16;41:19;42:20;
43:1
**sought (1)**
38:24
**sound (1)**
23:9
**South (3)**
6:4;7:1;11:14
**space (1)**
38:8
**speak (6)**
4:16;5:14;12:11,22;
24:16;33:14
**speaks (1)**
36:23;42:3
**specific (6)**
20:24;28:1;44:7;
45:1,21;49:4
**specifically (5)**
24:17;26:25;39:3,6;
45:12
**spoke (9)**
12:24;13:22;21:21;
24:12;30:22;40:17;
47:23;54:15,16
**Sprint (1)**
14:11
**stable (1)**

47:8
**start (2)**
15:1;53:10
**started (7)**
9:24;37:11;41:3;
44:11,16;46:24;47:11
**stating (1)**
25:14
**still (11)**
8:2;14:19;32:14,15;
36:1,13;41:20;47:4;
48:2;49:3,21
**stipulate (2)**
42:8,13
**stipulation (3)**
42:18;43:4,8
**stop (21)**
21:3,6,12,13,14,19;
22:8,18,21;23:2,8,21;
24:13,18;31:25;33:13;
44:24;46:25;47:11,23;
48:1
**stopped (1)**
24:3
**storage (2)**
37:3;38:8
**store (2)**
17:22,24
**Street (1)**
6:14
**stress (6)**
34:25;38:17,25;39:5;
46:5,10
**stressed (4)**
19:23;22:12;54:23,
25
**strike (3)**
14:6;39:22;50:7
**stuff (1)**
4:24
**subject (2)**
28:12;55:16
**submitted (1)**
20:18
**subpoenaed (1)**
40:20
**substance (1)**
26:8
**sue (5)**
25:20,25;26:8,10,15
**sued (1)**
9:2
**suffered (7)**
34:10,15;38:13;39:1;
45:24;46:18;50:24
**sum (1)**
26:8
**supervisor (7)**
22:3,4,5;24:2,12,16,
21
**supervisor's (1)**
24:19
**Supplemental (1)**

43:20
**supposed (4)**
18:13,14;49:7,7
**Sure (12)**
17:3,3;27:7,18;
31:16;37:15;38:23;
42:6;43:3;45:19;48:6,
21
**sworn (1)**
4:3

**T**

**Tabitha (2)**
40:16,17
**table (1)**
5:13
**talk (3)**
5:1,12;36:15
**talked (6)**
11:2;27:22;33:18;
38:10;45:25;50:23
**talking (5)**
5:11;9:8;27:24;
36:17;45:8
**TCPA (5)**
41:16,25;42:14,18;
43:4
**Teddy (3)**
12:20,23;13:1
**telephone (29)**
14:10,22;15:1,9,16,
19;16:3;18:24;22:23;
23:13;27:23;28:24;
29:3,18,24;34:22;
36:22;38:14;39:15,23;
40:1,2;41:4;45:9,9,25;
50:25;51:2;53:2
**Ten (1)**
6:21
**terms (1)**
18:9
**Terrace (2)**
51:21,22
**testified (2)**
4:3;54:21
**testimony (11)**
11:24;12:5,9,12;
16:23;20:14;27:18;
32:5,11;33:22;44:25
**theft (1)**
26:21
**thinking (1)**
22:12
**Thirty-one (1)**
5:25
**though (2)**
22:6;47:10
**thought (5)**
41:15;46:4,16;48:22;
49:9
**threat (5)**
27:7,8,15;35:19;

45:10
**threaten (1)**
    25:19
**threatened (15)**
    19:15,17,21;25:13,
    18,25;26:10,13,14,18;
    27:13,19,20;28:3;45:6
**threatening (2)**
    19:9;26:24
**three (1)**
    16:17
**times (8)**
    9:4;16:18;18:23;
    21:5;44:22;47:11;
    52:13,14
**tired (1)**
    19:17
**title (2)**
    22:1;28:8
**today (21)**
    4:13;5:24;11:24;
    12:6,9,12;20:14,17;
    22:6;37:12;44:25;45:1;
    51:11,15,16;52:3,8,12;
    54:16,21;55:22
**together (1)**
    7:17
**told (8)**
    8:7,8;24:17;30:11;
    31:8,9;40:25;48:24
**Tomahawk (11)**
    6:2,4,9,19,20;7:1;
    8:2;11:13,14;40:10;
    51:23
**took (1)**
    55:9
**total (1)**
    46:21
**toward (3)**
    15:21;23:10;39:6
**towards (1)**
    9:14
**Transportation (1)**
    53:7
**treatment (1)**
    38:25
**triggered (2)**
    19:5,18
**trip (1)**
    36:16
**truck (2)**
    9:24,25
**trucking (3)**
    9:14,19;53:8
**true (1)**
    18:6
**try (8)**
    5:2,6,7,10,13;12:21;
    13:13;50:9
**trying (4)**
    16:24;29:25;50:6;
    52:10
**turn (1)**

34:7
**Turning (1)**
    25:10
**turns (1)**
    49:10
**twice (1)**
    22:14
**two (5)**
    5:17;11:17;16:19;
    19:7;47:14
**type (1)**
    9:13

---

**U**

**uh-huhs (1)**
    5:2
**under (1)**
    5:13
**underlying (1)**
    17:12
**understood (2)**
    4:17;47:10
**undue (1)**
    46:5
**union (2)**
    50:15,17
**universal (1)**
    15:25
**unless (1)**
    46:21
**up (28)**
    4:16;5:1;9:25;16:12;
    20:17;23:19,24;24:1,2,
    15;25:8;32:4,10,18,22;
    33:2,11;37:3,23,24;
    39:4,6,16,19;41:12;
    47:15;49:6,14
**upset (2)**
    30:5,17
**use (6)**
    14:21;36:22;37:7,23;
    38:7;39:10
**used (4)**
    14:13;39:23;40:7,11
**uses (1)**
    39:22
**using (3)**
    40:2,3;50:8
**Utah (2)**
    10:23,24

---

**V**

**vacation (1)**
    52:6
**vacuum (3)**
    5:20;42:21,24
**vehicle (1)**
    51:12
**verbal (2)**
    4:20,25
**verification (1)**

44:3
**verify (1)**
    32:4
**Verizon (2)**
    14:13,14
**version (1)**
    56:9
**versus (1)**
    33:25
**videos (1)**
    12:8
**violation (1)**
    41:4
**Virginia (1)**
    28:17
**Volheim (23)**
    4:22;5:15;12:16,19,
    22;13:1;20:8,11;41:23;
    42:2,8;43:7,19,23;
    46:2;51:3;53:23,25;
    54:6,8;55:15;56:4,8
**voluntarily (1)**
    10:15

---

**W**

**W6095 (1)**
    6:18
**W-A-D-D-E-L (1)**
    6:18
**Wadell (1)**
    6:18
**waiting (1)**
    5:12
**watch (1)**
    12:8
**Wausau (1)**
    17:22
**way (8)**
    10:1;17:17;26:1,23;
    29:9;38:19;40:22;47:1
**ways (1)**
    34:19
**week (1)**
    35:2
**weren't (2)**
    7:16;10:6
**West (5)**
    6:8,13,14,15,16
**Western (1)**
    4:10
**Wexler (1)**
    4:8
**What's (6)**
    5:22;6:3;19:5;20:6;
    29:23;43:17
**whole (1)**
    51:5
**Wisconsin (10)**
    4:11;6:2,19,22;8:16;
    17:22;40:6,10;50:17;
    51:24
**withdraw (10)**

18:19,21,22;47:2,9;
    49:12,15,18;50:6,9
**withdrawing (3)**
    46:25;47:11,23
**withdrawn (7)**
    18:15;41:9;42:1,14,
    19;43:5,11
**withdrew (4)**
    47:5,13;48:2;49:21
**within (5)**
    23:17;24:13;35:1,1,2
**without (1)**
    56:9
**witness (8)**
    4:2;39:9;46:4;51:5;
    53:12,21;54:5;55:14
**woman (2)**
    21:24;28:6
**Wood (1)**
    28:15
**words (4)**
    17:4;26:22;45:23;
    46:16
**work (8)**
    5:17;29:22;30:6;
    31:10,11;35:3;51:16;
    52:4
**worked (1)**
    52:12
**working (1)**
    51:20
**worry (1)**
    46:6
**written (1)**
    20:17
**wrong (1)**
    13:19

---

**Y**

**year (4)**
    6:12;15:3;18:11;
    53:11
**years (2)**
    6:21;14:9
**Yep (2)**
    15:6;50:13
**yielded (1)**
    27:4

---

**1**

**1 (4)**
    20:4,7,9;25:10
**10 (3)**
    29:14;37:11;44:20
**10:15 (1)**
    56:10
**100 (3)**
    16:8,9,10
**11 (1)**
    45:5
**12/23/1987 (1)**

5:23
**12th (1)**
    23:8
**14 (1)**
    52:13
**150 (4)**
    16:10,11,14;17:1
**16th (1)**
    20:22
**17 (1)**
    21:1
**18 (6)**
    16:4;22:16,22;32:1;
    45:3;53:2
**18th (1)**
    44:15
**19 (3)**
    16:5;25:10;53:3
**1st (2)**
    48:8,15

---

**2**

**2 (6)**
    43:15,18,20;44:1;
    45:13,17
**20 (6)**
    22:17,22,25;23:13,
    18;28:10
**200 (3)**
    16:12,15;17:8
**2009 (1)**
    40:8
**2010 (2)**
    40:8,9
**2018 (11)**
    13:24;14:16;15:5;
    16:1;21:10;23:3,8;
    33:25;39:20,24;47:16
**2019 (10)**
    13:25;14:16;15:23;
    16:1;20:23;33:25;
    39:20,24;44:15;53:11
**23 (1)**
    34:8
**277-1467 (2)**
    39:24;40:1

---

**3**

**3 (1)**
    20:25
**319 (2)**
    29:19,20

---

**4**

**4 (2)**
    34:7,8
**423 (2)**
    6:8,13
**4260 (3)**
    15:7,11,17

Erik D. Rigby vs.
Crosscheck Solutions, LLC, et al.

Deposition of Erick Rigby
October 18, 2019

**6**

**6 (2)**
  29:14;44:20
**642-3875 (1)**
  40:13

**7**

**715 (1)**
  14:5
**757 (3)**
  39:24;40:1,13
**757-319 (1)**
  29:21

**8**

**8 (3)**
  44:14;52:13,14

**9**

**9 (1)**
  37:13
**9.8 (1)**
  37:13
**904 (2)**
  6:4;7:1
**966-4260 (1)**
  14:3