IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

MADISON DIVISION

---oOo---

ERICK D. RIGBY,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )
                                   )No. 3:19-cv-00036-JDP
                                   )
CROSSCHECK SERVICES, LLC           )
d/b/a OPTIO SOLUTIONS, LLC         )
d/b/a QUALIA COLLECTION            )
SERVICES,                          )
                                   )
            Defendant.             )
                                   )
                                   )

DEPOSITION OF BRUCE HOTALING, PMK

ON BEHALF OF  OPTIO SOLUTIONS, LLC

Monday, September 16, 2019

PETALUMA, CALIFORNIA

ECOSCRIBE SOLUTIONS - JOB NO.:  30793

REPORTED BY:  A. MAGGI SAUNDERS,

            C.S.R. No. 2755



**EcoScribe Solutions**
www.EcoScribeSolutions.com
888.651.0505

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

MADISON DIVISION

---oOo---

ERICK D. RIGBY,                     )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )
                                    )No. 3:19-cv-00036-JDP
                                    )
CROSSCHECK SERVICES, LLC            )
d/b/a OPTIO SOLUTIONS, LLC          )
d/b/a QUALIA COLLECTION             )
SERVICES,                           )
                                    )
            Defendant.              )
                                    )
                                    )


DEPOSITION OF BRUCE HOTALING, PMK

ON BEHALF OF  OPTIO SOLUTIONS, LLC

Monday, September 16, 2019

PETALUMA, CALIFORNIA


ECOSCRIBE SOLUTIONS - JOB NO.:  30793

REPORTED BY:  A. MAGGI SAUNDERS,

            C.S.R. No. 2755

Page 2

```
1              I N D E X
2
3  WITNESS:  BRUCE TOTALING - AS PMK FOR OPTIO SOLUTIONS
4
5                                           Page
6  Examination by MR. VOLHEIM              5
7  Examination by MR. LITTLE               81
8  Further Examination by MR. VOLHEIM      87
9
10             E X H I B I T S
11
12 FOR PLAINTIFF                          PAGE
13 Exhibit A    Plaintiff's First Amended
14             Notice of Deposition
15 Exhibit B    Demand for Jury Trial
16 Exhibit C    Defendant Optio Solutions,
17             LLC's Response to Plaintiff's
18             Request for Admission
19 Exhibit D    Defendant Optio Solutions, LLC's
20             Response to Plaintiff's First
21             Set of Interrogatories
22 Exhibit E    Defendant Optio Solutions
23             LLC's Supplemental Response to
24             Plaintiff's Request for Production
25             of Documents
```

Page 3

```
1  PLAINTIFF'S EXHIBITS MARKED - CONTINUED
2  Exhibit F    Claim Master Update printouts
3             Multipage
4  Exhibit G    Call Completion Computer Printout
5             Two pages
6  Exhibit H    November 8, 2018 letter to
7             Erick Rigby from Qualia Collection
8             Services
9  Exhibit I    Ashley Homestore Documents
10 Exhibit J    Claim Collection Search documents
11            many redactions
12 Exhibit K    First page of "Mitel 3300
13            IP Communications Platform
14            Technician's Handbook
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       BE IT REMEMBERED that, pursuant to Notice
2  of Taking Deposition, and on Monday, the 16th day of
3  September, 2019, commencing at the hour of 10:13
4  o'clock a.m. thereof, at the REGUS BUSINESS CENTER,
5  755 Baywood Drive, 2nd Floor, Petaluma, California
6  94954, before me, A. MAGGI SAUNDERS, a Certified
7  Shorthand Reporter in and for the State of
8  California, there personally appeared for oral
9  deposition,
10
11          BRUCE HOTALING,
12
13 called as a witness by the Plaintiff ERICK RIGBY,
14 who, being by me first duly sworn, was thereupon
15 examined and interrogated as hereinafter set forth.
16
17          ---oOo---
18
19
20
21
22
23
24
25
```

Page 5

```
1            APPEARANCES
2
3  APPEARING TELEPHONICALLY:
4  FOR THE PLAINTIFF, ERICK RIGBY
5    SULAIMAN LAW GROUP, LTD.
6    BY:  NATHAN VOLHEIM, ESQ.
7    2500 S. Highland Avenue, Suite 200
8    Lombard, Illinois 60148
9    (630) 948-8411
10   nvolheim@sulaimanlaw.com
11
12 APPEARING TELEPHONICALLY:
13 FOR THE DEFENDANT CROSSCHECK SERVICES, LLC d/b/a
14   OPTIO SOLUTIONS, LLC AND THE
15   WITNESS HEREIN, BRUCE HOTALING
16   LIPPES MATHIAS WEXLER FRIEDMAN, LLP
17   BY:  BRENDAN H. LITTLE, ESQ.
18   50 Fountain Plaza - Suite 1700
19   Buffalo, New York 14202
20   (716) 853-5100
21   blittle@lippes.com
22
23 APPEARING IN PERSON:  D. LILAH McLEAN, ESQ.N
24 Corporate Counsel and Manager of Legal Affairs, OPTIO
25 SOLUTIONS, LLC, lmclean@optiosolutions.com
```

Page 6

1  MONDAY, SEPTEMBER 16, 2019 - 10:13 O'CLOCK A.M.
2
3      PETALUMA, CALIFORNIA
4
5  PLEASE NOTE:  BOTH MR. VOLHEIM AND MR. LITTLE
6    APPEAR TELEPHONICALLY AT THIS DEPOSITION
7
8      ---oOo---
9    BRUCE HOTALING, PMK FOR CROSSCHECK SERVICES,
10 called as a witness herein, being first duly sworn by
11 the Certified Shorthand Reporter to tell the truth,
12 the whole truth, and nothing but the truth, testified
13 as follows:
14 EXAMINATION BY MR. VOLHEIM:
15    MR. VOLHEIM:  Q.  Good morning,
16 Mr. Hotaling.  My name is Nathan Volheim.  I represent
17 the Plaintiff in this matter.
18      Please feel free to call me "Nate," do you
19 mind, because I've already butchered your name, do you
20 mind if I call you "Bruce"?
21    A.  Bruce is fine.
22    Q.  Okay.  And, like I said, please feel free
23 to call me Nate.
24    A.  Okay.
25    Q.  Bruce, have you been deposed before?

Page 7

1    A.  A long time ago.
2    Q.  Okay.  So, even if you've been deposed
3 yesterday, I'm going to go over a couple of ground
4 rules, I just -- it makes this go easier.
5      First and foremost, obviously, I am in
6 my office in -- well, not obviously -- I am in my
7 office in Oak Brook, Illinois outside of Chicago.  I
8 am the only one here, I am appearing telephonically.
9      Your counsel is in his office, I believe
10 in Buffalo, New York, and that is all by the
11 agreement of the parties.
12      Can you state where you are, Bruce?
13    A.  I am in Petaluma, California.
14    Q.  Other than our fine Court Reporter and
15 Mrs. McLean, is there anyone else in the room with you
16 right now?
17    A.  No, sir.
18    Q.  Okay.  So, obviously, because this is
19 telephonic, it raises a few challenges:  First and
20 foremost, I'm going to ask you some questions, and it's
21 important that we try not to talk over each other.
22      I will do my best, obviously, to not
23 talk over you, please do your best not to talk over
24 me.  If it happens, by accident, Miss Saunders will
25 yell at us, but I can assure you it's not out of any

Page 8

1 disrespect from me.  It's just the mechanics of doing
2 this telephonically.
3      Also, on that note, you want to keep all
4 of your answers verbal.  Any physical gestures, I can't
5 see, as well as they don't show up on the deposition
6 transcript.
7      Are those ground rules fair?
8    A.  Yes, sir.
9    Q.  Okay, great.
10      If you need to take a break at any point,
11 or anyone else needs to take a break at any point,
12 that's completely fine.  This is not a sprint, but I
13 don't want it to be a marathon, either, of course.
14      I don't anticipate this lasting more than
15 an hour or two.  However, like I said, you are free to
16 take as many breaks as you need.  All that I ask is, if
17 we are in the middle of a question, please finish
18 answering that question; is that fair?
19    A.  Yes, sir.
20    Q.  Okay.  You understand that you are under
21 oath today; is that correct?
22    A.  Correct.
23    Q.  Are you under the influence of any
24 substances, either legal or illegal, that would impair
25 your ability to give truthful and accurate testimony

Page 9

1 today?
2    A.  No.
3    Q.  If you answer my question, is it fair for
4 me to assume you that understand the question?
5    A.  If I answer your question?
6    Q.  Correct.
7    A.  Yeah; if I answer it, yes.
8    Q.  Okay.  And obviously, if I ask you
9 something that you don't understand, or you want
10 clarification, please feel free to ask.  It is very
11 likely that I will ask you something in a clumsy way,
12 and you may need some further clarification, and I do
13 not take offense if you ask for clarification, okay?
14    A.  Yup.
15    Q.  Okay.  Last thing:  Throughout this
16 deposition your counsel may object.  Unless he
17 instructs you specifically not to answer, let him make
18 his objection, and then you can go ahead and answer the
19 question.  Is that understood?
20    A.  Correct, okay.
21    Q.  Okay.  All right.
22      Can you state and spell your full name
23 for the record.
24    A.  My first name is Bruce, B-r-u-c-e.  My
25 last name is H-o-t-a-l-i-n-g.  It's pronounced

Page 10

1  "Hotaling".
2      Q.   Okay.  And who do you work for?
3      A.   Optio Solutions.  O-p-t-i-o, Solutions.
4  Sorry, Nate.
5      Q.   That's not a problem.
6           Does Optio Solutions have any dba's?
7      A.   Yes.
8      Q.   And what are those?
9      A.   Qualia.  And that's spelled Q-u-a-l-i-a,
10  Collection Services.
11     Q.   Any other dba's other than that?
12     A.   No, sir.
13     Q.   Okay.  Today I might use some shorthand,
14  just saying "Otio".  Is it fair for us both to
15  understand that I'm referring to your company,
16  Optio Solutions?
17     A.   Yes, that's fine.
18     Q.   Okay.  How long have you worked for Optio?
19     A.   Twelve years.
20     Q.   And what is your current role?
21     A.   I'm the vice president.
22     Q.   And just as kind of a general overview,
23  what responsibilities fall under your purview as
24  vice president?
25     A.   I manage a collections group.  I'm

Page 11

1  responsible for compliance, responsible for coaching
2  and training, hiring and recruiting.  Basically,
3  teaching collectors how to collect the debts that we
4  are responsible for.
5      Q.   How long have you served in the role of
6  vice president?
7      A.   At Optio Solutions?
8      Q.   Yes, please.
9      A.   All 12 years.
10     Q.   Okay.  You mentioned that part of your
11  duty is dealing with collectors and making sure that
12  they are in compliance; is that fair to say?
13     A.   Yes.
14     Q.   As part of those duties do you make sure
15  that your -- excuse me.
16          As part of those duties, is it part of
17  your responsibility to make sure that collectors are
18  in compliance with the Fair Debt Collection Practices
19  Act, or "FDCPA" for short?
20     A.   Yes.
21     Q.   Just generally, what is your training or
22  experience with the FDCPA?
23     A.   My personal experience, or my personal
24  training?
25     Q.   Yeah, let's start with that.

Page 12

1      A.   Well, I'm versed in the FDCPA.  I am -- we
2  go through -- we have compliance meetings twice a month
3  at our -- with all of our collectors and myself.
4           Yeah; I mean, that's probably it.
5      Q.   Do you hold any degrees or certifications
6  with respect to the FDCPA?
7      A.   I have an ACA credential that I received
8  for a collections professional.
9      Q.   Approximately when did you receive that?
10     A.   Hmm.  Probably -- Well, it was just
11  recently updated -- probably in the last six months it
12  was recently updated, so I would probably have to say
13  six months to a year.
14     Q.   What is the highest level of education
15  that you have achieved?
16     A.   Personally?
17     Q.   Yes.
18     A.   I finished my junior year at Sonoma State
19  University.
20     Q.   Okay.  You do not have a law degree; is
21  that correct?
22     A.   That's correct.
23     Q.   Okay.
24          MR. VOLHEIM:  I'm going to ask our
25  Court Reporter, unless you already have it, to hand you

Page 13

1  what's been premarked as Exhibit A, A as in apple.
2           If you could go ahead and take a look at
3  Exhibit A, and let me know when you are done, I would
4  appreciate it.
5           (Plaintiff's First Amended Notice of
6           Deposition marked Plaintiff's Exhibit A
7           for identification.)
8           THE WITNESS:  I have Exhibit A.
9           MR. VOLHEIM:  Okay, great.
10          Bruce, if you could just quickly look
11  through Exhibit A, and let me know when you are done.
12     A.   (Looking at the document)  Okay, I'm done,
13  sir.
14     Q.   Thank you.
15          MR. VOLHEIM:  For the record, Exhibit A
16  has been -- or is Plaintiff's First Amended Notice of
17  Deposition.
18     Q.   Have you seen Exhibit A before today,
19  Bruce?
20     A.   Yes, sir.
21     Q.   When do you recollect first seeing
22  Exhibit A?
23     A.   I think Wednesday of last week.
24     Q.   There are topics 1 through 27.  Do you see
25  those topics?

1   A.   Yes, sir.

2   Q.   Did you review those topics before today?

3   A.   I read through them, yes.

4   Q.   Is it your understanding that Optio has

5 designated you its Corporate Representative to testify

6 as to Topics 1 through 27?

7   A.   Yes, sir.

8   Q.   And regarding Topics 1 through 27, are

9 there any of those topics in which you feel that you

10 cannot truthfully, accurately and completely testify

11 to?

12   A.   I'm going to have to look through them

13 again real quick.

14   Q.   Go ahead.

15   A.   (Reviewing the document.)

16        No. 2, I don't have -- I am -- I don't

17 have the knowledge of the telephone system.

18        2, 3 and 4 seem to be the -- pretty much

19 the same thing; the same with 5.

20        You know, all of the questions I can

21 answer truthfully.  Some of them I may not have the

22 information that is necessary for the question in

23 regards -- especially in regards to the workings of

24 the phone system that -- that you mention in here.

25 Everything else seems fine.

1   Q.   Okay.  So, to clarify, you cannot

2 testify -- and I don't want to put words in your mouth,

3 so please --

4   A.   No --

5   Q.   -- please correct me if I'm wrong --

6   A.   -- please don't --

7   Q.   -- but you can cannot testify to the

8 technology, the phone system or the technology that

9 Optio may have used in contacting our client -- my

10 client?

11        MR. LITTLE:  Object to the form.

12        THE WITNESS:  Did Brendan just say

13 something?

14        MR. LITTLE:  You can answer, Bruce.

15        THE WITNESS:  Okay.  Yes, I -- I can

16 answer the -- I guess what I was saying is I don't

17 know -- if you are going to ask me -- I don't know how

18 to say it -- questions pertaining to the -- to the

19 internal workings of the phone, but I can speak to the

20 other information in regards to what we use to collect

21 our debt.  Does that make sense?

22        MR. VOLHEIM:  Q.  Okay.  Yes, thank you.

23        Miss Saunders, can we go off the record,

24 please.

25        THE REPORTER:  Absolutely.

1        (Brief discussion held off the record.)

2        MR. VOLHEIM:  Okay, we can go back on the

3 record, Miss Saunders.

4   Q.   Bruce?

5   A.   Yup.

6   Q.   I'm not asking you for your legal opinion

7 in any way, but as someone who does compliance work for

8 Optio, what is your understanding of my client's

9 allegations in the lawsuit at issue?

10   A.   You want me to answer to what Mr. Rigby

11 is -- what we're doing here today?

12   Q.   Sure.

13   A.   There is an allegation of a third-party

14 disclosure;

15        There is an allegation of a TCPA

16 violation;

17        And there is an allegation of alleged

18 harassment.

19   Q.   Okay.  Did my client make an allegation

20 that he asked Optio to stop calling him?

21        MR. LITTLE:  Form.  You can answer, Bruce.

22        THE WITNESS:  Yes, he did.

23        But he also followed that up, I'd have

24 to look at the documentation notes to give you the

25 date that that happened on, but I do know that

1 approximately 19 minutes after that conversation,

2 your client called our department back, and proceeded

3 to have further conversations with regards to his

4 debt, even after -- he's the one -- even after he

5 said not to call him anymore, he called us back.

6        And therefore, once he made that phone

7 call back to us, and then agreed to have us call him

8 back the next day to discuss a payment plan, as far

9 as we were concerned, the Cease and Desist was null

10 and voided at that point.

11        MR. VOLHEIM:  Q.  Okay.  So, I didn't jump

12 in there Bruce, because I don't want to talk over you,

13 but we're going to have to go over a ground rule here.

14        You've got to answer the question that I

15 ask, and you can't go off answering questions that I

16 didn't ask --

17   A.   I didn't --

18   Q.   -- because your counsel is going to have

19 an opportunity to ask you questions after I'm done.

20 And at that point you are free to expound on as much as

21 you would like.

22        But my question in this circumstance was

23 pretty much:  Did my client make a specific

24 allegation, and your answer went into a contextual

25 defense of why you believe that your company didn't

Page 18

1 violate the law.
2        So all I'm asking is, try to keep your
3 answers to the question that I asked, and not
4 anticipate or go off on a tangent that you want to get
5 in. You'll be able to get that in when your counsel
6 asks you follow-up questions; is that fair?
7     **A.    I did answer your question. And you left**
8 **the question open for me to completely answer the**
9 **question the way I did.**
10    Q.    Bruce, I'm not going to get combative with
11 you --
12    **A.    I'm not being combative --**
13    Q.    Bruce, I didn't talk over you. Please
14 continue not to talk over me.
15        I already have a witness who stated that
16 he can't testify to a lot of topics that are important.
17        So, if we want to get combative, we can
18 adjourn this deposition, and we can get a witness who
19 can testify to those topics.
20        MR. LITTLE: Object to the form.
21        MR. VOLHEIM: There wasn't a question
22 there.
23    Q.    Why was Optio contacting my client?
24    **A.    Because your client wrote three checks to**
25 **our client, and the checks were returned,**

Page 19

1 "Non Sufficient Funds".
2    Q.    Who is your client in the context of that
3 response?
4    **A.    CrossCheck.**
5    Q.    What is my client's relationship with
6 CrossCheck?
7    **A.    CrossCheck is the check guarantee company**
8 **for Ashley Furniture.**
9    Q.    To your knowledge and understanding, is
10 CrossCheck part of Ashley Furniture?
11    **A.    Rephrase the question, please?**
12    Q.    To your knowledge and understanding, is
13 CrossCheck a part of Ashley Furniture?
14        MR. LITTLE: I objected to the form.
15        MR. VOLHEIM: You may answer.
16    **A.    Oh. Repeat the question, please?**
17    Q.    To your knowledge and understanding, is
18 Ashley Furniture -- or excuse me, strike that.
19        To your knowledge and understanding, is
20 CrossCheck a part of Ashley Furniture
21        MR. LITTLE: Object to the form. You can
22 answer, if you know.
23        **THE WITNESS: CrossCheck is not part of**
24 **Ashley Furniture.**
25        MR. VOLHEIM: Q. When Optio contacted my

Page 20

1 client, had my client defaulted on his payments to
2 CrossCheck?
3    **A.    Yes.**
4    Q.    Does Optio [Furniture] [sic.] own any part
5 of the debt in which it was seeking collection on?
6        MR. LITTLE: Object to the form.
7        **THE WITNESS: Who is "Optio Furniture"?**
8        MR. VOLHEIM: Q. I apologize.
9        Does Optio own any part of the debt that
10 it was seeking collection on behalf of CrossCheck for?
11    **A.    No, sir.**
12    Q.    Was Optio acting as a debt collector with
13 respect to my client?
14        MR. LITTLE: Form.
15        **THE WITNESS: Yes, sir.**
16        MR. VOLHEIM: Q. How many accounts was
17 Optio collecting on behalf of my client with respect to
18 Ashley Furniture?
19    **A.    Well, we weren't collecting on behalf of**
20 **your client. We were collecting from your client.**
21    Q.    How many accounts was Optio collecting?
22    **A.    Three.**
23    Q.    Three different accounts.
24    **A.    Three different checks, Nate.**
25    Q.    Okay. Were all of those checks under the

Page 21

1 same account number, or different account numbers?
2    **A.    Same.**
3        MR. LITTLE: Form.
4        MR. VOLHEIM: Q. Did you say, "same"?
5    **A.    I didn't hear what Brendan said.**
6        MR. LITTLE: I just objected to the form.
7        **THE WITNESS: Oh.**
8        MR. LITTLE: You can answer, Bruce.
9        **THE WITNESS: Repeat the question.**
10        MR. VOLHEIM: Q. Were all three checks
11 under the same account number?
12    **A.    To my --**
13        MR. LITTLE: Object to the form.
14        **THE WITNESS: To my knowledge, yes.**
15        MR. VOLHEIM: Q. What is that account
16 number? What is the account number that Optio was
17 collecting on?
18    **A.    What was the account number?**
19    Q.    Correct.
20    **A.    I don't -- I don't -- I'd have to see**
21 **the -- I don't have that in front of me; I'm not sure.**
22    Q.    Okay. What document or documents would
23 give you that information?
24    **A.    Copies of the checks.**
25    Q.    Okay. Let me clarify. Did Optio assign

Page 22

1 an account number related to collection activity
2 against my client?
3    A.    Correct; yes, we did.
4    Q.    Okay.  Do you know that collection
5 number --
6    A.    I would --
7    Q.    Excuse me, strike that.
8         Do you know that account number?
9    A.    I would need to see the documentation
10 notes.
11    Q.    Okay.  So I think the document that would
12 help, be helpful to you would be Exhibit F, as in
13 Frank.  So, why don't you go ahead and pull that out,
14 and let me know if I'm correct.
15    A.    Okay.  Go ahead, Nate.
16    Q.    Exhibit F for the record is a copy of
17 Optio's account notes.  Have you seen this document
18 before?
19    A.    Yes.
20    Q.    Will this document tell you the account
21 number that Optio was using in reference to my client?
22    A.    Yes.
23    Q.    What is that account number?
24    A.    4760109.
25    Q.    Okay.  And I believe that probably appears

Page 23

1 on many pages, but let's just go to the first page,
2 it's in the upper left-hand corner, is that correct,
3 under Claim No.?
4    A.    Correct.
5    Q.    Okay.  Was Optio collecting or using any
6 other account numbers with respect to my client?
7    A.    Yes.
8    Q.    What are those account numbers?
9    A.    I don't have those available to me, unless
10 they are in one of the exhibits.  They are not -- I'm
11 looking through Exhibit F, and they are not in here.
12    Q.    You would agree with me that Exhibit F
13 only references Account No. 4760109; is that correct?
14    A.    Correct.
15    Q.    In connection with Exhibit F -- strike
16 that.
17         When did Optio receive my client's
18 account from CrossCheck?
19    A.    It looks like we received it on
20 August 28th, 2018.
21    Q.    When you received it, did Cross- -- did
22 Optio send any written correspondence to my client?
23    A.    Yes.
24    Q.    What is the date of the written -- the
25 first written correspondence that Optio sent?

Page 24

1    A.    I'm looking -- I don't recall off the top
2 of my head, and I don't -- I do not see it on
3 Exhibit F.
4    Q.    Should Exhibit F include a notation of any
5 written correspondence that Optio has sent?
6    A.    (Looking at the document)
7         One moment, please.  Let me look through
8 this exhibit because there is several pages here.
9 You are going to have to bear with me for a second.
10    Q.    Take your time.
11    A.    Okay.  So we did -- here it is right
12 here -- we sent the first letter on September 3rd,
13 2018.
14    Q.    What page are you referencing for that
15 information?
16    A.    It would be page three.  I guess -- is the
17 page number at the bottom right?
18    Q.    There are Bates numbers at the bottom
19 right-hand corner.  If you want to give me that, that
20 would be appreciated.
21    A.    Yeah, look at -- look at Optio 016.
22    Q.    Okay.  And can you draw my attention to
23 where you are seeing that date?
24    A.    Right where it says "First Request".
25    Q.    I apologize.  Can you give me better

Page 25

1 direct- -- or other directions.  I'm not seeing the
2 First Request?
3    A.    Are you looking at page 16?
4    Q.    I am -- Oh, I see it now.  It's in the
5 middle of the box there.
6    A.    Correct.
7    Q.    Okay.  This is the first correspondence
8 that Optio sent to my client?
9    A.    Correct.
10    Q.    Did Optio produce, in connection with this
11 litigation, did Optio produce a copy of that letter, to
12 your knowledge?
13    A.    I don't understand the question.
14    Q.    Through the course of this litigation, did
15 Optio produce a copy of the letter it sent to my client
16 on September 3rd, 2018?
17    A.    Do we have a copy of it?
18    Q.    No.  I'll get to that in a moment.
19         To your knowledge, has Optio given me a
20 copy of the letter dated September 3rd, 2018 it sent to
21 my client?
22    A.    I have no idea.
23    Q.    Does Optio have a copy or access to this
24 letter?
25    A.    Not to my knowledge.  I'm not sure.

Page 26

1    Q.    You don't know if Optio has the ability to
2  get copies of letters that it sends?
3    **A.    Correct.**
4    Q.    Who would know the answer to that
5  question?
6    **A.    I'm not sure.**
7    Q.    What other correspondence -- what other
8  written correspondence did Optio send to my client
9  other than the letter dated September 3rd, 2018?
10    **A.    We sent a Second Request letter on**
11  **September 13th, 2018.**
12    Q.    And where is that notated?
13    **A.    Page 17, the same box, second line down.**
14    Q.    To your knowledge, has Optio produced a
15  copy of that letter in the course of this litigation?
16    **A.    I do not know.**
17    Q.    To your knowledge, does Optio -- is Optio
18  able to get a copy of that letter dated September 3rd,
19  2018?
20    **A.    I'm not sure.**
21    Q.    Are you also unaware of who would know?
22    **A.    That's correct.**
23    Q.    Other than those two correspondences, has
24  Optio produced or sent my client any other written
25  correspondence?

Page 27

1    **A.    Yes.**
2    Q.    What other dates?
3    **A.    We sent on September 20th, 2018, on page**
4  **18, we sent -- we re-sent the first letter upon your**
5  **client's request.**
6    Q.    Is that -- what date was that?
7    **A.    9/20/2018.**
8    Q.    Any other written correspondence sent by
9  Optio to my client?
10    **A.    Yes.  We sent a -- on page 19 of**
11  **Exhibit F, we sent a Third Request letter on**
12  **October 22nd, 2018.**
13    Q.    And is it fair to say that you are unaware
14  if Optio produced any of these correspondence in the
15  course of this litigation?
16    **A.    Produced them to who?**
17    Q.    To me.
18    **A.    Yes, same answers as before.**
19    Q.    Any other letters after October 22nd,
20  2018?
21    **A.    Yes.  We sent a preauthorization letter,**
22  **agreeing to the payment plan that your client agreed**
23  **to, and I -- it's in one of the exhibits, I'm just not**
24  **sure which one, so I would need to search for that to**
25  **give you the date.**

Page 28

1    Q.    Any other correspondence other than those
2  that we've discussed?
3    **A.    Not to my knowledge.**
4    Q.    Did my client ever send Optio any written
5  correspondence?
6    **A.    Not to my knowledge.**
7    Q.    Could I ask you to turn to what's been
8  premarked as Exhibit D as in dog.
9    **A.    [Reviewing document]  Okay.**
10    Q.    Before we get to Exhibit D, based on your
11  experience -- well, strike that.  We'll get back to
12  that.  My apologies.
13        For the record Exhibit D is Defendant
14  Optio Solution, LLC's Responses to Plaintiff's First
15  Set of Interrogatories.
16        (Optio Solutions, LLC's Responses to
17        Plaintiff's First Set of Interrogatories
18        marked Plaintiff's Exhibit B for
19        identification.)
20        MR. VOLHEIM:  Q.  Have you seen this
21  document before today?
22    **A.    I did.**
23    Q.    When is the first time that you saw this
24  document?
25    **A.    Wednesday.**

Page 29

1    Q.    Had you seen this document prior to
2  Wednesday?
3    **A.    Oh, you just asked me when the first time**
4  **I saw it was.**
5    Q.    So you didn't see this document prior to
6  Wednesday.
7    **A.    That's -- Yes, that's the answer to your**
8  **question.**
9    Q.    Okay.  If that's the case, I want you to
10  turn to the last page.
11    **A.    Okay.**
12    Q.    Whose signature appears at the last page?
13    **A.    That's mine.**
14    Q.    Do you want to go ahead and read that
15  verification?
16    **A.    [Reading]:**
17        **"Bruce Hotaling, first being duly sworn**
18        **deposes and states that he is the Vice**
19        **President of Consumer Relations for**
20        **Optio Solutions, LLC, the Defendant in**
21        **the above-entitled action;**
22        **"That he has read the foregoing response**
23        **to the Plaintiff's Interrogatories, and**
24        **knows the contents thereof;**
25        **That the statements of fact are above --**

Page 30

1      [oh, I'm sorry] -- the statements of
2      fact above are true, to the best of his
3      knowledge, except as to those matters
4      alleged upon information and belief and
5      that, as to those matters, he believes
6      them to be true."
7    Q.   What date did you sign that verification?
8    A.   I'm not sure, sir.
9    Q.   If I told you it purported that Defendant
10 produced these responses on May 3rd, 2019, do you have
11 any reason to doubt that is correct?
12   A.   No, sir.
13   Q.   So, how did you sign that sworn statement,
14 if the first time that you saw these documents was on
15 Wednesday?
16   A.   I don't remember.
17   Q.   I'm sorry, what don't you remember?
18   A.   Repeat the question, please?
19   Q.   Sure.  You told me that you saw these
20 documents for the first time on Wednesday; is that
21 correct?
22   A.   Correct.
23   Q.   Yet Defendant produced these documents
24 with your signature on May 3rd, 2019.
25      So my question is, how did you sign that

Page 31

1 verification under oath, stating that you reviewed
2 these documents, when you hadn't seen them until
3 Wednesday?
4    A.   Well, that was over five months ago, so I
5 forgot that I had signed this.
6    Q.   Do you have any issues with your memory?
7       MR. LITTLE:  Form.
8       THE WITNESS:  I would -- I would
9 appreciate it, Nate, if you don't insult me.
10      MR. VOLHEIM:  Q.  I didn't insult you, I
11 asked a question.
12      You just stated you didn't remember
13 something, and I'm asking you if you have any issues
14 with your memory.
15      MR. LITTLE:  Form.
16      THE WITNESS:  Don't ask me questions like
17 that, please.
18      MR. VOLHEIM:  Do you want to instruct your
19 client to answer the question, Brendan?
20      MR. LITTLE:  Well, if you ask it properly.
21      MR. VOLHEIM:  Q.  Do you have any issues
22 with your memory, Bruce?
23      MR. LITTLE:  What do you mean by "issues,"
24 Nate?
25      MR. VOLHEIM:  Q.  Are you instructing your

Page 32

1 client not to answer?
2       MR. LITTLE:  No, I don't understand what
3 the question is regarding "issues".  You can ask him if
4 he --
5       MR. VOLHEIM:  Do you have any problems
6 remembering things?
7       MR. LITTLE:  -- has a medical issue.  Do
8 you have a medical issue with your memory?  That would
9 be an appropriate question.
10      MR. VOLHEIM:  Q.  Do you have problems
11 remembering things, Bruce?
12      MR. LITTLE:  Form.
13      THE WITNESS:  What types of things, Nate?
14      MR. VOLHEIM:  Q.  How about things you do
15 at work?
16   A.   No.
17   Q.   Okay.  So now that we went over this, did
18 you review this document prior to last Wednesday?
19   A.   Apparently so.
20   Q.   What does "apparently" mean?  It's a "yes
21 or a "no":  Did you review this document prior to
22 Wednesday?
23      MR. LITTLE:  Form.  You can answer.
24      THE WITNESS:  Yes.
25      MR. VOLHEIM:  Q.  Did you help provide the

Page 33

1 answers contained in this document?
2    A.   No.
3    Q.   How do you know the answers are correct,
4 then, if you didn't help provide them?
5    A.   I'm not sure how to answer that question.
6 I have -- We have internal, in-house counsel that
7 answers these.
8    Q.   Who answered these questions?
9    A.   I'm not sure.
10   Q.   You don't know who answered these
11 questions?
12   A.   I'm not sure who provided me the answers,
13 no, sir.
14   Q.   So you are not sure who provided them.  Do
15 you know the answers are correct?
16   A.   I would have to read through the document.
17   Q.   Okay.  But if you go back to the last page
18 it says one of the things you attested to is:
19      He has read the foregoing responses to
20      the Plaintiff's Interrogatories, and
21      knows the contents thereof, and that the
22      statements of fact above are true to the
23      best of his knowledge, except those
24      matters alleged upon information and
25      belief, and that those matters he

1    believes them to be true.
2         So what did you base your belief that the
3    answers were true on, if you don't know who reviewed
4    them and you don't know if they are true?
5         MR. LITTLE:  Form.
6         **THE WITNESS:  I would have to trust the**
7    **system.**
8         MR. VOLHEIM:  Q.  What system?
9    **A.   The system that we have in place to answer**
10   **these types of complaints.**
11        Q.   So you didn't review whether or not these
12   answers are correct, you just trusted the system, and
13   signed off on it; is that fair to say?
14        MR. LITTLE:  Form.
15        **THE WITNESS:  Repeat the question?**
16        MR. VOLHEIM:  Q.  Did you review the --
17   When you signed off on this verification, did you
18   review whether or not the answers were true, or did you
19   just trust that the system would put down true answers?
20   **A.   I trusted the --**
21        MR. LITTLE:  Form.
22        **THE WITNESS:  I trusted the system.**
23        MR. VOLHEIM:  Q.  Did you do any personal
24   investigation as to whether or not the answers were
25   true or accurate?

1    **A.   No, sir.**
2         MR. VOLHEIM:  All right.  Let's go off the
3    record.
4         (Brief discussion held off the record.)
5         MR. VOLHEIM:  All right.  We can go back
6    on the record.
7         Q.   Bruce, I'm going to direct your attention
8    to an answer No. 18 -- excuse me -- Interrogatory
9    No. 18.
10   **A.   Okay.**
11        Q.   Let me know when you are there.
12   **A.   I'm there.**
13        Q.   Interrogatory 18 states:
14        "State whether you sent or received any
15        written correspondence, including
16        e-mails to and/or from the plaintiff in
17        the relevant time period.
18        "For each written correspondence, please
19        list the date and the content of the
20        written correspondence."
21        Do you see that interrogatory?
22   **A.   Yup.**
23        Q.   You don't need to list the dates -- or
24   strike that.
25        Read me the response, the first sentence

1    of Defendants' Response?
2    **A.   "Defendant did not receive any written**
3    **communication from plaintiff."**
4         Q.   Okay.  Did you help prepare that answer?
5    **A.   I did not.**
6         Q.   Do you know who made that response?
7    **A.   I do not.**
8         Q.   Do you know if that response is true or
9    not?
10   **A.   To my knowledge, it's true.**
11        Q.   And what are you basing your knowledge on?
12   **A.   We didn't get any written communication**
13   **from Mr. Rigby.**
14        Q.   What is your confidence level, 1 to 100,
15   with 100 being most confident, that you did not receive
16   any written correspondence from Mr. Rigby?
17        MR. LITTLE:  Object to the form.
18        **THE WITNESS:  That's a pretty big range,**
19   **don't you think?**
20        MR. VOLHEIM:  Q.  I'm not going to answer
21   questions from you, Bruce.  I'm asking them today.
22   **A.   Okay.**
23        Q.   The same question, and we can have the
24   Court Reporter read it back, if you need to.
25   **A.   My confidence level 1 to 100 that we did**

1    **not receive any written communication from the**
2    **Plaintiff?  I would have to say 100 percent, to my**
3    **knowledge.**
4         Q.   Are you as confident -- Go ahead, sorry; I
5    don't mean to talk over you.
6    **A.   To my knowledge, 100 percent.**
7         Q.   Okay.  Are you as confident in that
8    100 percent as you are confident in all the testimony
9    that you've given today?
10        MR. LITTLE:  Form.
11        **THE WITNESS:  Yes.**
12        MR. VOLHEIM:  Q.  Okay, great.
13        I'm going to ask you to turn to what's
14   been premarked as Exhibit H, and let me know when you
15   have that.
16   **A.   [Getting the document/reviewing the**
17   Exhibit H]  Okay.
18        Q.   Have you seen -- oh, excuse me.
19        For the record Exhibit H is
20   correspondence sent from the Defendant to Plaintiff.
21        (Correspondence sent from Defendant to
22        Plaintiff marked Plaintiff's Exhibit H
23        for identification.)
24        MR. VOLHEIM:  Q.  Have you seen Exhibit H
25   before today?

Page 38

1     A.   Yes.
2     Q.   When is the first time you saw Exhibit H?
3     A.   On Wednesday.
4     Q.   The first page of Exhibit H is a letter
5  dated November 8th, 2018.  Do you see that?
6     A.   Yup.
7     Q.   What is this document?
8     A.   It's the -- our dunn notice that we sent
9  to the consumer.
10    Q.   Based on your knowledge, not including
11  legal opinion, under what circumstances does the FDCPA
12  require the debt collector to sent a dunning notice?
13       MR. LITTLE:  Form.
14       THE WITNESS:  Repeat the question?
15       MR. VOLHEIM:  Can you please read that
16  back, Miss Saunders.
17       THE REPORTER:  Of course.
18   (The following question was read by
19    the Reporter as requested:
20       "Question:  Based on your
21       knowledge, not including legal
22       opinion, under what circumstances
23       does the FDCPA require the debt
24       collector to send a dunning
25       notice?")

Page 39

1        THE WITNESS:  We are required to send a
2  validation notice to the consumer.
3        MR. VOLHEIM:  Q.  When are you required to
4  send that validation notice?
5     A.   First --
6        MR. LITTLE:  Form.  You may answer.
7        THE WITNESS:  With -- as soon as we
8  receive the debt.
9        MR. VOLHEIM:  Q.  When did Optio receive
10  the debt in this circumstance?
11    A.   I believe it was August.
12    Q.   If Optio received the debt in August, and
13  it has to send a written correspondence when it sends
14  the debt, why did it wait over three months to send the
15  dunning notice?
16    A.   I need to take a moment to read this
17  letter, because I believe that I may have misstated
18  that this is the original -- this is not the original
19  validation notice that was sent.
20    Q.   Go ahead.
21    A.   [Reading the document]  Where is that
22  first exhibit?  Because I believe this is a follow-up.
23        This November 8th letter is a follow-up
24  letter -- this is not the original validation notice
25  that was sent in August.

Page 40

1     Q.   When you say a follow-up letter, what do
2  you mean by that?
3     A.   Your client asked that we re-send the
4  letter.
5     Q.   Okay.  How did my client ask you to
6  re-send the letter?
7     A.   Verbally.
8     Q.   Okay.  And I believe you testified earlier
9  that you were 100 percent confident that my client
10  never sent any written correspondence to Optio; is that
11  correct?
12    A.   To my knowledge, yes.
13    Q.   Why don't you go ahead and read the first
14  sentence of that letter dated November 8th, 2018.
15    A.   [Reading]
16       "We are in receipt of your written
17       correspondence regarding Account
18       No. 4760109."
19    Q.   Now that you've read that, I'm going to
20  ask you again:  Did my client send any written
21  correspondence to Optio?
22    A.   To my knowledge, I have never seen
23  anything.
24    Q.   Okay.  So, I want you to compare Exhibit D
25  and the answer that you allegedly verified on

Page 41

1  Interrogatory No. 18, which says:
2        "Defendant did not receive any written
3        communication from Plaintiff," and I
4  want you to compare that with Exhibit H, which is a
5  letter sent by Optio, which says:
6        "We are in receipt of your written
7        correspondence regarding account
8        No. 460109."
9        Are both of those statements true?
10    A.   Yeah, I -- I don't -- I don't recall ever
11  seeing anything from Mr. Rigby.
12    Q.   Okay.  So does that mean that Exhibit H
13  contains a false statement, or?
14    A.   (Looking at the document)  No, sir, I
15  don't believe the statement is false.
16    Q.   Okay.  So that means the statement, you
17  would agree with me, says, "we are in receipt of your
18  written correspondence"?
19    A.   I see what it says, Nate.  I'm just
20  unfamiliar with receiving anything personally.
21    Q.   Okay.  All right.  Understood.
22    A.   So I can't --
23    Q.   But you are --
24    A.   So I can't -- I can't --
25    Q.   Go ahead.

Page 42

1      A.   I can't -- I can't tell you that I saw
2 something from Mr. Rigby, and that there's a
3 contradiction between Exhibit -- Exhibit H and
4 Exhibit D, I don't have that knowledge, I don't have
5 that information.
6      Q.   In Exhibit -- I'm not asking for your
7 personal information.
8           In Exhibit H, is Optio affirmatively
9 stating that they received written correspondence
10 from my client?
11          MR. LITTLE:  Form.
12          THE WITNESS:  According to this, yes.
13          MR. VOLHEIM:  Q.  Okay.  In Exhibit D, in
14 its response to Interrogatory No. 18, did Defendant
15 affirmatively state that it did not receive any written
16 communication from my client?
17     A.   (Looking at the document)  Yes, that's
18 what it says.
19     Q.   To your knowledge, which of these two
20 statements is true?
21     A.   Exhibit D, or I think -- yeah, it's D.
22     Q.   Okay.  So if Exhibit D is true, does that
23 mean Exhibit H is false?
24          MR. LITTLE:  Form.
25          THE WITNESS:  I don't believe that Exhibit

Page 43

1 H is in -- is false in the fact that we are letting
2 Mr. Rigby know his check number, the date, the amount,
3 who it was payable to.
4          MR. VOLHEIM:  Q.  That's not what I'm
5 asking.  I am going to cut you off, because we already
6 had this conversation.
7           All I care about right now is the first
8 sentence, which says:
9           "We are in receipt of your written
10          correspondence regarding account
11          No. 4760109."
12     A.   (Looking at the document)
13     Q.   Is that statement true or false?
14          MR. LITTLE:  Form.
15          THE WITNESS:  I'm not sure.  To my
16 knowledge, I've already explained that to you.
17          MR. VOLHEIM:  Q.  Would you agree with me
18 that, either Exhibit H has to be false with respect to
19 that sentence, or Exhibit D has to be false with
20 respect to the first sentence of Interrogatory No. 18?
21          MR. LITTLE:  Form.
22          THE WITNESS:  I couldn't answer that
23 question, Nate; I'm not sure.
24          MR. VOLHEIM:  Q.  Why can you not answer
25 that question?

Page 44

1      A.   Because I don't know which one would be
2 false.  If either --
3      Q.   Do you agree that --
4      A.   -- I don't know which, if either one is
5 false, that -- he's taking -- he's taking Exhibit H out
6 of context, so.
7      Q.   How is he taking Exhibit H out of context?
8      A.   He being you, Nate.  You are --
9      Q.   Okay.  How am I taking Exhibit H out of
10 context?
11     A.   You are taking the entire letter, and you
12 are trying to ask me if the entire letter is false.  I
13 don't believe it to be false.
14     Q.   I'm not asking you if the entire letter is
15 false.  I'm asking you if the statement, the first
16 sentence -- I haven't asked you anything about the
17 entire letter.  I've asked you if the first sentence is
18 true or false.
19     A.   I can't -- I don't know.  I don't know
20 which it would be.
21     Q.   All right.  Do you agree with me that
22 either that sentence is false, or Interrogatory
23 No. 18's response is false?
24          MR. LITTLE:  Form.
25          THE WITNESS:  I -- based on -- on the

Page 45

1 single sentence on Exhibit H and the Exhibit D, No. 18
2 Response, one would have -- it would appear one would
3 have to be false.
4          MR. VOLHEIM:  Q.  But you don't know which
5 one it is.
6      A.   No, I do not.
7      Q.   When debt collectors send communications
8 to consumers, does the FDCPA require that they are
9 truthful and accurate?
10          MR. LITTLE:  Form.
11          THE WITNESS:  Could you read the question
12 back to me please.
13          (The following question was read by
14          the Reporter as requested:
15          "Question:  When debt collectors
16          send communications to consumers,
17          does the FDCPA require that they
18          are truthful and accurate?")
19          THE WITNESS:  Well, yeah; but the debt
20 collectors don't send the letters.  But, yes, they are
21 required to be truthful and accurate, yes.
22          MR. VOLHEIM:  Q.  Who sent Exhibit H?
23     A.   I -- it's a system-generated letter.
24     Q.   What -- who owns or operates the system
25 that generated the letter?

Page 46

1    A.    I'm not sure.

2    Q.    Does Optio, are they -- are they the ones
3 that sent the letter?

4    A.    The letter would have come from Qualia
5 Collection Services.

6    Q.    Is that part of Optio?

7    A.    Yes.

8    Q.    I'm going to ask you to turn to page --
9 what's been premarked as Exhibit G, as in girl.

10    A.    Okay.

11        MR. VOLHEIM:  For the record, Exhibit G is
12 a call log produced by Defendant.

13    Q.    Have you seen Exhibit G before today?

14    A.    On Wednesday.

15    Q.    Okay.  Is that the first time that you've
16 seen Exhibit G?

17    A.    Yes, sir.

18    Q.    What is Exhibit G?

19    A.    It's our phone call log.

20    Q.    Okay.  Are these outgoing calls or
21 incoming calls or a combination?

22    A.    To my knowledge, these would be both.

23    Q.    Okay.  I'm going to ask you, on the first
24 page, seven lines down, there is an entry with a time
25 stamp of 83846.  Let me know when you see that.

Page 47

1    A.    Yup.

2    Q.    Okay.  The date of that call is
3 October 12th, 2018; is that correct?

4    A.    Correct.

5    Q.    Okay.  Now, is that a call -- is that an
6 outbound call that Optio placed, or is that an incoming
7 call?

8    A.    (Looking at the document)  To my
9 knowledge, it's an outbound call.

10    Q.    Okay.  So that by that, that means an
11 outbound call Optio placed to a phone number, correct?

12    A.    Correct.

13    Q.    Okay.  What phone number did Optio call on
14 October 12th, 2018?

15    A.    (715) 966-4260.

16    Q.    Okay.  And who -- whose phone number, to
17 the extent you know, whose phone number is that?

18    A.    To my knowledge, it's Mr. Rigby's phone.

19    Q.    Okay.  So based on this dialer log, Optio
20 placed a phone call to my client on October 12th, 2018?

21        MR. LITTLE:  Object to the form and your
22 characterization of calling it a "dialer log".

23        MR. VOLHEIM:  Q.  Based on this call log,
24 did Optio place a phone call to my client on October
25 12th, 2018?

Page 48

1    A.    Yes; the number was manually dialed.

2    Q.    Okay.  You can set that aside.  We
3 probably will need that in a minute, so keep it close.

4    A.    Keep what close?

5    Q.    Exhibit G.  I'm going to ask you to turn
6 back to what's been premarked as Exhibit F, as in
7 Frank, which would be the Account Notes.

8    A.    Okay.

9    Q.    I'm going to ask you to turn to Optio 44,
10 the Bates stamp at the bottom, it would be Optio 44.

11    A.    [Complies]  Okay.

12    Q.    All right.  With regards to Optio 44, did
13 Optio have a phone conversation with my client on
14 October 2nd, 2018?

15    A.    [Looking at document]  Yes, at -- yes, go
16 ahead.

17    Q.    And at what time was that?

18    A.    1409.

19    Q.    Okay.  I assume that's military time?

20    A.    Correct.

21    Q.    Okay.  And was that a call in which Optio
22 called my client?

23    A.    Correct.

24    Q.    Okay.  And the number that Optio called
25 was (715) 966-4260?

Page 49

1    A.    Correct.

2    Q.    All right.  So there are some notes under
3 that call.  Can you go ahead and read me what those
4 notes say?

5    A.    [Reading]

6        Home phone, talked to, and then the home
7 phone's typed in there, HP, (715) 966-4260.

8        Talked to "X," which is the -- is the
9 check-writer in this case.

10        Gave the call recording and the Mini
11 Miranda.

12        I explained -- "IEF" stands for "I
13 explained facts".

14        I asked if he received letter.

15        "X" said yes, finally did receive it.

16 Said he can't pay anything today.  Asked that we call
17 him in two weeks.

18        I said, "Okay, I will call you then."

19    Q.    Okay.  So these are notes -- is it fair to
20 say these are notes that were typed by Optio's -- one
21 of Optio's collection agents?

22    A.    Yes.

23    Q.    And is that Agent V. Flores?

24    A.    Correct.

25    Q.    So I want to ask you a couple things about

1 V. Flores's notes.

2        "MM," does that stand for Mini- -- you
3 stated that that stands for "Mini Miranda"; is that
4 correct?

5        **A.    Correct.**

6        Q.    What does that mean?

7        **A.    The "Mini Miranda"?**

8        Q.    Correct.

9        **A.    It's what we are required to give on every**
10 **communication.**

11        Q.    Okay.  And is that Mini Miranda, "This is
12 an attempt to collect by a debt collector.  Any
13 information will be used for that purpose"?

14        **A.    Yes.  Something like that, yes.**

15        Q.    Okay.  You said earlier that "X" stands
16 for the check-writer.  Is -- does that mean that "X"
17 stands for my client, Erick Rigby?

18        **A.    Yes.**

19        Q.    Okay.  Does Optio have a recording of this
20 phone call?

21        **A.    No, sir.**

22        Q.    Okay.  On the phone call, Ms. Flores --
23 I -- is Flores -- Ms. Flores, is that a female or a
24 male?

25        **A.    It's a male -- or a female, sorry.**

1        Q.    Okay.  On these -- in these notes
2 Ms. Flores typed, "Asked that we call him in two
3 weeks."  Is that correct?

4        **A.    Correct.**

5        Q.    Okay.  And Ms. Flores also typed, "I said,
6 okay, I will call you then," is that correct?

7        **A.    Correct.**

8        Q.    And this conversation took place on
9 October 2nd, 2018, correct?

10        **A.    Correct.**

11        Q.    When is the next time that Optio placed a
12 phone call to my client?

13        **A.    I don't see that on here.**

14        Q.    Okay.  If you go back to Exhibit G. . .

15        **A.    [Complies]  Yup.**

16        Q.    Will that -- will that tell you the
17 next time that Optio placed a phone call to my client?

18        **A.    Let's see.  So the -- the Flores call was**
19 **on October 2nd, right?**

20        Q.    Yes.

21        **A.    And the next call would have been**
22 **October 12th.  So that would --**

23        Q.    Ten days after October 2nd.

24        **A.    Two weeks, if you are -- there are two**
25 **working weeks, yes, just as --**

1        Q.    Ten days --

2        **A.    From October 2nd to October 12th is**
3 **essentially ten working days, which what is we did.**

4        Q.    Okay.  You would agree with me that it
5 is -- two weeks is 14 days.

6        MR. LITTLE:  Form.

7        **THE WITNESS:  Well, yeah, technically, I**
8 **guess it would be.**

9        MR. VOLHEIM:  Q.  Okay.  If I go back to
10 October 2018, that is a Tuesday.  October 2nd, 2018 is
11 a Tuesday, do you have any reason for doubting me about
12 that?

13        **A.    No; I don't have a calendar in front of**
14 **me, so I have to trust you.**

15        Q.    Okay.  And October 12th is a Friday.
16 October 12th, 2018 is a Friday.  Do you have any reason
17 to doubt me about that?

18        **A.    No.**

19        Q.    Okay.  In between those two dates is eight
20 working days.

21        **A.    Okay.**

22        Q.    Do you have any reason to doubt me about
23 that?

24        **A.    No.  I'm sure your math is correct.**

25        Q.    So did Optio wait two weeks, by any

1 definition, whether it's a full weak or a working week
2 of five days, did Optio wait two weeks before calling
3 my client again?

4        **A.    It doesn't appear we waited the -- a full**
5 **14 days, no.**

6        Q.    Did you wait the full ten days of working
7 days?

8        **A.    Well, I guess not, no.**

9        Q.    Why didn't Optio wait two weeks to call my
10 client --

11        **A.    Nate --**

12        Q.    -- as it said it would, and as he
13 requested?

14        **A.    Nate, I can't answer that question.  You**
15 **are talking about a year ago.  I don't know.  I don't**
16 **know why we didn't wait.**

17        Q.    Did Optio have any policies or procedures
18 with regards to phone calls that it makes to a
19 consumer?

20        **A.    Do we have any -- Repeat the question,**
21 **please?**

22        Q.    Does Optio have policies and procedures
23 with regards to phone calls to consumers?

24        **A.    Yes, of course.**

25        Q.    Are those policies and procedures written

Page 54

1 or memorialized in writing in any way?
2    A.   Yes, we have them in writing.
3    Q.   What do those policies and procedures say
4 regarding when a consumer asks Optio not to call for a
5 certain period?
6    A.   Well, he didn't ask for us not to call
7 him, right?
8    Q.   Well, he did for a certain period.
9    A.   [No response]
10   Q.   We can go back to the notes.  Let's just
11 go back to the notes.  These aren't my words, these are
12 Miss Flores's words, apparently --
13   A.   He --
14   Q.   -- asked that we call him in two weeks.
15   A.   Yeah.
16   Q.   So, based on Optio's policies and
17 procedures, when should the next time Optio called my
18 client have been?
19        MR. LITTLE:  Form.
20        THE WITNESS:  I would imagine, I guess it
21 would have to have been the 16th.  But you are counting
22 four weekend days in there, so.
23        MR. VOLHEIM:  Okay.  I think we've been
24 going for quite a while.  Why don't we -- Would anyone
25 like to take break?

Page 55

1        MR. LITTLE:  Sure.
2        (Recess taken from 11:27 a.m. to 11:47
3   a.m.)
4        MR. LITTLE:  So, I'm back, and you can go
5   ahead.
6        MR. VOLHEIM:  Thank you.  All right, back
7   on the record, please.
8    Q.   Okay.  Bruce, we just took a short break
9   of about ten minutes, and you understand that you are
10  still under oath and subject to the penalty of perjury;
11  is that correct?
12   A.   Yes.
13   Q.   Okay.  So I do not want to know the
14  substance of anything, any conversation you may have
15  had.  However, during that break, did you talk to
16  either your attorney or Mr. -- either of your attorneys
17  about your testimony today?
18   A.   Not specifically about the testimony, no.
19   Q.   Okay.  Did you talk to them about your,
20  Well, strike that.
21        All right.  When we left off we were
22  looking at Optio 044, which is a page within
23  Exhibit F.  Do you have that in front of you?
24   A.   Hang on.  Here it is.  Yes.
25   Q.   Okay.  So how -- In this situation, when a

Page 56

1 consumer asks to be contacted in two weeks, how does
2 Optio ensure that a phone call will not take place for
3 two weeks?
4    A.   The -- when a check-writer or a consumer
5 asks us for a follow-up call, as Mr. Rigby did here,
6 and it's not an exact, "Hey, call me in 14 days
7 exactly," it's -- you know, if someone says, "Give me a
8 call next week," you know, we'll call them next week.
9        Unless they -- unless they -- if she would
10 have put in here in the notes that Mr. Rigby requested
11 to be called on the -- on the 16th of October, then
12 that would be a more definitive -- you know, that would
13 have been a situation where she would have then had to
14 wait until the 16th.
15   Q.   Okay.  And what was -- what stopped Optio
16 from calling my client between October 2nd, 2018 and
17 October 12th, 2018?
18   A.   What stopped us?  Was that the --
19   Q.   Yeah; was there any sort of code or block,
20 or anything put within the system?
21   A.   No, sir.
22   Q.   Okay.  So how did Optio know that my
23 client did not want to be contacted for two weeks?
24   A.   It's in the notes there.  So the next time
25 they brought up the claim, they would see the notes,

Page 57

1 and they would wait.
2    Q.   Okay.  The phone call on October 12th,
3 2018, who was that made by, what representative of
4 Optio?
5    A.   Do you know what page that's on in the
6 Exhibit F?
7    Q.   I do not.  I mean, I would guess it would
8 be right after probably the page prior, 43 would be my
9 guess.
10   A.   Let's see.  Yes, it was the -- on page 43,
11 it was at 8:40 in the morning by Miss Flores.
12   Q.   Okay.  So the same person that called and
13 spoke with my client on October 2nd, 2018, also called
14 and spoke with my client on October 12th, 2018.
15   A.   Correct.
16   Q.   If you look at the notes by
17 Ms. Flores on October 12th, 2018, and you go to the end
18 of her notes, it says, "I let him know we've been
19 call --" and then it appears, and please correct me if
20 I'm wrong, it appears that that note is cut off and
21 continued on the next page.  Is that correct?
22   A.   Yes, that would be correct.
23   Q.   Okay.  Now, does Optio record any of its
24 phone calls with consumers?
25   A.   The only calls that we would record would

Page 58

1 be payment calls.
2     Q.  How do you know if a call is going to
3 resort -- excuse me -- result in a payment call?
4     A.  I would have a conversation with the
5 consumer, and we would agree on a payment plan or on a
6 single payment. And at that point, once we agreed on
7 what was going to be paid, how much and when, we would
8 then ask for the information to take care of the
9 payment.
10       At that point we would then record the
11 information that we take to process the payment.
12     Q.  Okay. So, Optio will not -- I don't know,
13 for lack of a better term, push "play" or push
14 "record," until a payment agreement is paid verbally.
15     A.  Yeah; we don't have the ability to do
16 that.
17     Q.  I'm sorry, you don't have the ability to
18 do what?
19     A.  There's no button to push to record on the
20 system.
21     Q.  Okay. Then, how does a recording start?
22     A.  We use a hand-held recording device that's
23 attached to the phone that records both the consumer
24 and the collector.
25     Q.  What is the name or model number, to the

Page 59

1 extent you know, of this hand-held device?
2     A.  I -- I don't know, Nate.
3     Q.  Is it -- I mean, is this device like, I
4 don't know, what you see in the -- in the movies, when
5 someone is taking notes to themselves, you know, the
6 hand-held little mini-recorder, is that kind of what
7 you are talking about?
8     A.  Yeah, the -- Yes, that's -- yeah, that's
9 exactly what it is.
10     Q.  Does it run on a -- is it digital, or does
11 it run on tape?
12     A.  I'm not -- I'm not sure, I believe it --
13     MR. LITTLE: Only if you know, Bruce. I
14 don't want you to guess.
15     THE WITNESS: Yeah, I'm not sure.
16     MR. VOLHEIM: Q. Do you ever make
17 outgoing phone calls in your capacity as Vice President
18 any more?
19     A.  I do.
20     Q.  Do you have that recording -- or, excuse
21 me -- that recording device, do you have that handy
22 when you make those calls?
23     A.  I do not, because I don't record payments.
24     Q.  Okay. So, if you are on a call and a
25 consumer wants to make a payment, you transfer that to

Page 60

1 somebody else?
2     A.  Correct. They fill out the form and they
3 do the recording.
4     Q.  Okay. How many payments did my client
5 make to Optio?
6     A.  To my knowledge -- well, I'm not sure.
7     To my knowledge, I thought -- I wasn't
8 sure if one of the checks cleared or not. Other than
9 that, if you can take a moment -- or if you can give me
10 a moment, I'm going to have to go through the -- the
11 Exhibit F to see if we received any payments from him.
12     Q.  Take your time.
13     A.  [Reviewing] Yeah, I don't see any
14 payments, Nate. [Having gone through some documents]
15     Q.  Okay. Did my client make, verbally over
16 the phone any promises to pay with Optio that
17 would prompt Optio to record his conversation with it?
18     A.  No; because there was nothing ever agreed
19 on. He never -- we never took a payment from him, so
20 we would not have recorded any of those promise-to-pay
21 conversations.
22     Q.  To your knowledge, did Optio produce any
23 recordings throughout -- to me throughout the course of
24 this litigation?
25     A.  Yes, one.

Page 61

1     Q.  Okay. If my client didn't make any
2 promise to pay, then why did Optio record that
3 conversation?
4     A.  I forgot that we did take -- we did have
5 an arrangement with him on one payment, but I don't see
6 anywhere in the Exhibit F that we -- that the payment
7 ever went through.
8     But, yes, I forgot, we did do -- we did
9 take -- we did have a conversation on one payment
10 that was -- that he had agreed to take care of.
11     Q.  Okay. Other than that recording, does
12 Optio have any other recordings with respect to my
13 client -- I'll just leave it there: Other than the one
14 recording you just referenced, does Optio have any
15 other recordings regarding my client?
16     A.  No, sir.
17     Q.  Okay. When -- this account -- I believe
18 you stated this account was placed by CrossCheck with
19 Optio in I believe early September. Is that about
20 right?
21     MR. LITTLE: Form.
22     THE WITNESS: I would have to look at
23 Exhibit F, but I believe that's accurate.
24     MR. VOLHEIM: Q. Okay. Well, why don't,
25 just to be accurate, I am not -- I assure you, I am not

Page 62

1 trying to cross you up, I just can't remember the date,
2 either. Why don't you look at Exhibit --
3     MR. LITTLE: August 28, 2018.
4     MR. VOLHEIM: Q. Does the date of
5 August 28th, 2018, sound right, Bruce?
6     **A. Yes, sir.**
7     Q. Okay. When this account was placed with
8 Optio by CrossCheck, was Optio given any documents
9 related to my client?
10     **A. We would have received a -- the -- a copy**
11 **of the check.**
12     Q. What else would Optio have received?
13     **A. I'm not sure if Ashley provided us an**
14 **invoice or not; I would have to look.**
15     Q. Okay. Did Ashley provide you -- Well,
16 let's take a step back, because you just said "Ashley".
17     Who did the information come from, Ashley
18 or CrossCheck?
19     **A. Well, the -- the claim is through**
20 **CrossCheck. Ashley is who we do the check guarantee**
21 **for, who CrossCheck does the check guarantee for.**
22     Q. Okay. So, as it relates to either Ashley
23 or CrossCheck, did they provide Optio with any phone
24 numbers upon placement?
25     **A. Yes.**

Page 63

1     Q. What phone number or phone numbers did
2 they provide Optio?
3     **A. The (715) 966-4260.**
4     Q. Other than that phone number, did
5 either Ashley or CrossCheck provide any other phone
6 numbers to Optio?
7     **A. Not that I'm aware of.**
8     Q. Okay. Did Optio call any other phone
9 numbers regarding my client?
10     **A. We did a --**
11     MR. LITTLE: Form.
12     **THE WITNESS: We did a location**
13 **information call to Mr. Rigby's mother.**
14     MR. VOLHEIM: Q. Okay. Do you know the
15 date that that location information call took place?
16     **A. You are going to have to give me a second**
17 **to find it.**
18     Q. Okay. I think -- I just want to help -- I
19 think you are going to be looking at Bates 25 within
20 Exhibit F?
21     **A. Okay, I'm on page 25. Let's see, which**
22 **way does this go. It's actually on -- it's on page 24**
23 **and 25.**
24     Q. Okay. Let's start with page 24, then.
25 Where does the entry related to the call to my client's

Page 64

1 mother start?
2     **A. On -- at the bottom, I believe it's the**
3 **January 7th, 2019, at 11:25 a.m.**
4     Q. And the phone number called is
5 (757) 319-0842; is that correct?
6     **A. Correct.**
7     Q. Where did CrossCheck -- strike that.
8     Where did Optio obtain that phone number?
9     **A. Without looking at the documents, I'm not**
10 **sure, Brendan -- or, Nate -- sorry.**
11     Q. What documents would you need to look at?
12     **A. The Ashley Furniture paperwork.**
13     Q. Okay. I think what you want to look at --
14 or what you are asking for is Exhibit I, as in Igloo,
15 so go ahead and pull that out, and let me know when you
16 have -- when you are done.
17     **A. Yes, I have it.**
18     Q. Okay. So, for the record, Exhibit I is
19 Bates Optio 9 through -- excuse me, strike that --
20 Optio 6 through 9. Are these -- have you seen these
21 documents before today?
22     **A. I have not, actually.**
23     Q. Okay. Are these documents that were
24 provided by Ashley to Optio?
25     **A. It appears to be, yes.**

Page 65

1     Q. Okay. Do you know when these documents
2 were provided by Ashley to Optio?
3     **A. I do not.**
4     Q. Okay. I'm going to direct your attention
5 to Bates -- to the second page, which would be
6 Optio 006.
7     **A. Yes.**
8     Q. In the -- under the "Bill To" is my
9 client's name. Do you see that?
10     **A. Yes.**
11     Q. There is a phone number listed there of
12 (715) 966-4260. Do you see that?
13     **A. I do.**
14     Q. Do you see any other phone numbers listed
15 on that document? And I understand if you need to take
16 a minute to look.
17     **A. I do not.**
18     Q. Okay. Turning to Optio 8, this would be
19 the last page of Exhibit I, you see the phone number
20 (715) 966-4260. Let me know if you see that.
21     **A. I do.**
22     Q. All right. To your -- and do you see any
23 other phone numbers listed on this page?
24     **A. I do not.**
25     Q. Okay. Was the phone number

Page 66

1 (715) 966-4260, who was that provided by?

2     **A.   On -- are we looking -- are you asking me**

3 **in reference to document 008?**

4     Q.   Yes.  Who filled out document 008?

5     **A.   I -- I have no idea.  I would assume Erick**

6 **did.**

7     Q.   Okay.  So feel free to look through

8 Exhibit I, which are all the documents produced by

9 Optio.  Does Exhibit I tell you where the phone number

10 (757) 319-0842 came from?

11     **A.   That number's not listed on any of the**

12 **Exhibit I.**

13     Q.   Okay.  Do you -- Are there other documents

14 that you need to review which were provided by either

15 Ashley or CrossCheck which would tell you where the

16 phone number ending in 0842 came from?

17     **A.   Repeat the question, please.**

18     Q.   Sure.  Are there other documents, outside

19 of Exhibit I, which would tell you where the phone

20 number "0842" came from?

21     **A.   I'm not -- I'm not sure if there's any**

22 **other documents, or not.  I don't see any.  Do you have**

23 **any other exhibits?**

24     Q.   I don't.  So I guess my question to you

25 is, where did the phone number (757) 319-0842 come

Page 67

1 from?

2     **A.   We probably did some Skip Tracing on**

3 **Mr. Rigby's account.  And I'm sure it probably was**

4 **generated from that.**

5     Q.   Okay.  So just to make sure we're talking

6 about the same thing, "Skip Tracing" is where -- Well,

7 why don't you explain to me what "Skip Tracing" is.

8 Let me not guess.

9     **A.   We do searches for the consumers to find**

10 **other phone -- central phone numbers to reach them.  If**

11 **we're having -- if we're not successful in making**

12 **contact with them, we have -- we look for asset**

13 **searches, we look for property, that sort of thing.**

14     Q.   Okay.  Other than on January 7th, 2019,

15 did Optio call the phone number ending in "0842" any

16 other times?

17     **A.   Let me look at the document real quick.**

18 **Which page was the call on again?**

19     Q.   That was on 24 and 25 of Exhibit . . .

20     A.   F.

21     A.   F.

22     A.   Okay, yeah.  [Reviewing documents]

23     So the question is is did we call back

24 the phone number ending in 0842 after January 7th; is

25 that correct?

Page 68

1     Q.   The question is did you call at any other

2 times, other than January 7th, 2019, either before or

3 after.

4     **A.   Oh.  No, sir.**

5     Q.   Okay.  If Optio had my client's phone

6 number which he provided to CrossCheck -- excuse me,

7 strike that.

8     If Optio had my client's phone number

9 ending in 4260, which he provided to Ashley, why did it

10 call the phone number 0842?

11     **A.   Because we had made several attempts at**

12 **the number ending in 4260 to reach Mr. Rigby again**

13 **after he had requested callbacks and whatnot, and all**

14 **we were getting was his answering machine.**

15     Q.   When, if ever -- When is the closest time,

16 if ever, prior to January 7th, 2019 that Optio spoke

17 with my client?

18     **A.   So you want to know when the last phone**

19 **call was that we talked to Mr. Rigby prior to the 7th?**

20     Q.   That's correct.

21     **A.   Let's see.  [Reviewing]  It appears that**

22 **the last contact was December 18th, 2018 at 10:02.**

23     Q.   If Optio knows -- or if it has a number

24 for a consumer, but is not able to get ahold of that

25 consumer, how long will it wait before it calls a

Page 69

1 different phone number?

2     **A.   It depends.**

3     Q.   What does it depend on -- Oh, I'm sorry,

4 go ahead.

5     **A.   It depends on how -- you know, the time**

6 **frame, so it would typically be five to seven days.**

7     Q.   Is there a policy or a procedure by Optio

8 which determines how long it will wait before calling a

9 different number?

10     **A.   Not -- there's nothing -- there is not a**

11 **written policy.  Our internal policy is to wait five to**

12 **seven days.**

13     Q.   Okay.  What other phone numbers, other

14 than the number ending in 4260 or 0842, did Optio call

15 attempting -- with regards to my client?

16     **A.   Again, I'm going to have to look through**

17 **the notes.**

18     Q.   Sure.

19     **A.   Let's see.  [Reviewing]  These are so hard**

20 **to read in this format . . . .**

21     It looks like we made an attempt to, on

22 the 7th as well, to try and reach a relative, I don't

23 know the name of the relative, at phone number (757)

24 484-8139, and then -- and the phone was never

25 answered.

Page 70

1    Q.   Okay.  And what page are you looking at
2  there?
3    A.   24.
4    Q.   Okay.  Any other numbers other than that
5  one?
6    A.   We made a call to (757) 642-3875, and that
7  phone number was -- someone picked up and hung right
8  up.  We didn't speak to anybody.
9    Q.   Okay.
10   A.   We also --
11   Q.   Any other numbers?
12   A.   We also spoke, or made an attempt to
13  (757) 686-2439, and that number just beeped, it
14  didn't -- it didn't ring to a phone, or anything.
15   Q.   Okay.  So with regards to the phone
16  numbers ending in 2439, 3875, and 8139, were those
17  numbers obtained via Skip Trace?
18   A.   Yes.
19   Q.   I'm going to direct your attention to
20  what's been -- to Exhibit F, you are just going to go
21  forward a few page to 21, Bates 21?
22   A.   Okay.
23   Q.   All right.  There is a note there about a
24  conversation that Optio had with someone, and I'm
25  referring to the one at 1734.  Do you see that?

Page 71

1    A.   Yes.
2    Q.   Okay.  Can you read me the account notes
3  there.
4    A.   [Reading]:  January 8th, 2019:  1734, home
5  phone, talked to -- and then it puts the phone number
6  of (715) 966-4260, talked to man, authorized Erick
7  Rigby, gave the call recording and the Mini Miranda.
8        I explained facts.
9        He stated, sorry, I have someone working
10  with me, correcting my credit, and they will fix
11  everything.  I do not need to talk to you.
12       And he ended the call.
13   Q.   Okay.  So, a couple questions.  You said,
14  "CR," that that -- you said, I think you indicated that
15  that stands for "call recording"?
16   A.   Yeah.
17   Q.   Okay.
18   A.   Call to --
19   Q.   Go ahead, Bruce.
20   A.   It's -- "CR" is call recording, or call
21  disclosure.
22   Q.   Okay.  And what does that disclosure say?
23   A.   I don't have that memorized, Nate.  I have
24  it -- it's on a card in front of me at work.
25   Q.   Okay.  Why, to your knowledge, why does

Page 72

1  Optio give a disclosure that calls will be recorded,
2  when its practice is to only record calls where payment
3  is being made?
4    A.   It's -- because we give the Mini Miranda
5  as well.
6    Q.   Okay.  I think in there you said, I do not
7  need -- or my client said, "I do not need to talk to
8  you," and ended call.  Is that correct?
9    A.   Yes.
10   Q.   Did Optio make any further phone calls to
11  my client's phone number ending in 4260, after
12  January 8th, 2019?
13   A.   Let's see.
14   Q.   And if you need to obviously reference
15  Exhibit G, feel free to do so.
16   A.   Yes, it looked like we did.
17   Q.   I'm going to ask you to flip ahead one
18  page to Bates 20.
19   A.   [Complies]
20   Q.   In the middle of the page there is a black
21  redaction.  Do you see that?
22   A.   Yes.
23   Q.   Okay.  What information is contained
24  within that redaction?
25   A.   I have no idea.

Page 73

1        MR. LITTLE:  Okay.  I'm going to object to
2  the form at this point.  I spoke to Teddy about this.
3  That was notes made by internal counsel, and redacted,
4  the notes were redacted based on the attorney-client.
5        So I am objecting to the form, and
6  telling Mr. Volheim, that I spoke to Teddy -- and I
7  will butcher his last name, I always do -- and his
8  office, and he inquired about that, and the
9  redactions are internal -- or inside counsel's notes
10  with respect to the file, and they are redacted for
11  the attorney-client privilege.
12       MR. VOLHEIM:  For the sake of today's
13  conversation, it's fine, Ms. Saunders, to just spell it
14  T-e-d-d-y.  We all know who he is and, thus the record
15  will be clear.
16   Q.   All right.  So what date -- I'm sorry,
17  Bruce, what date was the notes for the redaction made?
18   A.   I can't see the date.
19   Q.   Underneath the redaction there is a date
20  of January 15th, 2019.  Do you see that?
21   A.   Yes.
22   Q.   Okay.  Would that entry give you any
23  information as to what date the redaction was made, the
24  note with the redaction was made?
25   A.   No.

Page 74

1    Q.   What was the last date that Optio placed a
2  phone call to my client?
3    A.   **January 15th, 2019.**
4    Q.   To the extent that you know, why did Optio
5  stop placing phone calls to my client after
6  January 15th, 2019?
7    A.   **(Looking at the document) I'm not sure.**
8    Q.   All right, we're getting near the end
9  here.
10       I'm going to direct your attention....
11  we're within Exhibit F, and I'm sorry, I have got to
12  flip around now, I apologize.
13       Okay.  I'm going to direct your
14  attention to what's been premarked as Exhibit --
15  well, excuse me, Exhibit F, on page 33 is what I am
16  on now.
17    A.   **[Flipping to the document]  Okay.**
18    Q.   All right.  At the bottom of Exhibit -- or
19  excuse me, page 33, there is an entry on December 12th,
20  2018 at 16:34:55.  With regards to that time, I believe
21  you testified earlier that is military time?
22    A.   **Correct.**
23    Q.   Okay.  Would that be 4:34:55- -- so would
24  that be 4:34 p.m.?
25    A.   **Correct.**

Page 75

1    Q.   And is that Pacific Standard Time, or what
2  time is that?
3    A.   **I believe it's Pacific Standard Time.**
4    Q.   Okay.  In that note, did my client state
5  that he had been called four times today, and that's
6  harassment, and that he does not want phone calls from
7  Optio any more?
8    A.   **Correct.**
9    Q.   How many times did Optio call my client on
10  December 12th, 2018?
11    A.   **I need to reference Exhibit G.**
12    Q.   Okay.  Please feel free to do so.
13    A.   **What was the date again?**
14    Q.   December 12th, 2018.
15    A.   **Looked like one that lasted 16 seconds,**
16  **another one that lasted 16 seconds, an incoming call;**
17       **And then another one that lasted a**
18  **minute, seven;**
19       **And then an incoming -- inbound call.**
20       **And then that's it.**
21    Q.   Okay.  The entry on -- at 1633, was that
22  an outgoing call or an inbound call?
23    A.   **1633.  And what -- Are you looking at an**
24  **Exhibit?**
25    Q.   Yes, I'm sorry.  In Exhibit G, it's about

Page 76

1  four up from the bottom, so it would be 1633 is the
2  start time.
3    A.   **Oh, the one that was for one second?**
4    Q.   Correct.
5    A.   **It appears to be an outbound.**
6    Q.   Okay.  The call at 1524 and 36 seconds, is
7  that an outbound or an inbound call?
8    A.   **It appears to be an outbound.**
9    Q.   The call at 1529 and 58 seconds, is that
10  an outbound call or an inbound call?
11    A.   **It appears to be outbound.**
12    Q.   Why did Optio call my client approximately
13  five minutes apart?
14    A.   **I'm not -- I would have to go back to the**
15  **notes and look and see.**
16    Q.   Okay, feel free to do so.
17    A.   **[Looking at the notes]  So we made one at**
18  **12:12 -- or, I'm sorry, on 12/12 at 1652 -- oh, that**
19  **was an inbound call, sorry.**
20    Q.   Can you direct me to what page you are
21  looking at?
22    A.   **Yeah, I'm just trying to -- Nate, I am**
23  **trying to get all the -- the calls.  They are in --**
24  **they are kind of -- the order is kind of funky, so I'm**
25  **just trying to put together the -- the actual call that**

Page 77

1  belongs to what call.
2       So, it's -- all of the conversation is
3  going to be based on page 32 and 33.
4       Looks like we made the call, outbound,
5  at 1634, and that's the one that we already talked
6  about, that he said he did not want any more calls
7  from us.
8       And then, at 1652, he called back in.  He
9  was -- yeah, he called back in at 1652.
10       And then . . .  That was the next day.
11  [Reviewing]  That's what I have in the notes.
12    Q.   Okay.  So I'm not sure, but I don't think
13  that answered my question.  My question was certainly
14  not about the 1652 call, or the 1634 call.
15       My question is about the call, the two
16  calls:  One at 1524 and 36 seconds, and the other at
17  1529 and 58 seconds.  Those two calls are about five
18  minutes apart, and my question is why did Optio place
19  two calls to my client within approximately five
20  minutes?
21    A.   **I don't know.**
22    Q.   Does Optio have a policy or a procedure
23  about how long it should wait between calls to
24  consumers?
25    A.   **Well, it depends on the content of the**

Page 78

1 conversation. So, if he asked us to call him back, and
2 we tried to call, and something happened on the line --
3 and the calls are -- the call times are short, right,
4 they are 16 seconds --
5    Q.   Yes.
6    A.   -- and 16, seconds.
7         So, something might have happened on the
8 phone line, something might have happened -- I mean,
9 this is his cell phone -- so he could have been -- it
10 could have been -- I don't know, it could have been a
11 number of things that we could have called back like
12 that, but the fact that the calls are so short tells
13 me there wasn't a conversation.
14    Q.   Okay. Is there anything in the account
15 notes with respect to Exhibit F, which indicate what
16 happened during those two calls. And again, for
17 clarity, the 1524 and 36 seconds and the 1529 and 58
18 seconds.
19    A.   No, there's nothing in the call notes that
20 talks about those two calls specifically.
21    Q.   In fact, there is no entries in the
22 account notes with regards to those two calls; is that
23 correct?
24    A.   That's correct.
25    Q.   Okay. What would that indicate to you,

Page 79

1 that there are no entries within the account notes?
2    A.   It's hard to say. It could have been what
3 I just described, that they called and -- and got a
4 fast busy, they called, and it didn't go through . . .
5 I mean, there is -- you know, I -- I -- there's no way
6 to definitively give you an answer about that, because
7 I don't -- I don't know, I wasn't the one who made the
8 phone calls.
9    Q.   Okay. So you were -- those possible
10 answers you are giving me are hypothetical guesses by
11 you; is that fair to say?
12         MR. LITTLE: Form.
13         THE WITNESS: Yes, that would be correct.
14         MR. VOLHEIM: Q. Is it also possible that
15 a representative of Optio just decided to call a phone
16 number within approximately five minutes of each other?
17         MR. LITTLE: Form.
18         THE WITNESS: It would be possible, but --
19 it could have been possible because of what I
20 explained.
21         MR. VOLHEIM: Q. I'm going to direct your
22 attention back to Optio 32, going into 33. There is a
23 note, which I think it begins on 32, of a conversation
24 Optio had with my client. Does that actually -- it
25 looks . . . . Hold on a moment, I apologize.

Page 80

1         The conversation that starts on 33 at --
2 that said he has too many other expenses, do you see
3 that?
4    A.   Yes.
5    Q.   Okay. Obviously, that's the middle of a
6 conversation, correct?
7    A.   Well, it started on page 32.
8    Q.   Okay, great. So, let's go to page 32.
9 What date was the date of that phone call?
10   A.   12/12.
11   Q.   Okay. And that phone call ends with, "EXT
12 Linda call him tomorrow." What does that mean?
13   A.   Well, he called in and spoke to a
14 collector in my department, and the -- explained, Linda
15 will call him tomorrow.
16         And if you read through the entire
17 entry, it says, he has too many other expenses, this
18 is not his priority, said that he can pay $100 a
19 month, if we want it, said -- on page 32, he says he
20 can't pay anything until January.
21         Said that if -- that he is just trying
22 to fix one bill at a time.
23         Explained I will review it, and see if I
24 can accept his proposal.
25         And then he said -- then the collector

Page 81

1 told him that Linda, who he had had previous
2 conversations with, would give him a call back
3 tomorrow.
4    Q.   Okay. And when did Linda call him back?
5    A.   Let's see. [Reviewing] Looks like Linda
6 returned his phone call on the 13th at 1502. And they
7 discussed the payment plan that's -- that you read in
8 the note entry.
9    Q.   If my client -- strike that.
10         Bruce, I don't have -- and let me make
11 sure. So going back to Exhibit D.
12   A.   Exhibit D, as in David?
13   Q.   D, as in David.
14   A.   Okay.
15   Q.   Last page, your verification: Who
16 directed or asked you to sign this verification page?
17   A.   Our in-house legal department prepares the
18 documents.
19   Q.   Do you know who gave you the document to
20 sign?
21   A.   I -- I don't. It was almost six months
22 ago, so I don't remember who physically handed me the
23 document to sign it.
24   Q.   Could it have been Mrs. McLean?
25   A.   No.

Page 82

1    Q.   Did you review any documents prior --
2 related to this case, prior to signing that
3 verification?
4    A.   Wait.  Say that again?
5    Q.   Did you review any documents related to
6 this case -- excuse me, strike that.
7         Did you review any documents or materials
8 related to this litigation prior to signing that
9 verification page?
10   A.   I don't recall.
11   Q.   And do you -- strike that.
12        MR. VOLHEIM:  All right.  Bruce, I don't
13 have any other questions for you, subject to whatever
14 Mr. Little may ask you.  Thank you for your time.
15
16
17 EXAMINATION BY MR. LITTLE:
18        MR. LITTLE:  Q.  Good afternoon, Bruce.  I
19 just have a couple follow-up questions regarding what
20 Mr. Volheim asked you this morning and into this
21 afternoon.
22        We've talked about several telephone
23 communications between Mr. Rigby and Optio Solutions,
24 looking at Exhibits F and G.  Do you recall that
25 dialogue today with Mr. Volheim?

Page 83

1    A.   Yes.
2    Q.   In any of the outbound calls made by Optio
3 to Mr. Rigby, were those manually-dialed calls, or
4 automatic -- automatically-generated calls?
5    A.   All --
6        MR. VOLHEIM:  Objection.  Foundation.
7 Calls for a legal conclusion.  Go ahead.
8        THE WITNESS:  All manual.
9        MR. LITTLE:  Q.  And when you say
10 "manual," can you explain what you mean by that?
11   A.   We don't use an automated telephone
12 dialing system.
13        MR. VOLHEIM:  Brendan, let me just -- I
14 don't mean to cut you off, you have been very good not
15 to cut me off.  I'll stipulate on the record to
16 withdraw the TCPA claim.
17        MR. LITTLE:  Okay.  So stipulated that
18 Plaintiff is withdrawing his TCPA claim.
19        MR. VOLHEIM:  Hold on.  With prejudice --
20 Hold on, maybe we should talk about this?
21        Let's go off the record for a record.
22        MR. LITTLE:  Sure.
23        (Brief discussion held off the record.)
24        MR. LITTLE:  All right.  Mr. Volheim and I
25 had a conversation off the record, and we're now back

Page 84

1 on the record.
2         And Mr. Volheim, correct me if I'm
3 wrong, but Plaintiff is withdrawing her -- excuse
4 me -- his TCPA Claim with prejudice, both sides to
5 bear their respective costs and fees.  Is that
6 correct, Mr. Volheim?
7         MR. VOLHEIM:  That is correct.
8         MR. LITTLE:  Okay, thank you.
9    Q.   Bruce, we talked about a letter, as
10 Exhibit H, this morning and this afternoon.  Do you
11 recall the letter dated November 8th of '18, if you
12 could put it in front of you?
13   A.   Yes, I have it.
14   Q.   Okay.  And is this letter manually typed
15 by someone, or is this a letter that's automatically
16 generated by a system or a computer system?
17   A.   It's a system-generated letter.
18   Q.   And under what circumstances would a
19 letter like this be sent to a consumer?
20   A.   Whether we had a written or a verbal
21 request from the consumer.
22   Q.   And what would the written or verbal
23 request from the consumer consist of?
24   A.   It could be a number of things:
25        It could be, if there was a dispute;

Page 85

1         If there was an -- in this case, a
2 request for the -- for another notice, because the
3 first notice was not received.
4         It could be a number of different things.
5    Q.   And when a consumer verbally requests that
6 a notice be re-sent, or sent again, what does a -- what
7 does the collector do in order to make that happen?
8    A.   The collector prompts the system, with a
9 back screen prompt, to go ahead and have the system
10 automatically generate the letter.
11   Q.   And the automatic -- Well, strike that,
12 the letter that's been marked, and it's Bates Optio 001
13 and marked as Exhibit H, is that a -- and I think
14 you -- correct me if I'm wrong if you said this
15 already -- it's an automatically-generated letter?
16   A.   Correct.
17   Q.   And why was this letter sent to Mr. Rigby?
18   A.   He requested a second notice, or a
19 follow-up notice, because he alleged he didn't receive
20 our previous notices.
21   Q.   And was Mr. Rigby's request for a second
22 notice verbal or in writing?
23   A.   Verbal, to my knowledge, based on the
24 Exhibit F notes.
25   Q.   And the first sentence we talked about

Page 86

1 this morning in Exhibit H, "We are in receipt of your
2 written correspondence regarding Account No. 4760109,
3 could that -- was that -- well, strike that.
4       The language, "We are in receipt of your
5 written correspondence regarding Account No. 4760109,"
6 was that in fact -- was this letter in fact generated
7 because of written correspondence sent by Mr. Rigby?
8       A.   Not to my knowledge.  It was a verbal
9 request.
10      Q.   Does Optio generate different letters
11 based off of verbal responses, versus -- or verbal
12 requests versus written requests?
13      A.   No, sir.
14      Q.   So, this letter of November 8th, 2018
15 Optio 001, would have been sent due to a verbal request
16 or a written request.
17      A.   Correct.
18      Q.   Exhibit D, as in dog, the
19 Interrogatories....
20      A.   Yes.
21      Q.   Bear with me one second while I get them
22 pulled up on my computer, it's a little behind here.
23      A.   Okay.
24      Q.   All right .  If you flip to the second to
25 the last page, is there a date on the lower left-hand

Page 87

1 corner?
2       A.   The second to the last page, yes, May 3rd,
3 2019?
4       Q.   And the last page, we've talked about your
5 verification this morning.  Is that your signature?
6       A.   Yes, sir.
7       Q.   And did you review this document on or
8 about May 3rd of 2019?
9       A.   I did.
10      Q.   And who would have provided you with this
11 document for you to review?
12      A.   Our in-house legal department.
13      Q.   And does the in-house legal department
14 provide you with with documentation from time to time
15 to review and sign?
16      A.   Yes.
17      Q.   And it is your understanding that Optio
18 conducted an investigation regarding the claims
19 asserted by Mr. Rigby here?
20      A.   Yes.
21      Q.   And the information and responses to the
22 questions or the interrogatories in Exhibit D as in
23 David, are those true and accurate, to the best of your
24 knowledge, as of May 3rd, 2019?
25      A.   Yes.

Page 88

1       MR. LITTLE:  That's all I have, Bruce.
2       MR. VOLHEIM:  All right.  And I'm sorry, I
3 have to ask a few follow-ups, but they'll be brief.
4
5 FURTHER EXAMINATION BY MR. VOLHEIM:
6       MR. VOLHEIM:  Q.  Bruce, with respect to
7 Exhibit H, you testified that this is a template
8 letter; is that correct?
9       A.   Correct.
10      Q.   And this letter would be sent regardless
11 if a consumer has a verbal request or a written
12 request; is that correct?
13      A.   Yes.
14      Q.   Why doesn't the letter just say, we are in
15 receipt of your request regarding Account No. 46- --
16 excuse me -- 4760109?  Why does Optio add the word
17 "written"?
18      A.   I have no idea.  I wasn't privy to the
19 development of the letter.
20      Q.   Do you think it would be more accurate to
21 state, we are in receipt of your request regarding
22 Account No. 4760109?
23      MR. LITTLE:  Form.
24      THE WITNESS:  I don't know.
25      MR. VOLHEIM:  Q.  In your opinion, is it

Page 89

1 more accurate to leave off the word "written," and not
2 delineate whether the request was written or verbal?
3       MR. LITTLE:  Object to the form.
4       THE WITNESS:  In my opinion, yes,
5 probably.
6       MR. LITTLE:  Q.  Does Optio have the
7 ability to alter the templates it uses to send to
8 consumers?
9       A.   Unfortunately, I'm not -- I am not privy
10 to that side of the business.
11      Q.   Well, if you go down to the middle of the
12 page, there is input information, like Check Number,
13 Amount Number, Service Fee, Total Due, Check Date, you
14 see that, correct?
15      A.   Yup.
16      Q.   And that changes based on the consumer
17 it's being sent to, correct?
18      A.   Are you asking me if we send every other
19 consumer Erick Rigby's name and information?
20      Q.   Yes.
21      A.   No.  Why would we do that?
22      Q.   Okay.  So I can take the answer as "no".
23      A.   Yeah; we don't -- that would change, based
24 on -- on who the letter's going to.
25      Q.   Okay.  So, if that information can change,

Page 90

1 can the information contained within the first
2 paragraph change?
3     A.    I -- again, I don't know, Nate.  I'm not
4 sure how that process works.
5     Q.    And last couple questions:
6          Regarding Exhibit D, and your
7 verification, you testified, I think now, that you
8 reviewed this information on or around May 3rd, 2019;
9 is that correct?
10    A.    Correct.
11    Q.    But you do not remember who asked you to
12 verify this information.
13    A.    I don't remember who brought it to me to
14 look at, no.
15    Q.    And did you prior to signing this
16 document, did you review any materials?
17    A.    Can you give me an example?
18    Q.    Did you review any account notes from my
19 client prior to signing this document?
20    A.    I don't recall.
21    Q.    Did you review any call logs prior to
22 signing this document?
23    A.    I don't recall.  It's six months ago.
24    Q.    Did you make any changes or edits to this
25 document prior to signing it?

Page 91

1     A.    No.
2          MR. VOLHEIM:  Okay, Bruce, I appreciate
3 your time.  I don't have any other questions for you.
4          (The proceedings were adjourned at 1:00
5          p.m.)

Page 92

1          DECLARATION UNDER PENALTY OF PERJURY
2
3
4     I,_____,
5 declare under penalty of perjury under the laws of
6 the State of California, that the foregoing is true
7 and correct; that I have read my deposition and have
8 made the necessary corrections, additions, or changes
9 to my answers that I deem necessary.
10    Executed on this _____day of _____,
11 2019.
12
13
14
15
16          BRUCE HOTALING
17
18          ---oOo---
19
20
21
22
23
24
25

Page 93

1                            )
2 STATE OF CALIFORNIA )    ss.
3                            )
4          CERTIFICATE OF REPORTER
5     I, A. MAGGI SAUNDERS, a Certified Shorthand
6 Reporter in and for the State of California, duly
7 appointed and licensed to administer oaths and so
8 forth, do hereby certify:
9          That the witness named in the foregoing
10 deposition was by me duly sworn to tell the truth,
11 the whole truth and nothing but the truth;
12          That the deposition was reported by me, a
13 Certified Shorthand Reporter and disinterested
14 person, and thereafter transcribed into typewriting
15 under my direction;
16          That if the deposition has not been signed
17 by the time of trial, a reasonable opportunity having
18 been given the witness to do so, signature has been
19 waived in accordance with stipulation between
20 counsel.
21          IN WITNESS WHEREOF, I have hereunto set my
22 hand and subscribed my signature this 19th day of
23 September, 2019.
24          A. MAGGI SAUNDERS, C.S.R. No. 2755,
25          Certified Shorthand Reporter,
              In and For the State of California

Page 94

```
1                    DEPOSITION ERRATA SHEET
2
3    Page No. _____ Line No. _____
4    Change: _____
5    Reason for Change _____
6    Page No. _____ Line No. _____
7    Change: _____
8    Reason for Change: _____
9    Page No. _____ Line No. _____
10   Change: _____
11   Reason for Change _____
12   Page No. _____ Line No. _____
13   Change: _____
14   Reason for Change: _____
15   Page No. _____ Line No. _____
16   Change: _____
17   Reason for Change: _____
18   Page No. _____ Line No. _____
19   Change: _____
20   Reason for Change: _____
21   Page No. _____ Line No. _____
22   Change: _____
23   Reason for Change: _____
24   Page No. _____ Line No. _____
25   Change: _____
```

| Exhibits | 1 | 2 |
|---|---|---|

**Exhibit A** 2:13 13:1,3,6,8,11,15,18,22

**Exhibit B** 2:15 28:18

**Exhibit C** 2:16

**Exhibit D** 2:19 28:8,10,13 40:24 42:4, 13,21,22 43:19 45:1 81:11,12 86:18 87:22 90:6

**Exhibit E** 2:22

**Exhibit F** 3:2 22:12,16 23:11,12,15 24:3,4 27:11 48:6 55:23 57:6 60:11 61:6,23 63:20 70:20 74:11,15 78:15 85:24

**Exhibit G** 3:4 46:9,11,13,16,18 48:5 51:14 72:15 75:11,25

**Exhibit H** 3:6 37:14,17,19,22,24 38:2, 4 41:4,12 42:3,8,23,25 43:1,18 44:5,7, 9 45:1,22 84:10 85:13 86:1 88:7

**Exhibit I** 3:9 64:14,18 65:19 66:8,9, 12,19

**Exhibit J** 3:10

**Exhibit K** 3:12

| $ |
|---|

**$100** 80:18

| ( |
|---|

**(757)** 69:23

| - |
|---|

**---ooo---** 4:17 6:8

| 0 |
|---|

**001** 85:12 86:15

**006** 65:6

**008** 66:3,4

**016** 24:21

**044** 55:22

**0842** 66:16,20 67:15,24 68:10 69:14

**1** 13:24 14:6,8 36:14,25

**100** 36:14,15,25 37:2,6,8 40:9

**10:02** 68:22

**10:13** 4:3 6:1

**11:25** 64:3

**11:27** 55:2

**11:47** 55:2

**12** 11:9

**12/12** 76:18 80:10

**12:12** 76:18

**12th** 47:3,14,20,25 51:22 52:2,15,16 56:17 57:2,14,17 74:19 75:10,14

**13th** 26:11 81:6

**14** 52:5 53:5 56:6

**1409** 48:18

**14202** 5:19

**1502** 81:6

**1524** 76:6 77:16 78:17

**1529** 76:9 77:17 78:17

**15th** 73:20 74:3,6

**16** 6:1 25:3 75:15,16 78:4,6

**1633** 75:21,23 76:1

**1634** 77:5,14

**1652** 76:18 77:8,9,14

**16:34:55** 74:20

**16th** 4:2 54:21 56:11,14

**17** 26:13

**1700** 5:18

**1734** 70:25 71:4

**18** 27:4 35:8,9,13 41:1 42:14 43:20 45:1 84:11

**18's** 44:23

**18th** 68:22

**19** 17:1 27:10

**1:00** 91:4

**2** 14:16,18

**20** 72:18

**200** 5:7

**2018** 23:20 24:13 25:16,20 26:9,11,19 27:3,12,20 38:5 40:14 47:3,14,20,25 48:14 51:9 52:10,16 56:16,17 57:3,13, 14,17 62:3,5 68:22 74:20 75:10,14 86:14

**2019** 4:3 6:1 30:10,24 64:3 67:14 68:2,16 71:4 72:12 73:20 74:3,6 87:3, 8,24 90:8

**20th** 27:3

**21** 70:21

**22nd** 27:12,19

**24** 63:22,24 67:19 70:3

**2439** 70:16

**25** 63:19,21,23 67:19

**2500** 5:7

**27** 13:24 14:6,8

**28** 62:3

**28th** 23:20 62:5

**2nd** 4:5 48:14 51:9,19,23 52:2,10 56:16 57:13

| 3 |
|---|

**3** 14:18

**32** 77:3 79:22,23 80:7,8,19

**33** 74:15,19 77:3 79:22 80:1

**36** 76:6 77:16 78:17

**3875** 70:16

**3rd** 24:12 25:16,20 26:9,18 30:10,24 87:2,8,24 90:8

| 4 |
|---|

**4** 14:18

**4260** 68:9,12 69:14 72:11

**43** 57:8,10

**44** 48:9,10,12

**46-** 88:15

**460109** 41:8

**4760109** 22:24 23:13 40:18 43:11 86:2,5 88:16,22

**484-8139** 69:24

**4:34** 74:24

**4:34:55-** 74:23

---

**5**

**5** 14:19

**50** 5:18

**58** 76:9 77:17 78:17

---

**6**

**6** 64:20

**60148** 5:8

**630 948-8411** 5:9

---

**7**

**715 966-4260** 47:15 48:25 49:7 63:3 65:12,20 66:1 71:6

**716 853-5100** 5:20

**755** 4:5

**757 319-0842** 64:5 66:10,25

**757 642-3875** 70:6

**757 686-2439** 70:13

**7th** 64:3 67:14,24 68:2,16,19 69:22

---

**8**

**8** 65:18

**8139** 70:16

**83846** 46:25

**8:40** 57:11

**8th** 38:5 39:23 40:14 71:4 72:12 84:11 86:14

---

**9**

**9** 64:19,20

**9/20/2018** 27:7

**94954** 4:6

---

**A**

**a.m.** 4:4 6:1 55:2,3 64:3

**ability** 8:25 26:1 58:15,17 89:7

**able** 18:5 26:18 68:24

**about** 32:14 43:7 44:16 49:25 52:11, 17,22 53:15 55:9,17,18,19 59:7 61:19 67:6 70:23 73:2,8 75:25 77:6,14,15, 17,23 78:20 79:6 82:22 83:20 84:9 85:25 87:4,8

**above** 29:25 30:2 33:22

**above-entitled** 29:21

**Absolutely** 15:25

**ACA** 12:7

**accept** 80:24

**access** 25:23

**accident** 7:24

**According** 42:12

**account** 21:1,11,15,16,18 22:1,8,17, 20,23 23:6,8,13,18 40:17 41:7 43:10 48:7 61:17,18 62:7 67:3 71:2 78:14,22 79:1 86:2,5 88:15,22 90:18

**accounts** 20:16,21,23

**accurate** 8:25 34:25 45:9,18,21 61:23,25 87:23 88:20 89:1

**accurately** 14:10

**achieved** 12:15

**Act** 11:19

**acting** 20:12

**action** 29:21

**activity** 22:1

**actual** 76:25

**actually** 63:22 64:22 79:24

**add** 88:16

---

**adjourn** 18:18

**adjourned** 91:4

**Affairs** 5:24

**affirmatively** 42:8,15

**after** 17:1,4,19 27:19 51:23 57:8 67:24 68:3,13 72:11 74:5

**afternoon** 82:18,21 84:10

**again** 14:13 40:20 53:3 67:18 68:12 69:16 75:13 78:16 82:4 85:6 90:3

**against** 22:2

**Agent** 49:23

**agents** 49:21

**ago** 7:1 31:4 53:15 81:22 90:23

**agree** 23:12 41:17 43:17 44:3,21 52:4 58:5

**agreed** 17:7 27:22 58:6 60:18 61:10

**agreeing** 27:22

**agreement** 7:11 58:14

**ahead** 9:18 13:2 14:14 22:13,15 29:14 37:4 39:20 40:13 41:25 48:16 49:3 55:5 64:15 69:4 71:19 72:17 83:7 85:9

**ahold** 68:24

**allegation** 16:13,15,17,19 17:24

**allegations** 16:9

**alleged** 16:17 30:4 33:24 85:19

**allegedly** 40:25

**almost** 81:21

**already** 6:19 12:25 18:15 43:5,16 77:5 85:15

**also** 8:3 16:23 26:21 51:5 57:13 70:10,12 79:14

**alter** 89:7

**always** 73:7

**Amended** 13:5,16

**amount** 43:2 89:13

**and/or** 35:16

**another** 75:16,17 85:2

**answer** 9:3,5,7,17,18 14:21 15:14,16 16:10,21 17:14,24 18:7,8 19:15,22 21:8 26:4 29:7 31:19 32:1,23 33:5

---

34:9 35:8 36:4,20 39:6 40:25 43:22,24
53:14 79:6 89:22

**answered** 33:8,10 69:25 77:13

**answering** 8:18 17:15 68:14

**answers** 8:4 18:3 27:18 33:1,3,7,12,
15 34:3,12,18,19,24 79:10

**anticipate** 8:14 18:4

**any** 7:25 8:4,10,11,23 10:6,11 12:5
14:9 16:7 20:4,9 23:5,22 24:4 26:24
27:8,14,19 28:1,4 30:11 31:6,13,21
32:5 34:23 35:14 36:2,12,16 37:1
40:10,20 41:2 42:15 50:12 52:11,16,
22,25 53:17,20 54:1 55:14 56:19
57:23 59:18 60:11,13,16,20,22 61:1,
12,14 62:8,23 63:5,8 65:14,22 66:11,
21,22,23 67:15 68:1 70:4,11 72:10
73:22 75:7 77:6 82:1,5,7,13 83:2
90:16,18,21,24 91:3

**anybody** 70:8

**anymore** 17:5

**anyone** 7:15 8:11 54:24

**anything** 40:23 41:11,20 44:16 49:16
55:14 56:20 70:14 78:14 80:20

**anywhere** 61:6

**apart** 76:13 77:18

**apologies** 28:12

**apologize** 20:8 24:25 74:12 79:25

**apparently** 32:19,20 54:12

**appear** 6:6 45:2 53:4

**APPEARANCES** 5:1

**appeared** 4:8

**appearing** 5:3,12,23 7:8

**appears** 22:25 29:12 57:19,20 64:25
68:21 76:5,8,11

**apple** 13:1

**appreciate** 13:4 31:9 91:2

**appreciated** 24:20

**appropriate** 32:9

**approximately** 12:9 17:1 76:12
77:19 79:16

**are** 7:12 8:7,15,17,20,23 10:8 11:4,12,
17 13:3,11,24 14:8 15:17 17:20 18:16
23:8,10,11 24:9,14,18,23 25:3 26:21

27:13 29:25 30:2 31:25 33:3,14,15,22
34:4,12 35:11 36:11 37:4,7,8 39:1,3
40:16 41:6,9,17,23 43:1,9 44:8,11,12
45:8,18,20 46:2,20 49:2,19,20 50:9
51:24 53:15,25 54:11,21 55:9 59:7,24
63:16,19 64:14,16,20,23 66:2,8,13,18
69:19 70:1,20 73:9,10 75:23 76:20,23,
24 77:17 78:3,4,12 79:1,10 86:1,4
87:23 88:14,21 89:18

**aren't** 54:11

**around** 74:12 90:8

**arrangement** 61:5

**Ashley** 19:8,10,13,18,20,24 20:18
62:13,15,16,17,20,22 63:5 64:12,24
65:2 66:15 68:9

**aside** 48:2

**ask** 7:20 8:16 9:8,10,11,13 12:24
15:17 17:15,16,19 28:7 31:16,20 32:3
37:13 40:5,20 44:12 46:8,23 48:5,9
49:25 54:6 58:8 72:17 82:14 88:3

**asked** 16:20 18:3 29:3 31:11 40:3
44:16,17 49:14,16 51:2 54:14 78:1
81:16 82:20 90:11

**asking** 16:6 18:2 31:13 36:21 42:6
43:5 44:14,15 64:14 66:2 89:18

**asks** 18:6 54:4 56:1,5

**asserted** 87:19

**asset** 67:12

**assign** 21:25

**assume** 9:4 48:19 66:5

**assure** 7:25 61:25

**attached** 58:23

**attempt** 50:12 69:21 70:12

**attempting** 69:15

**attempts** 68:11

**attention** 24:22 35:7 65:4 70:19
74:10,14 79:22

**attested** 33:18

**attorney** 55:16

**attorney-client** 73:4,11

**attorneys** 55:16

**August** 23:20 39:11,12,25 62:3,5

**authorized** 71:6

**automated** 83:11

**automatic** 83:4 85:11

**automatically** 84:15 85:10

**automatically-generated** 83:4
85:15

**available** 23:9

**Avenue** 5:7

**aware** 63:7

---

**B**

**B-R-U-C-E** 9:24

**back** 16:2 17:2,5,7,8 28:11 33:17 35:5
36:24 38:16 45:12 48:6 51:14 52:9
54:10,11 55:4,6 62:16 67:23 76:14
77:8,9 78:1,11 79:22 81:2,4,11 83:25
85:9

**base** 34:2

**based** 28:10 38:10,20 44:25 47:19,23
54:16 73:4 77:3 85:23 86:11 89:16,23

**Basically** 11:2

**basing** 36:11

**Bates** 24:18 48:10 63:19 64:19 65:5
70:21 72:18 85:12

**Baywood** 4:5

**bear** 24:9 84:5 86:21

**because** 6:19 7:18 17:12,18 18:24
24:8 39:17,22 43:5 44:1 59:23 60:18
62:16 68:11 72:4 79:6,19 85:2,19 86:7

**been** 6:25 7:2 13:1,16 28:7 37:14 46:9
48:6 51:24 54:18,21,23 56:13 57:18
70:20 74:14 75:5 78:9,10 79:2,19
81:24 83:14 85:12 86:15

**beeped** 70:13

**before** 4:6 6:25 13:18 14:2 22:18
27:18 28:10,21 37:25 46:13 53:2
64:21 68:2,25 69:8

**begins** 79:23

**behalf** 20:10,17,19

**behind** 86:22

**being** 4:14 6:10 18:12 29:17 36:15
44:8 72:3 89:17

**belief** 30:4 33:25 34:2

**believe** 7:9 17:25 22:25 39:11,17,22 40:8 41:15 42:25 44:13 59:12 61:17, 19,23 64:2 74:20 75:3

**believes** 30:5 34:1

**belongs** 77:1

**best** 7:22,23 30:2 33:23 87:23

**better** 24:25 58:13

**between** 42:3 52:19 56:16 77:23 82:23

**big** 36:18

**bill** 65:8 80:22

**black** 72:20

**blittle@lippes.com** 5:21

**block** 56:19

**both** 6:5 10:14 41:9 46:22 58:23 84:4

**bottom** 24:17,18 48:10 64:2 74:18 76:1

**box** 25:5 26:13

**break** 8:10,11 54:25 55:8,15

**breaks** 8:16

**Brendan** 5:17 15:12 21:5 31:19 64:10 83:13

**brief** 16:1 35:4 83:23 88:3

**Brook** 7:7

**brought** 56:25 90:13

**Bruce** 4:11 5:15 6:9,20,21,25 7:12 9:24 13:10,19 15:14 16:4,21 17:12 18:10,13 21:8 29:17 31:22 32:11 35:7 36:21 55:8 59:13 62:5 71:19 73:17 81:10 82:12,18 84:9 88:1,6 91:2

**Buffalo** 5:19 7:10

**business** 4:4 89:10

**busy** 79:4

**butcher** 73:7

**butchered** 6:19

**button** 58:19

---

**C**

**calendar** 52:13

**California** 4:5,8 6:3 7:13

**call** 6:18,20,23 17:5,7 46:12,19 47:2,5, 6,7,9,11,13,20,23,24 48:21 49:3,10, 16,18 50:20,22 51:2,6,12,17,18,21 53:9 54:4,6,14 56:2,5,6,8 57:2,19 58:2,3 59:24 63:8,13,15,25 67:15,18, 23 68:1,10,19 69:14 70:6 71:7,12,15, 18,20 72:8 74:2 75:9,16,19,22 76:6,7, 9,10,12,19,25 77:1,4,14,15 78:1,2,3, 19 79:15 80:9,11,12,15 81:2,4,6 90:21

**callbacks** 68:13

**called** 4:13 6:10 17:2,5 48:22,24 54:17 56:11 57:12,13 64:4 75:5 77:8,9 78:11 79:3,4 80:13

**calling** 16:20 47:22 53:2 56:16 69:8

**calls** 46:20,21 53:18,23 57:24,25 58:1 59:17,22 68:25 72:1,2,10 74:5 75:6 76:23 77:6,16,17,19,23 78:3,12,16,20, 22 79:8 83:2,3,4,7

**came** 66:10,16,20

**can** 7:12,25 9:18,22 14:20 15:7,14,15, 19,23 16:2,21 18:17,18,19 19:21 21:8 24:22,25 32:3,23 35:5 36:23 38:15 43:24 48:2 49:3 54:10 55:4 60:9 71:2 76:20 80:18,24 83:10 89:22,25 90:1, 17

**can't** 8:4 17:15 18:16 41:22,24 42:1 44:19 49:16 53:14 62:1 73:18 80:20

**cannot** 14:10 15:1,7

**capacity** 59:17

**card** 71:24

**care** 43:7 58:8 61:10

**case** 29:9 49:9 82:2,6 85:1

**Cease** 17:9

**cell** 78:9

**CENTER** 4:4

**central** 67:10

**certain** 54:5,8

**certainly** 77:13

**certifications** 12:5

**Certified** 4:6 6:11

**challenges** 7:19

**change** 89:23,25 90:2

**changes** 89:16 90:24

**characterization** 47:22

**check** 19:7 43:2 62:11,20,21 89:12,13

**check-writer** 49:9 50:16 56:4

**checks** 18:24,25 20:24,25 21:10,24 60:8

**Chicago** 7:7

**circumstance** 17:22 39:10

**circumstances** 38:11,22 84:18

**claim** 23:3 56:25 62:19 83:16,18 84:4

**claims** 87:18

**clarification** 9:10,12,13

**clarify** 15:1 21:25

**clarity** 78:17

**clear** 73:15

**cleared** 60:8

**client** 15:9,10 16:19 17:2,23 18:23,24, 25 19:2 20:1,13,17,20 22:2,21 23:6,22 25:8,15,21 26:8,24 27:9,22 28:4 31:19 32:1 40:3,5,9,20 42:10,16 47:20,24 48:13,22 50:17 51:12,17 53:3,10 54:18 56:16,23 57:13,14 60:4,15 61:1, 13,15 62:9 63:9 68:17 69:15 72:7 74:2,5 75:4,9 76:12 77:19 79:24 81:9 90:19

**client's** 16:8 19:5 23:17 27:5 63:25 65:9 68:5,8 72:11

**close** 48:3,4

**closest** 68:15

**clumsy** 9:11

**coaching** 11:1

**code** 56:19

**collect** 11:3 15:20 50:12

**collecting** 20:17,19,20,21 21:17 23:5

**collection** 10:10 11:18 20:5,10 22:1,4 46:5 49:21

**collections** 10:25 12:8

**collector** 20:12 38:12,24 50:12 58:24 80:14,25 85:7,8

**collectors** 11:3,11,17 12:3 45:7,15, 20

**combative** 18:10,12,17

**combination** 46:21

**come** 46:4 62:17 66:25

**commencing** 4:3

**communication** 36:3,12 37:1 41:3
42:16 50:10

**communications** 45:7,16 82:23

**company** 10:15 17:25 19:7

**compare** 40:24 41:4

**complaints** 34:10

**completely** 8:12 14:10 18:8

**compliance** 11:1,12,18 12:2 16:7

**Complies** 48:11 51:15 72:19

**computer** 84:16 86:22

**concerned** 17:9

**conclusion** 83:7

**conducted** 87:18

**confidence** 36:14,25

**confident** 36:15 37:4,7,8 40:9

**connection** 23:15 25:10

**consist** 84:23

**consumer** 29:19 38:9 39:2 53:19
54:4 56:1,4 58:5,23 59:25 68:24,25
84:19,21,23 85:5 88:11 89:16,19

**consumers** 45:8,16 53:23 57:24 67:9
77:24 89:8

**contact** 67:12 68:22

**contacted** 19:25 56:1,23

**contacting** 15:9 18:23

**contained** 33:1 72:23 90:1

**contains** 41:13

**content** 35:19 77:25

**contents** 29:24 33:21

**context** 19:2 44:6,7,10

**contextual** 17:24

**continue** 18:14

**continued** 57:21

**contradiction** 42:3

**conversation** 17:1 43:6 48:13 51:8
55:14 58:4 60:17 61:3,9 70:24 73:13
77:2 78:1,13 79:23 80:1,6 83:25

**conversations** 17:3 60:21 81:2

**copies** 21:24 26:2

**copy** 22:16 25:11,15,17,20,23 26:15,
18 62:10

**corner** 23:2 24:19 87:1

**Corporate** 5:24 14:5

**correct** 8:21,22 9:6,20 12:21,22 15:5
21:19 22:3,14 23:2,4,13,14 25:6,9
26:3,22 30:11,21,22 33:3,15 34:12
40:11 47:3,4,11,12 48:20,23 49:1,24
50:4,5,8 51:3,4,6,7,9,10 52:24 55:11
57:15,19,21,22 60:2 64:5,6 67:25
68:20 72:8 74:22,25 75:8 76:4 78:23,
24 79:13 80:6 84:2,6,7 85:14,16 86:17
88:8,9,12 89:14,17 90:9,10

**correcting** 71:10

**correspondence** 23:22,25 24:5 25:7
26:7,8,25 27:8,14 28:1,5 35:15,18,20
36:16 37:20,21 39:13 40:10,17,21
41:7,18 42:9 43:10 86:2,5,7

**correspondences** 26:23

**costs** 84:5

**could** 13:2,10 28:7 45:11 78:9,10,11
79:2,19 81:24 84:12,24,25 85:4 86:3

**couldn't** 43:22

**counsel** 5:24 7:9 9:16 17:18 18:5
33:6 73:3

**counsel's** 73:9

**counting** 54:21

**couple** 7:3 49:25 71:13 82:19 90:5

**course** 8:13 25:14 26:15 27:15 38:17
53:24 60:23

**Court** 7:14 12:25 36:24

**CR** 71:14,20

**credential** 12:7

**credit** 71:10

**cross** 62:1

**Cross-** 23:21

**Crosscheck** 5:13 6:9 19:4,6,7,10,13,
20,23 20:2,10 23:18 61:18 62:8,18,20,
21,23 63:5 64:7 66:15 68:6

**current** 10:20

**cut** 43:5 57:20 83:14,15

---

**D**

**d/b/a** 5:13

**date** 16:25 23:24 24:23 27:6,25 30:7
35:19 43:2 47:2 62:1,4 63:15 73:16,
17,18,19,23 74:1 75:13 80:9 86:25
89:13

**dated** 25:20 26:9,18 38:5 40:14 84:11

**dates** 27:2 35:23 52:19

**David** 81:12,13 87:23

**day** 4:2 17:8 77:10

**days** 51:23 52:1,3,5,20 53:2,5,6,7
54:22 56:6 69:6,12

**dba's** 10:6,11

**dealing** 11:11

**debt** 11:18 15:21 17:4 20:5,9,12
38:12,23 39:8,10,12,14 45:7,15,19
50:12

**debts** 11:3

**December** 68:22 74:19 75:10,14

**decided** 79:15

**defaulted** 20:1

**Defendant** 5:13 28:13 29:20 30:9,23
36:2 37:20,21 41:2 42:14 46:12

**Defendants'** 36:1

**defense** 17:25

**definition** 53:1

**definitive** 56:12

**definitively** 79:6

**degree** 12:20

**degrees** 12:5

**delineate** 89:2

**department** 17:2 80:14 81:17 87:12,
13

**depend** 69:3

**depends** 69:2,5 77:25

**deposed** 6:25 7:2

**deposes** 29:18

**deposition** 4:2,9 6:6 8:5 9:16 13:6,17 18:18

**described** 79:3

**designated** 14:5

**Desist** 17:9

**determines** 69:8

**development** 88:19

**device** 58:22 59:1,3,21

**dialed** 48:1

**dialer** 47:19,22

**dialing** 83:12

**dialogue** 82:25

**did** 12:9 14:2 15:12 16:19,22 17:23 18:7,9 21:4,25 22:3 23:17,21 24:11 25:10,11,14 26:8 28:4,22 30:7,13,25 32:17,21,25 34:2,16,17,18,23 36:2,4, 5,15,25 39:9,14 40:5,20 41:2 42:14,15 47:13,24 48:12 49:15 52:3,25 53:2,6, 17 54:8 55:15,19 56:5,22,23 60:4,15, 22 61:2,4,8,9 62:15,17,23 63:1,4,8,10, 12 64:7,8 66:6,25 67:2,15,23 68:1,9 69:14 72:10,16 74:4 75:4,9 76:12 77:6,18 81:4 82:1,5,7 87:7,9 90:15,16, 18,21,24

**didn't** 17:11,16,17,25 18:13 21:5 29:5 31:10,12 33:4 34:11 36:12 53:9,16 54:6 61:1 70:8,14 79:4 85:19

**different** 20:23,24 21:1 69:1,9 85:4 86:10

**digital** 59:10

**direct** 35:7 65:4 70:19 74:10,13 76:20 79:21

**direct-** 25:1

**directed** 81:16

**directions** 25:1

**disclosure** 16:14 71:21,22 72:1

**discuss** 17:8

**discussed** 28:2 81:7

**discussion** 16:1 35:4 83:23

**dispute** 84:25

**disrespect** 8:1

**document** 13:12 14:15 21:22 22:11, 17,20 24:6 28:9,21,24 29:1,5 32:18,21 33:1,16 38:7 39:21 41:14 42:17 43:12 47:8 48:15 65:15 66:3,4 67:17 74:7,17 81:19,23 87:7,11 90:16,19,22,25

**document/reviewing** 37:16

**documentation** 16:24 22:9 87:14

**documents** 21:22 30:14,20,23 31:2 60:14 62:8 64:9,11,21,23 65:1 66:8, 13,18,22 67:22 81:18 82:1,5,7

**dog** 28:8 86:18

**doubt** 30:11 52:17,22

**doubting** 52:11

**down** 26:13 34:19 46:24 89:11

**draw** 24:22

**Drive** 4:5

**due** 86:15 89:13

**duly** 4:14 6:10 29:17

**dunn** 38:8

**dunning** 38:12,24 39:15

**during** 55:15 78:16

**duties** 11:14,16

**duty** 11:11

---

## E

**e-mails** 35:16

**earlier** 40:8 50:15 74:21

**early** 61:19

**easier** 7:4

**edits** 90:24

**education** 12:14

**eight** 52:19

**either** 8:13,24 43:18 44:2,4,22 55:16 62:2,22 63:5 66:14 68:2

**else** 7:15 8:11 14:25 60:1 62:12

**end** 57:17 74:8

**ended** 71:12 72:8

**ending** 66:16 67:15,24 68:9,12 69:14 70:16 72:11

**ends** 80:11

**ensure** 56:2

**entire** 44:11,12,14,17 80:16

**entries** 78:21 79:1

**entry** 46:24 63:25 73:22 74:19 75:21 80:17 81:8

**Erick** 4:13 5:4 50:17 66:5 71:6 89:19

**especially** 14:23

**ESQ** 5:6,17

**ESQ.N** 5:23

**essentially** 52:3

**even** 7:2 17:4

**ever** 28:4 41:10 59:16 60:18 61:7 68:15,16

**every** 50:9 89:18

**everything** 14:25 71:11

**exact** 56:6

**exactly** 56:7 59:9

**EXAMINATION** 6:14 82:17 88:5

**examined** 4:15

**example** 90:17

**except** 30:3 33:23

**excuse** 11:15 19:18 22:7 35:8 37:18 58:3 59:20 64:19 68:6 74:15,19 82:6 84:3 88:16

**exhibit** 13:1,3,6,8,11,15,18,22 22:12, 16 23:11,12,15 24:3,4,8 27:11 28:8, 10,13,18 37:14,17,19,22,24 38:2,4 39:22 40:24 41:4,12 42:3,4,6,8,13,21, 22,23,25 43:18,19 44:5,7,9 45:1,22 46:9,11,13,16,18 48:5,6 51:14 55:23 57:6 60:11 61:6,23 62:2 63:20 64:14, 18 65:19 66:8,9,12,19 67:19 70:20 72:15 74:11,14,15,18 75:11,24,25 78:15 81:11,12 84:10 85:13,24 86:1, 18 87:22 88:7 90:6

**exhibits** 23:10 27:23 66:23 82:24

**expenses** 80:2,17

**experience** 11:22,23 28:11

**explain** 67:7 83:10

**explained** 43:16 49:12,13 71:8 79:20 80:14,23

**expound** 17:20

**EXT** 80:11

**extent** 47:17 59:1 74:4

---

### F

**fact** 29:25 30:2 33:22 43:1 78:12,21 86:6

**facts** 49:13 71:8

**fair** 8:7,18 9:3 10:14 11:12,18 18:6 27:13 34:13 49:19 79:11

**fall** 10:23

**false** 41:13,15 42:23 43:1,13,18,19 44:2,5,12,13,15,18,22,23 45:3

**fast** 79:4

**FDCPA** 11:19,22 12:1,6 38:11,23 45:8,17

**Fee** 89:13

**feel** 6:18,22 9:10 14:9 66:7 72:15 75:12 76:16

**fees** 84:5

**female** 50:23,25

**file** 73:10

**fill** 60:2

**filled** 66:4

**finally** 49:15

**find** 63:17 67:9

**fine** 6:21 7:14 8:12 10:17 14:25 73:13

**finish** 8:17

**finished** 12:18

**first** 4:14 6:10 7:5,19 9:24 13:5,16,21 23:1,25 24:12,24 25:2,7 27:4 28:14, 17,23 29:3,17 30:14,20 35:25 38:2,4 39:5,22 40:13 43:7,20 44:15,17 46:15, 23 85:3,25 90:1

**five** 31:4 53:2 69:6,11 76:13 77:17,19 79:16

**fix** 71:10 80:22

**flip** 72:17 74:12 86:24

**Flipping** 74:17

**Floor** 4:5

**Flores** 49:23 50:22,23 51:2,5,18 57:11,17

**Flores's** 50:1 54:12

**follow-up** 18:6 39:22,23 40:1 56:5 82:19 85:19

**follow-ups** 88:3

**followed** 16:23

**following** 38:18 45:13

**follows** 6:13

**foregoing** 29:22 33:19

**foremost** 7:5,20

**forgot** 31:5 61:4,8

**form** 15:11 16:21 18:20 19:14,21 20:6,14 21:3,6,13 31:7,15 32:12,23 34:5,14,21 36:17 37:10 38:13 39:6 42:11,24 43:14,21 44:24 45:10 47:21 52:6 54:19 60:2 61:21 63:11 73:2,5 79:12,17 88:23 89:3

**format** 69:20

**forth** 4:15

**forward** 70:21

**Foundation** 83:6

**Fountain** 5:18

**four** 54:22 75:5 76:1

**frame** 69:6

**Frank** 22:13 48:7

**free** 6:18,22 8:15 9:10 17:20 66:7 72:15 75:12 76:16

**Friday** 52:15,16

**FRIEDMAN** 5:16

**front** 21:21 52:13 55:23 71:24 84:12

**full** 9:22 53:1,4,6

**Funds** 19:1

**funky** 76:24

**Furniture** 19:8,10,13,18,20,24 20:4,7, 18 64:12

**further** 9:12 17:3 72:10 88:5

---

### G

**gave** 49:10 71:7 81:19

**general** 10:22

**generally** 11:21

**generate** 85:10 86:10

**generated** 45:25 67:4 84:16 86:6

**gestures** 8:4

**get all** 76:23

**girl** 46:9

**give** 8:25 16:24 21:23 24:19,25 27:25 50:9 56:7 60:9 63:16 72:1,4 73:22 79:6 81:2 90:17

**given** 25:19 37:9 62:8

**giving** 79:10

**good** 6:15 82:18 83:14

**great** 8:9 13:9 37:12 80:8

**ground** 7:3 8:7 17:13

**group** 5:5 10:25

**guarantee** 19:7 62:20,21

**guess** 15:16 24:16 52:8 53:8 54:20 57:7,9 59:14 66:24 67:8

**guesses** 79:10

---

### H

**H-O-T-A-L-I-N-G** 9:25

**hand** 12:25

**hand-held** 58:22 59:1,6

**handed** 81:22

**handy** 59:21

**Hang** 55:24

**happen** 85:7

**happened** 16:25 78:2,7,8,16

**happens** 7:24

**harassment** 16:18 75:6

**hard** 69:19 79:2

**he** 9:16 16:20,22,23 17:4,5,6 18:16 29:18,22 30:5 32:4 33:19,25 44:7,8 49:14,16 53:12 54:6,8,13 60:19 61:10 66:8,9,13 71:9,12 73:8,14 75:5,6 77:6, 8,9 78:1,9 80:2,13,17,18,19,21,25 81:1 85:18,19

**he's** 17:4 44:5

**head** 24:2

**hear** 21:5

**held** 16:1 35:4 83:23

**help** 22:12 32:25 33:4 36:4 63:18

**helpful** 22:12

**her** 57:18 84:3

**here** 7:8 14:24 16:11 17:13 23:11 24:8,11,12 51:13 55:24 56:5,10 74:9 86:22 87:19

**herein** 5:15 6:10

**hereinafter** 4:15

**Hey** 56:6

**highest** 12:14

**Highland** 5:7

**him** 9:17 16:20 17:5,7 32:3 49:17 51:2 54:7,14 57:18 60:11,19 61:5 78:1 80:12,15 81:1,2,4

**hiring** 11:2

**his** 7:9 9:18 17:3 20:1 30:2 33:23 43:2 60:17 68:14 73:7 78:9 80:18,24 81:6 83:18 84:4

**Hmm** 12:10

**hold** 12:5 79:25 83:19,20

**home** 49:6 71:4

**Hotaling** 4:11 5:15 6:9,16 10:1 29:17

**hour** 4:3 8:15

**HP** 49:7

**hung** 70:7

**hypothetical** 79:10

I

**idea** 25:22 66:5 72:25 88:18

**identification** 13:7 28:19 37:23

**IEF** 49:12

**Igloo** 64:14

**illegal** 8:24

**Illinois** 5:8 7:7

**imagine** 54:20

**impair** 8:24

**important** 7:21 18:16

**in-house** 33:6 81:17 87:12,13

**inbound** 75:19,22 76:7,10,19

**include** 24:4

**including** 35:15 38:10,21

**incoming** 46:21 47:6 75:16,19

**indicate** 78:15,25

**indicated** 71:14

**influence** 8:23

**information** 14:22 15:20 21:23 24:15 30:4 33:24 42:5,7 50:13 58:8,11 62:17 63:13,15 72:23 73:23 87:21 89:12,19, 25 90:1,8,12

**input** 89:12

**inquired** 73:8

**inside** 73:9

**instruct** 31:18

**instructing** 31:25

**instructs** 9:17

**insult** 31:9,10

**internal** 15:19 33:6 69:11 73:3,9

**interrogated** 4:15

**interrogatories** 28:15,17 29:23 33:20 86:19 87:22

**interrogatory** 35:8,13,21 41:1 42:14 43:20 44:22

**investigation** 34:24 87:18

**invoice** 62:14

**issue** 16:9 32:7,8

**issues** 31:6,13,21,23 32:3

J

**January** 64:3 67:14,24 68:2,16 71:4 72:12 73:20 74:3,6 80:20

**jump** 17:11

**junior** 12:18

K

**keep** 8:3 18:2 48:3,4

**kind** 10:22 59:6 76:24

**know** 13:3,11 14:20 15:17 16:25 19:22 22:4,8,14 26:1,4,16,21 33:3,10, 15 34:3,4 35:11 36:6,8 37:14 43:2 44:1,4,19 45:4 46:25 47:17 53:15,16 55:13 56:7,8,12,22 57:5,18 58:2,12 59:1,2,4,5,13 63:14 64:15 65:1,20 68:18 69:5,23 73:14 74:4 77:21 78:10 79:5,7 81:19 88:24 90:3

**knowledge** 14:17 19:9,12,17,19 21:14 25:12,19,25 26:14,17 28:3,6 30:3 33:23 36:10,11 37:3,6 38:10,21 40:12,22 42:4,19 43:16 46:22 47:9,18 60:6,7,22 71:25 85:23 86:8 87:24

**knows** 29:24 33:21 68:23

L

**lack** 58:13

**language** 86:4

**last** 9:15,25 12:11 13:23 29:10,12 32:18 33:17 65:19 68:18,22 73:7 74:1 81:15 86:25 87:2,4 90:5

**lasted** 75:15,16,17

**lasting** 8:14

**law** 5:5 12:20 18:1

**lawsuit** 16:9

**leave** 61:13 89:1

**left** 18:7 55:21

**left-hand** 23:2 86:25

**legal** 5:24 8:24 16:6 38:11,21 81:17 83:7 87:12,13

**letter** 24:12 25:11,15,20,24 26:9,10, 15,18 27:4,11,21 38:4 39:17,23,24 40:1,4,6,14 41:5 44:11,12,14,17 45:23,25 46:3,4 49:14 84:9,11,14,15, 17,19 85:10,12,15,17 86:6,14 88:8,10, 14,19

**letter's** 89:24

**letters** 26:2 27:19 45:20 86:10

**letting** 43:1

**level** 12:14 36:14,25

**like** 6:22 8:15 17:21 23:19 31:16 50:14 54:25 59:3 69:21 72:16 75:15 77:4 78:11 81:5 84:19 89:12

**likely** 9:11

**LILAH** 5:23

**Linda** 80:12,14 81:1,4,5

**line** 26:13 78:2,8

**lines** 46:24

**LIPPES** 5:16

**list** 35:19,23

**listed** 65:11,14,23 66:11

**litigation** 25:11,14 26:15 27:15 60:24 82:8

**little** 5:17 6:5 15:11,14 16:21 18:20 19:14,21 20:6,14 21:3,6,8,13 31:7,15, 20,23 32:2,7,12,23 34:5,14,21 36:17 37:10 38:13 39:6 42:11,24 43:14,21 44:24 45:10 47:21 52:6 54:19 55:1,4 59:6,13 61:21 62:3 63:11 73:1 79:12, 17 82:14,17,18 83:9,17,22,24 84:8 86:22 88:1,23 89:3,6

**LLC** 5:13,14,25 29:20

**LLC's** 28:14,16

**LLP** 5:16

**lmclean@optiosolutions.com** 5:25

**location** 63:12,15

**log** 46:12,19 47:19,22,23

**logs** 90:21

**Lombard** 5:8

**long** 7:1 10:18 11:5 68:25 69:8 77:23

**look** 13:2,10 14:12 16:24 24:7,21 57:16 61:22 62:2,14 64:11,13 65:16 66:7 67:12,13,17 69:16 76:15 90:14

**looked** 72:16 75:15

**looking** 13:12 23:11 24:1,6 25:3 41:14 42:17 43:12 47:8 48:15 55:22 63:19 64:9 66:2 70:1 74:7 75:23 76:17,21 82:24

**looks** 23:19 69:21 77:4 79:25 81:5

**lot** 18:16

**lower** 86:25

---

# M

**machine** 68:14

**made** 17:6 36:6 57:3 68:11 69:21 70:6,12 72:3 73:3,17,23,24 76:17 77:4 79:7 83:2

**MAGGI** 4:6

**make** 9:17 11:14,17 15:21 16:19 17:23 59:16,22,25 60:5,15,16 61:1 67:5 72:10 81:10 85:7 90:24

**makes** 7:4 53:18

**making** 11:11 67:11

**male** 50:24,25

**man** 71:6

**manage** 10:25

**Manager** 5:24

**manual** 83:8,10

**manually** 48:1 84:14

**manually-dialed** 83:3

**many** 8:16 20:16,21 23:1 60:4 75:9 80:2,17

**marathon** 8:13

**marked** 13:6 28:18 37:22 85:12,13

**materials** 82:7 90:16

**math** 52:24

**MATHIAS** 5:16

**matter** 6:17

**matters** 30:3,5 33:24,25

**maybe** 83:20

**Mclean** 5:23 7:15 81:24

**me** 4:6,14 6:18,23 7:24 8:1 9:4 11:15 13:3,11 15:5,17 16:10 18:8,14 19:18 21:21,25 22:7,14 23:9,12 24:7,9,19,25 25:19 27:17 29:3 30:19 31:9,16 33:12 35:8,11,25 37:14,18 41:17 43:17 44:12,21 45:12 46:25 49:3 52:4,11,14, 17,22 56:6,7 57:19 58:3 59:21 60:9,23 63:16 64:15,19 65:20 66:2 67:7,8,17 68:6 71:2,10,24 74:15,19 76:20 78:13 79:10 81:10,22 82:6 83:13,15 84:2,4 85:14 86:21 88:16 89:18 90:13,17

**mean** 12:4 31:23 32:20 37:5 40:2 41:12 42:23 50:6,16 57:7 59:3 78:8 79:5 80:12 83:10,14

**means** 41:16 47:10

**mechanics** 8:1

**medical** 32:7,8

**meetings** 12:2

**memorialized** 54:1

**memorized** 71:23

**memory** 31:6,14,22 32:8

**mention** 14:24

**mentioned** 11:10

**middle** 8:17 25:5 72:20 80:5 89:11

**might** 10:13 78:7,8

**military** 48:19 74:21

**mind** 6:19,20

**mine** 29:13

**Mini** 49:10 50:3,7,11 71:7 72:4

**Mini-** 50:2

**mini-recorder** 59:6

**minute** 48:3 65:16 75:18

**minutes** 17:1 55:9 76:13 77:18,20 79:16

**Miranda** 49:11 50:3,7,11 71:7 72:4

**Miss** 7:24 15:23 16:3 38:16 54:12 57:11

**misstated** 39:17

**MM** 50:2

**model** 58:25

**moment** 24:7 25:18 39:16 60:9,10 79:25

**Monday** 4:2 6:1

**month** 12:2 80:19

**months** 12:11,13 31:4 39:14 81:21 90:23

**more** 8:14 56:12 59:18 75:7 77:6 88:20 89:1

**morning** 6:15 57:11 82:20 84:10 86:1 87:5

**most** 36:15

**mother** 63:13 64:1

**mouth** 15:2

**movies** 59:4

---

**N**

**name** 6:16,19 9:22,24,25 58:25 65:9 69:23 73:7 89:19

**Nate** 6:18,23 10:4 20:24 22:15 31:9,24 32:13 41:19 43:23 44:8 53:11,14 59:2 60:14 64:10 71:23 76:22 90:3

**Nathan** 5:6 6:16

**near** 74:8

**necessary** 14:22

**need** 8:10,16 9:12 22:9 27:24 35:23 36:24 39:16 48:3 64:11 65:15 66:14 71:11 72:7,14 75:11

**needs** 8:11

**never** 40:10,22 60:19 69:24

**New** 5:19 7:10

**next** 17:8 51:11,17,21 54:17 56:8,24 57:21 77:10

**Non** 19:1

**notated** 26:12

**notation** 24:4

**note** 6:5 8:3 57:20 70:23 73:24 75:4 79:23 81:8

**notes** 16:24 22:10,17 48:7 49:2,4,19, 20 50:1 51:1 54:10,11 56:10,24,25 57:16,18 59:5 69:17 71:2 73:3,4,9,17 76:15,17 77:11 78:15,19,22 79:1 85:24 90:18

**nothing** 6:12 60:18 69:10 78:19

**notice** 4:1 13:5,16 38:8,12,25 39:2,4, 15,19,24 85:2,3,6,18,19,22

**notices** 85:20

**November** 38:5 39:23 40:14 84:11 86:14

**null** 17:9

**number** 21:1,11,16,18 22:1,5,8,21,23 24:17 43:2 47:11,13,16,17 48:1,24 58:25 63:1,4 64:4,8 65:11,19,25 66:9,

16,20,25 67:15,24 68:6,8,10,12,23 69:1,9,14,23 70:7,13 71:5 72:11 78:11 79:16 84:24 85:4 89:12,13

**number's** 66:11

**numbers** 21:1 23:6,8 24:18 62:24 63:1,6,9 65:14,23 67:10 69:13 70:4, 11,16,17

**nvolheim@sulaimanlaw.com** 5:10

---

**O**

**o'clock** 4:4 6:1

**O-P-T-I-O** 10:3

**Oak** 7:7

**oath** 8:21 31:1 55:10

**object** 9:16 15:11 18:20 19:21 20:6 21:13 36:17 47:21 73:1 89:3

**objected** 19:14 21:6

**objecting** 73:5

**objection** 9:18 83:6

**obtain** 64:8

**obtained** 70:17

**obviously** 7:5,6,18,22 9:8 72:14 80:5

**October** 27:12,19 47:3,14,20,24 48:14 51:9,19,22,23 52:2,10,15,16 56:11,16,17 52:2,13,14,17

**offense** 9:13

**office** 7:6,7,9 73:8

**once** 17:6 58:6

**one** 7:8 17:4 23:10 24:7 27:23,24 33:18 44:1,4 45:2,5 49:20 60:8,25 61:5,9,13 70:5,25 72:17 75:15,16,17 76:3,17 77:5,16 79:7 80:22 86:21

**ones** 46:2

**only** 7:8 23:13 57:25 59:13 72:2

**open** 18:8

**operates** 45:24

**opinion** 16:6 38:11,22 88:25 89:4

**opportunity** 17:19

**optio** 5:14,24 10:3,6,16,18 11:7 14:4 15:9 16:8,20 18:23 19:25 20:4,7,9,12, 17,21 21:16,25 22:21 23:5,17,22,25

24:5,21 25:8,10,11,15,19,23 26:1,8, 14,17,24 27:9,14 28:4,14,16 29:20 39:9,12 40:10,21 41:5 42:8 46:2,6 47:6,11,13,19,24 48:9,10,12,13,21,24 50:19 51:11,17 52:25 53:2,9,17,22 54:4,17 55:22 56:2,15,22 57:4,23 58:12 60:5,16,17,22 61:2,12,14,19 62:8,12,23 63:2,6,8 64:8,19,20,24 65:2,6,18 66:9 67:15 68:5,8,16,23 69:7,14 70:24 72:1,10 74:1,4 75:7,9 76:12 77:18,22 79:15,22,24 82:23 83:2 85:12 86:10,15 87:17 88:16 89:6

**Optio's** 22:17 49:20,21 54:16

**oral** 4:8

**order** 76:24 85:7

**original** 39:18,24

**other** 7:14,21 10:11 15:20 23:6 25:1 26:7,9,23,24 27:2,8,19 28:1 60:8 61:11,12,13,15 63:4,5,8 65:14,23 66:13,18,22,23 67:10,14,16 68:1,2 69:13 70:4,11 77:16 79:16 80:2,17 82:13 89:18 91:3

**Otio** 10:14

**our** 7:14 12:3,24 15:9,21 17:2 18:25 38:8 46:19 69:11 81:17 85:20 87:12

**out** 7:25 22:13 44:5,7,9 60:2 64:15 66:4

**outbound** 47:6,9,11 76:5,7,8,10,11 77:4 83:2

**outgoing** 46:20 59:17 75:22

**outside** 7:7 66:18

**over** 7:3,21,23 17:12,13 18:13,14 31:4 32:17 37:5 39:14 60:15

**overview** 10:22

**own** 20:4,9

**owns** 45:24

---

**P**

**p.m.** 74:24 91:5

**Pacific** 75:1,3

**page** 23:1 24:14,16,17 25:3 26:13 27:3,10 29:10,12 33:17 38:4 46:8,24 55:22 57:5,8,10,21 63:21,22,24 65:5, 19,23 67:18 70:1,21 72:18,20 74:15, 19 76:20 77:3 80:7,8,19 81:15,16 82:9

86:25 87:2,4 89:12

**pages** 23:1 24:8

**paid** 58:7,14

**paperwork** 64:12

**paragraph** 90:2

**part** 11:10,14,16 19:10,13,20,23 20:4,
9 46:6

**parties** 7:11

**pay** 49:16 60:16 61:2 80:18,20

**payable** 43:3

**payment** 17:8 27:22 58:1,3,5,6,9,11,
14 59:25 60:19 61:5,6,9 72:2 81:7

**payments** 20:1 59:23 60:4,11,14

**penalty** 55:10

**percent** 37:2,6,8 40:9

**period** 35:17 54:5,8

**perjury** 55:10

**person** 5:23 57:12

**personal** 11:23 34:23 42:7

**personally** 4:8 12:16 41:20

**pertaining** 15:18

**Petaluma** 4:5 6:3 7:13

**phone** 14:24 15:8,19 17:6 46:19
47:11,13,16,17,18,20,24 48:13 49:6
50:20,22 51:12,17 53:18,23 56:2 57:2,
24 58:23 59:17 60:16 62:23 63:1,4,5,8
64:4,8 65:11,14,19,23,25 66:9,16,19,
25 67:10,15,24 68:5,8,10,18 69:1,13,
23,24 70:7,14,15 71:5 72:10,11 74:2,5
75:6 78:8,9 79:8,15 80:9,11 81:6

**phone's** 49:7

**physical** 8:4

**physically** 81:22

**picked** 70:7

**place** 34:9 47:24 51:8 56:2 63:15
77:18

**placed** 47:6,11,20 51:11,17 61:18
62:7 74:1

**placement** 62:24

**placing** 74:5

**plaintiff** 4:13 5:4 6:17 35:16 36:3
37:2,20,22 41:3 83:18 84:3

**plaintiff's** 13:5,6,16 28:14,17,18
29:23 33:20 37:22

**plan** 17:8 27:22 58:5 81:7

**play** 58:13

**Plaza** 5:18

**please** 6:5,18,22 7:23 8:17 9:10 11:8
15:3,5,6,24 18:13 19:11,16 24:7 30:18
31:17 35:18 38:15 45:12 53:21 55:7
57:19 66:17 75:12

**PMK** 6:9

**point** 8:10,11 17:10,20 58:6,10 73:2

**policies** 53:17,22,25 54:3,16

**policy** 69:7,11 77:22

**possible** 79:9,14,18,19

**practice** 72:2

**Practices** 11:18

**preauthorization** 27:21

**prejudice** 83:19 84:4

**premarked** 13:1 28:8 37:14 46:9 48:6
74:14

**prepare** 36:4

**prepares** 81:17

**president** 10:21,24 11:6 29:19 59:17

**pretty** 14:18 17:23 36:18

**previous** 81:1 85:20

**prior** 29:1,5 32:18,21 57:8 68:16,19
82:1,2,8 90:15,19,21,25

**priority** 80:18

**privilege** 73:11

**privy** 88:18 89:9

**probably** 12:4,10,11,12 22:25 48:3
57:8 67:2,3 89:5

**problem** 10:5

**problems** 32:5,10

**procedure** 69:7 77:22

**procedures** 53:17,22,25 54:3,17

**proceeded** 17:2

**proceedings** 91:4

**process** 58:11 90:4

**produce** 25:10,11,15 60:22

**produced** 26:14,24 27:14,16 30:10,
23 46:12 66:8

**professional** 12:8

**promise** 61:2

**promise-to-pay** 60:20

**promises** 60:16

**prompt** 60:17 85:9

**prompts** 85:8

**pronounced** 9:25

**properly** 31:20

**property** 67:13

**proposal** 80:24

**provide** 32:25 33:4 62:15,23 63:2,5
87:14

**provided** 33:12,14 62:13 64:24 65:2
66:1,14 68:6,9 87:10

**pull** 22:13 64:15

**pulled** 86:22

**purported** 30:9

**purpose** 50:13

**pursuant** 4:1

**purview** 10:23

**push** 58:13,19

**put** 15:2 34:19 56:10,20 76:25 84:12

**puts** 71:5

Q

**Q-U-A-L-I-A** 10:9

**Qualia** 10:9 46:4

**question** 8:17,18 9:3,4,5,19 14:22
17:14,22 18:3,7,8,9,21 19:11,16 21:9
25:13 26:5 29:8 30:18,25 31:11,19
32:3,9 33:5 34:15 36:23 38:14,18,20
43:23,25 45:11,13,15 53:14,20 66:17,
24 67:23 68:1 77:13,15,18

**questions** 7:20 14:20 15:18 17:15,19
18:6 31:16 33:8,11 36:21 71:13 82:13,

19 87:22 90:5 91:3

**quick** 14:13 67:17

**quickly** 13:10

**quite** 54:24

---

**R**

**raises** 7:19

**range** 36:18

**re-send** 40:3,6

**re-sent** 27:4 85:6

**reach** 67:10 68:12 69:22

**read** 14:3 29:14,22 33:16,19 35:25 36:24 38:15,18 39:16 40:13,19 45:11, 13 49:3 69:20 71:2 80:16 81:7

**Reading** 29:16 39:21 40:15 49:5 71:4

**real** 14:13 67:17

**reason** 30:11 52:11,16,22

**recall** 24:1 41:10 82:10,24 84:11 90:20,23

**receipt** 40:16 41:6,17 43:9 86:1,4 88:15,21

**receive** 12:9 23:17 36:2,15 37:1 39:8, 9 41:2 42:15 49:15 85:19

**received** 12:7 23:19,21 35:14 39:12 42:9 49:14 60:11 62:10,12 85:3

**receiving** 41:20

**recently** 12:11,12

**recess** 55:2

**recollect** 13:21

**record** 9:23 13:15 15:23 16:1,3 22:16 28:13 35:3,4,6 37:19 46:11 55:7 57:23,25 58:10,14,19 59:23 60:17 61:2 64:18 72:2 73:14 83:15,21,23,25 84:1

**recorded** 60:20 72:1

**recording** 49:10 50:19 58:21,22 59:20,21 60:3 61:11,14 71:7,15,20

**recordings** 60:23 61:12,15

**records** 58:23

**recruiting** 11:2

**redacted** 73:3,4,10

**redaction** 72:21,24 73:17,19,23,24

**redactions** 73:9

**reference** 22:21 66:3 72:14 75:11

**referenced** 61:14

**references** 23:13

**referencing** 24:14

**referring** 10:15 70:25

**regarding** 14:8 32:3 40:17 41:7 43:10 54:4 61:15 63:9 82:19 86:2,5 87:18 88:15,21 90:6

**regardless** 88:10

**regards** 14:23 15:20 17:3 48:12 53:18,23 69:15 70:15 74:20 78:22

**REGUS** 4:4

**related** 22:1 62:9 63:25 82:2,5,8

**relates** 62:22

**Relations** 29:19

**relationship** 19:5

**relative** 69:22,23

**relevant** 35:17

**remember** 30:16,17 31:12 62:1 81:22 90:11,13

**REMEMBERED** 4:1

**remembering** 32:6,11

**Repeat** 19:16 21:9 30:18 34:15 38:14 53:20 66:17

**Rephrase** 19:11

**Reporter** 4:7 6:11 7:14 12:25 15:25 36:24 38:17,19 45:14

**represent** 6:16

**representative** 14:5 57:3 79:15

**request** 24:24 25:2 26:10 27:5,11 84:21,23 85:2,21 86:9,15,16 88:11,12, 15,21 89:2

**requested** 38:19 45:14 53:13 56:10 68:13 85:18

**requests** 85:5 86:12

**require** 38:12,23 45:8,17

**required** 39:1,3 45:21 50:9

**resort** 58:3

**respect** 12:6 20:13,17 23:6 43:18,20 61:12 73:10 78:15 88:6

**respective** 84:5

**response** 19:3 29:22 35:25 36:1,6,8 42:14 44:23 45:2 54:9

**responses** 28:14,16 30:10 33:19 86:11 87:21

**responsibilities** 10:23

**responsibility** 11:17

**responsible** 11:1,4

**result** 58:3

**returned** 18:25 81:6

**review** 14:2 32:18,21 34:11,16,18 66:14 80:23 82:1,5,7 87:7,11,15 90:16,18,21

**reviewed** 31:1 34:3 90:8

**reviewing** 14:15 28:9 60:13 67:22 68:21 69:19 77:11 81:5

**Rigby** 4:13 5:4 16:10 36:13,16 41:11 42:2 43:2 50:17 56:5,10 68:12,19 71:7 82:23 83:3 85:17 86:7 87:19

**Rigby's** 47:18 63:13 67:3 85:21 89:19

**right** 7:16 9:21 24:11,17,24 35:2,5 41:21 43:7 44:21 48:12 49:2 51:19 54:7 55:6,21 57:8 61:20 62:5 65:22 70:7,23 73:16 74:8,18 78:3 82:12 83:24 86:24 88:2

**right-hand** 24:19

**ring** 70:14

**role** 10:20 11:5

**room** 7:15

**rule** 17:13

**rules** 7:4 8:7

**run** 59:10,11

---

**S**

**said** 6:22 8:15 17:5 21:5 49:15,16,18 50:15 51:5 53:12 62:16 71:13,14 72:6, 7 77:6 80:2,18,19,21,25 85:14

**sake** 73:12

**same** 14:19 21:1,2,4,11 26:13 27:18 36:23 57:12 67:6

**Saunders** 4:6 7:24 15:23 16:3 38:16 73:13

**saw** 28:23 29:4 30:14,19 38:2 42:1

**say** 11:12 12:12 15:12,18 21:4 27:13 34:13 37:2 40:1 49:4,20 54:3 71:22 79:2,11 82:4 83:9 88:14

**saying** 10:14 15:16

**says** 24:24 33:18 41:1,5,17,19 42:18 43:8 56:7 57:18 80:17,19

**screen** 85:9

**search** 27:24

**searches** 67:9,13

**second** 24:9 26:10,13 63:16 65:5 76:3 85:18,21 86:21,24 87:2

**seconds** 75:15,16 76:6,9 77:16,17 78:4,6,17,18

**see** 8:5 13:24 21:20 22:9 24:2 25:4 29:5 35:21 38:5 41:19 46:25 51:13,18 56:25 57:10 59:4 60:11,13 61:5 63:21 65:9,12,14,19,20,22 66:22 68:21 69:19 70:25 72:13,21 73:18,20 76:15 80:2,23 81:5 89:14

**seeing** 13:21 24:23 25:1 41:11

**seeking** 20:5,10

**seem** 14:18

**seems** 14:25

**seen** 13:18 22:17 28:20 29:1 31:2 37:18,24 40:22 46:13,16 64:20

**send** 23:22 26:8 28:4 38:24 39:1,4,13, 14 40:20 45:7,16,20 89:7,18

**sends** 26:2 39:13

**sense** 15:21

**sent** 23:25 24:5,12 25:8,15,20 26:10, 24 27:3,4,8,10,11,21 35:14 37:20,21 38:8,12 39:19,25 40:10 41:5 45:22 46:3 84:19 85:6,17 86:7,15 88:10 89:17

**sentence** 35:25 40:14 43:8,19,20 44:16,17,22 45:1 85:25

**September** 4:3 6:1 24:12 25:16,20 26:9,11,18 27:3 61:19

**served** 11:5

**Service** 89:13

**Services** 5:13 6:9 10:10 46:5

**set** 4:15 28:15,17 48:2

**seven** 46:24 69:6,12 75:18

**several** 24:8 68:11 82:22

**she** 56:9,13

**short** 11:19 55:8 78:3,12

**shorthand** 4:7 6:11 10:13

**should** 24:4 54:17 77:23 83:20

**show** 8:5

**sic** 20:4

**side** 89:10

**sides** 84:4

**sign** 30:7,13,25 81:16,20,23 87:15

**signature** 29:12 30:24 87:5

**signed** 31:5 34:13,17

**signing** 82:2,8 90:15,19,22,25

**single** 45:1 58:6

**sir** 7:17 8:8,19 10:12 13:13,20 14:1,7 20:11,15 30:8,12 33:13 35:1 41:14 46:17 50:21 56:21 61:16 62:6 68:4 86:13 87:6

**situation** 55:25 56:13

**six** 12:11,13 81:21 90:23

**Skip** 67:2,6,7 70:17

**Solution** 28:14

**Solutions** 5:14,25 10:3,6,16 11:7 28:16 29:20 82:23

**some** 7:20 9:12 10:13 14:21 49:2 60:14 67:2

**somebody** 60:1

**someone** 16:7 56:7 59:5 70:7,24 71:9 84:15

**something** 9:9,11 15:13 31:13 42:2 50:14 78:2,7,8

**Sonoma** 12:18

**soon** 39:7

**sorry** 10:4 30:1,17 37:4 50:25 58:17 64:10 69:3 71:9 73:16 74:11 75:25

76:18,19 88:2

**sort** 56:19 67:13

**sound** 62:5

**speak** 15:19 70:8

**specific** 17:23

**specifically** 9:17 55:18 78:20

**spell** 9:22 73:13

**spelled** 10:9

**spoke** 57:13,14 68:16 70:12 73:2,6 80:13

**sprint** 8:12

**stamp** 46:25 48:10

**stand** 50:2

**Standard** 75:1,3

**stands** 49:12 50:3,15,17 71:15

**start** 11:25 58:21 63:24 64:1 76:2

**started** 80:7

**starts** 80:1

**state** 4:7 7:12 9:22 12:18 35:14 42:15 75:4 88:21

**stated** 18:15 31:12 50:3 61:18 71:9

**statement** 30:13 41:13,15,16 43:13 44:15

**statements** 29:25 30:1 33:22 41:9 42:20

**states** 29:18 35:13

**stating** 31:1 42:9

**step** 62:16

**still** 55:10

**stipulate** 83:15

**stipulated** 83:17

**stop** 16:20 74:5

**stopped** 56:15,18

**strike** 19:18 22:7 23:15 28:11 35:24 55:20 64:7,19 68:7 81:9 82:6,11 85:11 86:3

**subject** 55:10 82:13

**substance** 55:14

**substances** 8:24

**successful** 67:11

**Sufficient** 19:1

**Suite** 5:7,18

**SULAIMAN** 5:5

**sure** 11:11,14,17 16:12 21:21 25:25 26:6,20 27:24 30:8,19 33:5,9,12,14 43:15,23 46:1 52:24 55:1 59:12,15 60:6,8 62:13 64:10 66:18,21 67:3,5 69:18 74:7 77:12 81:11 83:22 90:4

**sworn** 4:14 6:10 29:17 30:13

**system** 14:17,24 15:8 34:7,8,9,12,19, 22 45:24 56:20 58:20 83:12 84:16 85:8,9

**system-generated** 45:23 84:17

---

**T**

**T-E-D-D-Y** 73:14

**take** 8:10,11,16 9:13 13:2 24:10 39:16 54:25 56:2 58:8,11 60:9,12 61:4,9,10 62:16 65:15 89:22

**taken** 55:2

**taking** 4:2 44:5,7,9,11 59:5

**talk** 7:21,23 17:12 18:13,14 37:5 55:15,19 71:11 72:7 83:20

**talked** 49:6,8 68:19 71:5,6 77:5 82:22 84:9 85:25 87:4

**talking** 53:15 59:7 67:5

**talks** 78:20

**tangent** 18:4

**tape** 59:11

**TCPA** 16:15 83:16,18 84:4

**teaching** 11:3

**technically** 52:7

**technology** 15:8

**Teddy** 73:2,6

**telephone** 14:17 82:22 83:11

**telephonic** 7:19

**telephonically** 5:3,12 6:6 7:8 8:2

**tell** 6:11 22:20 42:1 51:16 66:9,15,19

**telling** 73:6

**tells** 78:12

**template** 88:7

**templates** 89:7

**ten** 51:23 52:1,3 53:6 55:9

**term** 58:13

**testified** 6:12 40:8 74:21 88:7 90:7

**testify** 14:5,10 15:2,7 18:16,19

**testimony** 8:25 37:8 55:17,18

**thereof** 4:4 29:24 33:21

**thing** 9:15 14:19 67:6,13

**things** 32:6,11,13,14 33:18 49:25 78:11 84:24 85:4

**think** 13:23 22:11 36:19 42:21 54:23 63:18,19 64:13 71:14 72:6 77:12 79:23 85:13 88:20 90:7

**Third** 27:11

**third-party** 16:13

**thought** 60:7

**three** 18:24 20:22,23,24 21:10 24:16 39:14

**through** 12:2 13:11,24 14:3,6,8,12 23:11 24:7 25:14 33:16 60:10,14 61:7 62:19 64:19,20 66:7 69:16 79:4 80:16

**throughout** 9:15 60:23

**time** 7:1 24:10 28:23 29:3 30:14,20 35:17 38:2 46:15,24 48:17,19 51:11, 17 54:17 56:24 60:12 68:15 69:5 74:20,21 75:1,2,3 76:2 80:22 82:14 87:14 91:3

**times** 67:16 68:2 75:5,9 78:3

**today** 8:21 9:1 10:13 13:18 14:2 16:11 28:21 36:21 37:9,25 46:13 49:16 55:17 64:21 75:5 82:25

**today's** 73:12

**together** 76:25

**told** 30:9,19 81:1

**tomorrow** 80:12,15 81:3

**top** 24:1

**topics** 13:24,25 14:2,6,8,9 18:16,19

**Total** 89:13

**Trace** 70:17

**Tracing** 67:2,6,7

**training** 11:2,21,24

**transcript** 8:6

**transfer** 59:25

**true** 30:2,6 33:22 34:1,3,4,18,19,25 36:8,10 41:9 42:20,22 43:13 44:18 87:23

**trust** 34:6,19 52:14

**trusted** 34:12,20,22

**truth** 6:11,12

**truthful** 8:25 45:9,18,21

**truthfully** 14:10,21

**Tuesday** 52:10,11

**turn** 28:7 29:10 37:13 46:8 48:5,9

**Turning** 65:18

**Twelve** 10:19

**twice** 12:2

**two** 8:15 26:23 42:19 49:17 51:2,24 52:5,19,25 53:2,9 54:14 56:1,3,23 77:15,17,19 78:16,20,22

**typed** 49:7,20 51:2,5 84:14

**types** 32:13 34:10

**typically** 69:6

---

**U**

**unaware** 26:21 27:13

**under** 8:20,23 10:23 20:25 21:11 23:3 31:1 38:11,22 49:2 55:10 65:8 84:18

**Underneath** 73:19

**understand** 8:20 9:4,9 10:15 25:13 32:2 55:9 65:15

**understanding** 14:4 16:8 19:9,12, 17,19 87:17

**understood** 9:19 41:21

**unfamiliar** 41:20

**Unfortunately** 89:9

**University** 12:19

**unless** 9:16 12:25 23:9 56:9

**until** 31:2 56:14 58:14 80:20

**up** 8:5 16:23 56:25 62:1 70:7,8 76:1
86:22

**updated** 12:11,12

**upon** 27:4 30:4 33:24 62:24

**upper** 23:2

**use** 10:13 15:20 58:22 83:11

**used** 15:9 50:13

**uses** 89:7

**using** 22:21 23:5

---

**V**

**validation** 39:2,4,19,24

**verbal** 8:4 84:20,22 85:22,23 86:8,11,
15 88:11 89:2

**verbally** 40:7 58:14 60:15 85:5

**verification** 29:15 30:7 31:1 34:17
81:15,16 82:3,9 87:5 90:7

**verified** 40:25

**verify** 90:12

**versed** 12:1

**versus** 86:11,12

**vice** 10:21,24 11:6 29:18 59:17

**violate** 18:1

**violation** 16:16

**voided** 17:10

**Volheim** 5:6 6:5,14,15,16 12:24 13:9,
15 15:22 16:2 17:11 18:21 19:15,25
20:8,16 21:4,10,15 28:20 31:10,18,21,
25 32:5,10,14,25 34:8,16,23 35:2,5
36:20 37:12,24 38:15 39:3,9 42:13
43:4,17,24 45:4,22 46:11 47:23 52:9
54:23 55:6 59:16 61:24 62:4 63:14
73:6,12 79:14,21 82:12,20,25 83:6,13,
19,24 84:2,6,7 88:2,5,6,25 91:2

---

**W**

**wait** 39:14 52:25 53:2,6,9,16 56:14
57:1 68:25 69:8,11 77:23 82:4

**waited** 53:4

**weak** 53:1

**Wednesday** 13:23 28:25 29:2,6
30:15,20 31:3 32:18,22 38:3 46:14

**week** 13:23 53:1 56:8

**weekend** 54:22

**weeks** 49:17 51:3,24,25 52:5,25 53:2,
9 54:14 56:1,3,23

**well** 7:6 8:5 12:1,10 20:19 28:11 31:4,
20 45:19 52:7 53:8 54:6,8 55:20 60:6
61:24 62:15,19 67:6 69:22 72:5 74:15
77:25 80:7,13 85:11 86:3 89:11

**went** 17:24 32:17 61:7

**WEXLER** 5:16

**whatnot** 68:13

**whole** 6:12

**withdraw** 83:16

**withdrawing** 83:18 84:3

**word** 88:16 89:1

**words** 15:2 54:11,12

**work** 10:2 16:7 32:15 71:24

**worked** 10:18

**working** 51:25 52:3,20 53:1,6 71:9

**workings** 14:23 15:19

**works** 90:4

**writing** 54:1,2 85:22

**written** 23:22,24,25 24:5 26:8,24 27:8
28:4 35:15,18,20 36:2,12,16 37:1
39:13 40:10,16,20 41:2,6,18 42:9,15
43:9 53:25 69:11 84:20,22 86:2,5,7,
12,16 88:11,17 89:1,2

**wrong** 15:5 57:20 84:3 85:14

**wrote** 18:24

---

**Y**

**year** 12:13,18 53:15

**years** 10:19 11:9

**yell** 7:25

**yesterday** 7:3

**York** 5:19 7:10

**Yup** 9:14 16:5 35:22 38:6 47:1 51:15
89:15